1           IN THE UNITED STATES DISTRICT COURT

2               FOR THE DISTRICT OF HAWAII

3    PACIFIC RADIATION ONCOLOGY, )
     LLC, a Hawaii Limited       )
4    Liability Corporation, et   )
     al.,                        )
5                                )    Civil No. 12-00064 LEK-KSC
              Plaintiffs,        )
6                                )    Honolulu, Hawaii
         vs.                     )    January 31, 2012
7                                )    10:30 a.m.
     THE QUEEN'S MEDICAL CENTER, )
8    a Hawaii Non-Profit         )
     Corporation, et al.,        )
9                                )    Status Conference
              Defendants.        )
10   _____)

11                  TRANSCRIPT OF PROCEEDINGS
           BEFORE THE HONORABLE LESLIE E. KOBAYASHI
12            UNITED STATES DISTRICT COURT JUDGE

13   APPEARANCES:

14   For the Plaintiffs,:       MARK S. DAVIS, ESQ.
                                MICHAEL K. LIVINGSTON, ESQ.
15                              LORETTA A. SHEEHAN, ESQ.
                                CLARE E. CONNORS, ESQ.
16                              Davis Levin Livingston
                                851 Fort Street
17                              400 Davis Levin Livingston Place
                                Honolulu, Hawaii 96813
18
     For the Defendants.:       PAUL ALSTON, ESQ.
19                              CLAIRE WONG BLACK, ESQ.
                                Alston Hunt Floyd & Ing
20                              American Savings Bank Tower
                                1001 Bishop Street, 18th Floor
21                              Honolulu, Hawaii 96813

22   Also present:             ERIC A. SEITZ, ESQ.
                                820 Mililani Street, Ste. 714
23                              Honolulu, Hawaii 96813

24

25

1    Court Reporter:              Katherine Eismann, CSR, CRR, RDR
                                  United States District Court
2                                 300 Ala Moana Boulevard, C-338
                                  Honolulu, Hawaii 96850
3                                 (808)554-5652  ke@hid.uscourts.gov

4    Proceedings reported by machine shorthand, transcript produced
     by computer-aided transcription.
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (Tuesday, January 31, 2012, 10:30 a.m.)

2                          --oOo--

3              COURTROOM MANAGER:  Civil 12-00064 LEK-KSC, Pacific

4    Radiation Oncology, LLC, et al., versus The Queen's Medical

5    Center, et al.  This case has been called for status conference

6    regarding a motion for a temporary restraining order.

7              Counsel, please make your appearances for the record.

8              MR. DAVIS:  Good morning, Your Honor.  Mark Davis,

9    Mike Livingston, Loretta Sheehan, and Clare Connors for the

10   plaintiffs.

11             THE COURT:  All right.  Good morning to all of you.

12             Mr. Seitz, did you want to identify yourself for the

13   record?

14             MR. SEITZ:  Yes.  Eric Seitz for an intervenor who

15   has been allowed to identify himself as John Doe.

16             THE COURT:  All right.  Good morning to you all.

17             And Mr. Alston.

18             MR. ALSTON:  Good morning, Your Honor.  Paul Alston

19   and Claire Black appearing on behalf of the defendants.

20             THE COURT:  All right.  Good morning to both of you

21   as well.

22             COURTROOM MANAGER:  Sorry, Your Honor.  Mr. Seitz --

23   this is not in the federal removal yet, but that was his -- his

24   intervention is pending -- was pending.  (Handing documents to

25   Court.)

1          THE COURT:  Okay.  Very good.  All right.  You may be

2     seated.  I know that we have -- I have had an opportunity to

3     review the plaintiff's motion for temporary restraining order

4     as well as the verified complaint.

5          And I guess let me outline some of the things that I

6     want to discuss with you folks, and then if you could give me

7     where you folks see things.

8          My impression, which has only recently been formed

9     and rather quickly formed, is that February 1, 2011, that is

10    tomorrow, is the date apparently set or indicated for the

11    termination of privileges.  I would be interested in hearing if

12    that's still planned to go forward, if that was ever the case,

13    et cetera.

14         Secondly, on the removal, it appears to be removed on

15    the basis of federal question, and I'm interesting in hearing

16    from the plaintiffs will you be seeking a remand.

17         And third, I need to make a disclosure.  I don't

18    think it's a position of having to be -- I know I don't have to

19    recuse myself on this basis, but my younger sister Robin

20    Kobayashi is of counsel to the Alston Hunt firm, and she works

21    in the practice group involving law in employment.  So I don't

22    take any matters in which she's personally involved and

23    represents anyone.  I doubt and I don't think that she's going

24    to be involved in this case, but Mr. Alston can address that.

25         And secondly in reviewing the verified complaint, I

1   think that seed implant procedure, my father went through that

2   at Queen's, and I would say that happened about 10 to 14 years

3   ago.  I wasn't involved in meeting any of his doctors, but I am

4   generally familiar with the procedure.

5           With regard to these disclosures, Warren will provide

6   the disclosure form.  It's anonymously signed, and I don't get

7   it back, so only the clerk will inform me if any of the parties

8   have any objection to me remaining on the case.  Again, it's a

9   disclosure, and I'm not recusing myself on the basis of either

10  my sister or my father going through the procedure.

11          Okay.  So those are the issues or items I'd like to

12  discuss today.  If there are others, of course, you know, I'd

13  like to hear them.  I am going to first turn to Mr. Davis and

14  then Mr. Alston.

15          Mr. Davis.

16          MR. DAVIS:  I will, with the Court's permission, I

17  will walk up here.

18          THE COURT:  Yes, please.

19          MR. DAVIS:  The Court is correct with regard to the

20  suspension of privileges to occur tonight at midnight.  It was

21  actually February 1, 2012.  The Court said 2011.

22          THE COURT:  Oh, I am sorry.

23          MR. DAVIS:  Right.  There was a TRO hearing that had

24  been set at 10:00 a.m. over in state court in the removal.  We

25  have -- we are going to -- we haven't made a decision about

1  seeking a remand, because we just got it literally a very short

2  period of time ago.

3          THE COURT:  Sure.

4          MR. DAVIS:  So we will notify the Court about that as

5  soon as we can.  I am not going to deal with any of the legal

6  arguments or merits, because I understand this only to be a

7  status conference.

8          THE COURT:  Yes, yes.

9          MR. DAVIS:  So in advance of filing this complaint,

10  we had proposed to Queen's that there be just a standstill

11  until we had an opportunity to sit down and kind of chat about

12  all these issues, whether it's one day, two days, whatever

13  period of time that they were willing to do that, which they

14  declined at 8:00 o'clock on Thursday night.  We filed the

15  lawsuit and the motion the next day.

16          I do believe there are -- you know, the substance of

17  the TRO motion arises out of the law in our state which is the

18  *Silver* case that says that when you terminate, grant, modify,

19  amend privileges to a hospital, you know, there is a certain

20  amount of due process, and they lay out the procedure and so on

21  which was not done in this case.

22          And I don't think there's much dispute about whether

23  that due process was complied with.  So that was the basis of

24  our TRO that we were attempting and are attempting to block the

25  termination of privileges until such time as they conduct the

1   hearing that they are required to do.

2          There is -- you know, of great concern is our

3   patients (verbatim) who will need to treat their patients at

4   Queen's, because Queen's is the only place at which certain

5   procedures can be administered after the closing of St. Francis

6   at Liliha.

7          So up until, I guess it was January 5th, you know,

8   just a few weeks ago, these procedures could have been done at

9   some alternative hospital.  And now, of course, that is

10  blocked.  And of course this applies not only to -- there was

11  an couple of patients that have been, you know, diagnosed and

12  recommended for treatment in the last couple of days, one of

13  whom is represented by Mr. Seitz.  There is another one that,

14  you know, has contacted our office on kind of the same, you

15  know, situation, because they are in need of a service that

16  cannot be offered with their physician.

17         And of course I learned a few minutes ago that there

18  was -- you know, people are getting diagnosed every single day.

19  So without addressing the merits of the due process claim, and

20  the reason we had kind of asked for a standstill agreement,

21  because I think there are some alternatives that, you know, in

22  terms of a stipulated partial injunction, that would satisfy

23  the medical needs of, you know, our patients, which is the

24  irreparable harm, among other things, that, you know, people

25  are facing.

1          And so if we were able -- and I, you know, am now

2    proposing this as a, you know, partial injunction to modify the

3    privileges in a manner that will allow our clients -- and these

4    are -- this is the largest radiation oncologist in the state

5    and 60 percent of everybody that's -- does this work on Oahu.

6          If we are allowed to have the privileges modified, so

7    that our clients may continue to perform these procedures that

8    are not available elsewhere and that will allow our patients

9    to -- our clients to continue to treat patients who are in need

10   of hospitalization at Queen's -- and I will give you some

11   examples of who these are -- then it seems to me that we could

12   live with kind of a partial injunction until we are able to

13   litigate on some kind of a more formal basis, a preliminary

14   injunction with regard to the due process claims and so on.

15          So right now at Queen's, they are the only facility

16   that is licensed by the Nuclear Regulatory Commission for the

17   implantation of radioactive materials.  There were two.  There

18   is now one.  So it includes the seeds procedure, which you were

19   just talking about, but there is also many other procedures

20   including -- I believe they call it high dose rate radiation

21   that is administered in a two- to three-day hospitalization

22   through caters and so on but require a hospital setting --

23   inpatient hospital setting.

24          There are other procedures that require, you know,

25   hospital setting, anesthesia, et cetera.  And from our

1   standpoint -- and there are patients who are ill with other

2   things that may need external beam radiation which is available

3   at Queen's and also available at other facilities as well.  But

4   of course the problem is if you are an inpatient at Queen's,

5   and they want -- they are patients of our clients, they need to

6   be visited in the hospital.  And if external beam radiation is

7   required, it seems ridiculous to make them get down in an

8   ambulance and move -- go to another facility and then be

9   returned to Queen's as an inpatient.

10          So, you know, it seems to me that as an interim

11  relief, you know, by today, if we could agree to some type of

12  an event that -- you know, some sort of partial injunction that

13  would allow our clients to continue to exercise the services

14  that our patients require at Queen's in the manner that I have

15  outlined, it seems to me that is kind of a, you know, midway,

16  halfway, you know, proposal.

17          My client informs me an hour ago that they had a

18  phone call from one of the Queen's administration and said,

19  well, they would allow the two patients that we -- that have

20  been identified to have this treatment, but then of course it

21  doesn't apply at all to other people, other of our client's

22  patients that are required.  That may be diagnosed today,

23  tomorrow, next week and so on.

24          So that has -- that's what led us to come forward

25  and, you know, kind of propose this as a halfway position.

 1    Queen's obviously, from the board's action, wants our people

 2    off their, you know, campus because they are going to this mode

 3    of only allowing people that are paid employees of Queen's to

 4    practice this type of medicine for the patients admitted at

 5    Queen's.

 6           There are some very interesting issues raised by this

 7    which we have outlined in the complaint.  We think there are

 8    parts of the solicitation to our clients and others made that

 9    raise lots of, you know, very interesting questions,

10    legalities, and so on.  But those are issues that are really

11    not before the Court at this point.

12           Certainly if our clients are allowed to -- any

13    potential damages claim that arises out of this may certainly

14    be impacted if they may continue to use Queen's for the

15    facility -- for procedures that the patients require at

16    Queen's.

17           So that is kind of my comments with regard to the

18    status conference discussion as to the issue about whether

19    there is some middle-of-the-road position that would be

20    acceptable to our clients.

21           THE COURT:  Assuming that an agreement could be

22    reached to defer this termination for a certain period of time,

23    what are you thinking in terms of whether there would be an

24    evidentiary hearing, and if so, what do you think that would

25    look like in terms of number of witnesses, exhibits, and the

1 length of time that you would take to present your case?

2         MR. DAVIS:  You know, I think that if we decided, if

3 we decide -- I mean there exists a possibility that with this

4 type of relief, that we may not even require a preliminary

5 injunction.  I mean I just have to talk to all six of my -- you

6 know, to figure out where that goes.

7         But assuming that they want to retain their

8 privileges, which would really just mean with regard to the

9 administration of external beam radiation, which is you go in

10 to Queen's outpatient, you get your radiation, you go home.  No

11 hospital procedures, no admissions, no anesthesia, you know, et

12 cetera.

13         Assuming that we were going to, you know, proceed

14 with that proceeding, I would be -- I think we would be

15 prepared to do it on the basis of affidavits or very limited

16 testimony.  You know, the facts, I don't think there's a lot of

17 facts that are, you know, disputed.  Although I -- you know, we

18 have never seen any written opposition from Queen's, so I have

19 to, you know, say that until we see what they are going to

20 assert, I mean they may be asserting wrongdoing or immoral,

21 improper, you know, whatever, which of course is the whole

22 purpose that there should have been a hearing in the first

23 place so these things could be sorted out.

24         But at any rate with regard to the issue of a

25 preliminary injunction, if it's necessary to go there, I think

1    we would be prepared mostly to do it by way of affidavit unless

2    there's, you know, something -- some defense or claim that I

3    don't know about.

4              THE COURT:  All right.  Thank you very much.

5              MR. DAVIS:  Okay.

6              THE COURT:  Mr. Alston.

7              MR. ALSTON:  Thank you, Your Honor.  I want to be

8    very clear about two things.  The first is that Queen's is not

9    going to prejudice the health of any patient in present need of

10   services because of this dispute.

11             The policy that was adopted last September was clear

12   about what was going to happen on February 1st.  One might have

13   thought if they were -- if the plaintiffs thought they had

14   serious arguments against that policy, they would have been

15   here long ago.  Instead we are here on the eve of the policy

16   change with a claim that there's an emergency when in fact

17   there is none.

18             The policy that was adopted by Queen's, as confirmed

19   to the plaintiffs in January, is that any patients who have

20   begun treatment prior to February 1 may continue with these

21   doctors in The Queen's facilities.

22             We have also notified Mr. Livingston and also

23   Mr. Seitz that with respect to the would-be intervenor and

24   anyone else who is in urgent need of care that can only be

25   provided at Queen's, that exceptions will be made to make sure

1    that no one's health is put at risk.  So that is a matter of

2    voluntary action on the part of Queen's.

3          If there is a need for similar accommodations for

4    other individuals, we will be happy to take them up and happy

5    to consider them.  There is no need for an injunction from this

6    Court for that sort of relief and Queen's will not agree to a

7    partial injunction of the kind proposed by Mr. Davis.

8          With respect to the underlying dispute on a broad

9    basis, Queen's has decided that it can best serve the needs of

10   patients by having a closed facility.  That is the way most

11   radiation oncology facilities are run across the country.  It

12   is the way that is best designed to maximize patient

13   satisfaction and the quality of patient care.  So we are not

14   going to go back on that decision.

15         And I will be able to lay out both the factual and

16   the legal bases for the decision in papers that we will be able

17   to file later this afternoon.

18         If the voluntary agreements that I have outlined are

19   not enough to satisfy the plaintiffs and have them withdraw the

20   TRO application or perhaps even the preliminary injunction

21   application, then I agree with Mr. Davis.  This can be decided

22   largely on the papers.  Unfortunately, there is more that needs

23   to be developed than we were able to develop between Friday

24   afternoon and today so we would need not -- to have that

25   proceed not just on the papers we are going to file today, but

1    on, you know, on some more robust papers that lay out

2    additional facts that I think are important to the Court.

3          For example, one of the things that the plaintiffs

4    have complained is that -- that they have made transfers of

5    patients for convenience, because they have a facility on the

6    west side.  Well, from Queen's perspective what that means is

7    that it is convenient for the insured patients who can pay to

8    be transferred to the west side facility, but for some reason

9    those who are on Medicare and state-funded programs, who can't

10   pay, even though they live in Makaha and elsewhere are still

11   left at Queen's.

12         We think the transfer decisions are the result of

13   economic decisions not patient care decisions and convenience

14   decisions.  But that's for another day.

15         So the bottom line is, Your Honor, if we are able to

16   work out the immediate concerns, as I think we should be able

17   to, we don't need any action by the Court, in Queen's view,

18   today, tomorrow, or even this week.  Longer term, I think we

19   just need to talk among the counsel as to what and when needs

20   to be taken up by the Court.

21               THE COURT:  Okay.

22               MR. ALSTON:  Thank you.

23               THE COURT:  All right.  Very good.  So, Mr. Davis, in

24   light of Mr. Alston's comments, it appears that a partial

25   injunction stipulated to would not be an option, but a

```
 1   voluntary agreement accomplishing, one, that any patients who

 2   began treatment before February 1, 2012, would be able to

 3   continue treatment at The Queen's facility; two, an exception

 4   will be made for patients who can only receive treatment at

 5   Queen's Medical Center; and three, they would be willing to

 6   consider any other requests involving care at Queen's Medical

 7   Center if that patient isn't covered by points one or two, is

 8   what, in general, I heard Mr. Alston indicate.

 9              Mr. Alston?

10              MR. ALSTON:  Let me elaborate on that a bit, Your

11   Honor.  With respect to number two, that would be determined on

12   a case-by-case basis.  I know Mr. Davis has said that there are

13   a variety of procedures that are available only at Queen's.

14   That's not my understanding, so we may disagree about who needs

15   what and where.  But we will take up any requests on a

16   case-by-case basis and do it voluntarily without the need of an

17   injunction.

18              THE COURT:  Right.  But it would be spelled out in an

19   agreement of some sort.

20              MR. ALSTON:  Correct.

21              THE COURT:  And then without committing you to a

22   response either way, Mr. Davis, my thought is if that's a

23   possibility, then what we can do to hopefully motivate the

24   parties to continue on this path is then talk about the timing

25   of setting a hearing on the TRO that wouldn't involve today,
```

```
 1   tomorrow, or sometime this week, but would involve a certain

 2   period of time, based on everyone's schedule, the next 30 to 45

 3   days I am thinking just off the top of my head, during which

 4   time we would set up the briefing or whatever needed to be

 5   done.

 6              If the parties then came to a further agreement, that

 7   may void the necessity of holding the hearing on the TRO, and

 8   we may then meet and schedule whatever we need to do with

 9   regard to the preliminary injunction.  Again, throwing out

10   thoughts with regard to this.  I am just trying to get a handle

11   on what's going to facilitate, one, the patient care issues;

12   and, two, and orderly address of the legal issues.

13              Mr. Seitz.  Okay.  I am sorry.

14              MR. DAVIS:  I have comments.  I will hold them.

15              THE COURT:  Okay.

16              MR. SEITZ:  Just briefly.  Mr. Alston called me and

17   advised me what his position was going to be with respect to my

18   one client.

19              THE COURT:  Okay.

20              MR. SEITZ:  And presumably that will resolve his

21   situation, although I am concerned in several respects.

22              THE COURT:  Okay.

23              MR. SEITZ:  Mr. Alston told me that as far as he

24   knew, Queen's had no record of this particular patient, and my

25   understanding is that's probably because the procedure has not
```

1    been scheduled, but that it needs to be done in February by

2    Dr. Lederer, but apparently they are willing to allow that to

3    happen.  And if that does happen, then his claim is probably

4    mooted out.

5            In the meantime, however, as Mr. Davis indicated to

6    you, another patient has come to mind who is from the Big

7    Island who has a similar problem, and I am informed that at

8    some point while this was going on, Queen's actually contacted

9    that patient and said, "Oh, we can get some other doctor to do

10   that procedure for you."

11           Now, that's kind of troubling, because if that's what

12   they are going to do, basically, they are intervening in

13   doctor/patient relationships.  And what we were actually

14   contemplating doing regarding my one client was potentially

15   making that a class action with respect to all of the patients

16   who may be affected in various different ways.

17           So, I am willing, at least from the standpoint of

18   what's been said today, to sit and wait and see how it

19   develops, but I can see several issues of concern.  And one of

20   which may be that if this matter is unresolved within a short

21   time, Dr. Lederer and his colleagues may decide that they

22   cannot economically continue to offer the services to just

23   simply a few patients at Queen's.  And then the adverse

24   interests of the patients when, as, and if they come up for

25   their dates for their procedures, may not be able to have them.

 1    And these are in some cases life and death determining

 2    procedures.

 3             So, there are -- it's not resolved.  It's unsettled,

 4    and I think we have to be very careful.  I am willing to try

 5    and see what happens over a period of time as far as my

 6    interest is concerned, but that interest may be eroded

 7    depending upon how the parties act in the next couple of weeks.

 8             THE COURT:  Okay.  Mr. Davis.

 9             MR. DAVIS:  The issue that I think is actually at the

10    very core of what this dispute is is not for -- is not to

11    placate the patients who have come forward and hired lawyers

12    and then Queen's comes forward and says, "Okay.  We will make

13    an exception in your stay," because there was additional people

14    diagnosed today.  There will be more people diagnosed tomorrow.

15             And if the Court perhaps hasn't inferred this from

16    the nature of the pleadings and so on, there is a little, you

17    know, bad blood that exists about -- you know, between them.

18    So the idea that a patient of our clients must be subject to --

19    who is in need of a service not available elsewhere, or a

20    hospital service or something, must be then, you know, sent up

21    to the discretion of some administrator at Queen's as to

22    whether they can do that is completely unacceptable.

23             And that's why essentially what I have suggested and

24    what I would urge in terms of an immediate kind of a, you know,

25    keep the status quo arrangement until we have this matter

1    litigated, is that for any person who the physicians certify

2    are in need of services that are only available at Queen's or

3    for inpatients, because of other matters, that they -- that our

4    clients be allowed to treat their patients.  And that's got to

5    be a part of any type of agreement, volunteer agreement,

6    injunction, et cetera.

7            If Mr. Alston is not willing to include that as part

8    of a voluntary agreement, then we would ask to move on and ask

9    the Court to, you know, grant that as a temporary relief until

10   we get on to a preliminary injunction.

11           So, Mr. Alston, of course, raised an issue about, you

12   know, why is this -- you know, why are we at the, you know, the

13   end of the period.  And the fact of the matter is, which will

14   come out over -- and has been provided somewhat in our

15   submissions to the Court, there have been -- they have been

16   involved in constant, you know, discussions.  How is this going

17   to work?  Can you do this?  Can you do that?  There have been

18   modifications.  There have been changes.  There have been job

19   offers.  There have been come over to our side, many

20   discussions, which continued until this morning.

21           Because this morning I am informed that one of the

22   administrators at Queen's called up Dr. Lederer and said that

23   as to the two patients that, you know, came forward in the past

24   24 hours, we will allow them to be treated but nobody else.  So

25   there was no discussion about, you know, and anybody else that

1   is in identical circumstances.

2           So, that's a very essential part of this injunctive

3   relief.  It gives -- you know, our clients are going to, as

4   part of the partial relief until the preliminary injunction is

5   resolved, going to walk away from doing their practice at

6   Queen's until everything is resolved.

7           But what we are here and why extraordinary injunctive

8   relief is required today is so that when that patient comes in

9   that was diagnosed -- that will be diagnosed this afternoon or

10  tomorrow, we can say, "I can do the procedure.  I am the only

11  one that does the procedure.  And I will -- I can do it at

12  Queen's, and we can treat you."

13          And you can imagine the reaction of, you know, a

14  patient to say, "I can do the treatment.  It's over at Queen's,

15  but Queen's won't let me do it."

16          THE COURT:  But what I hear Mr. Alston saying though

17  is that if -- if the treatment can only be received at

18  Queen's -- and we must know what those treatments are.

19          MR. DAVIS:  We do.

20          THE COURT:  It's not sort of in a vacuum.  They will

21  be permitted to be treated at Queen's.

22          MR. DAVIS:  No, that's not what he said.  That's --

23  what he said was, "We will look at it on a case-by-case basis."

24  And that's what I think needs to be removed from the discretion

25  of the administrators.

 1            And, you know, Mr. Alston raised for the first time,

 2   you know, that I have heard, you know, that there's been some

 3   transferring of paying clients to one facility and welfare

 4   clients to another facility.

 5            THE COURT:  Well, yeah, I don't know.  I mean that's

 6   clearly part of the thing.

 7            MR. DAVIS:  And my point was that's the whole purpose

 8   of you having a hearing if there are allegations that they are

 9   doing something improper --

10            THE COURT:  Sure.

11            MR. DAVIS:  Okay.

12            THE COURT:  In terms of doing that.  All right.  So

13   that's not acceptable to you that exceptions will be made for

14   patients who can only receive treatment at Queen's Medical

15   Center, and they are going to look at that on a case-by-case

16   basis.  Case-by-case basis meaning they are going to make sure

17   that that's the only kind of treatment they can receive at

18   Queen's.  Not it's the only kind of treatment they can receive

19   at Queen's, but we are also going to look at whether we want to

20   take that patient or not.

21            MR. ALSTON:  Your Honor, my understanding is that I

22   started with this morning, that Queen's will not do anything

23   that prejudices any patient.

24            THE COURT:  Right.

25            MR. ALSTON:  And so when I say that they are open to

1   case-by-case exceptions, I mean that if someone comes

2   forward -- if Dr. Lederer, for example, comes forward and says,

3   "I need to do X treatment at Queen's for this patient," my

4   understanding is that Queen's will open the facilities to him.

5   But they are not prepared to let Dr. Lederer be the sole

6   arbiter or his colleagues to be the sole arbiters of who needs

7   what and where.

8           I think a reasonable dialog will occur, and the

9   reason why the phone call was made this morning, although I

10  didn't know it was going to be made, was that in seeing

11  Mr. Seitz' papers yesterday, I learned that not only was there

12  John Doe, but there was another patient who might need

13  treatment imminently.  And the decision was made, "Look.  We

14  are not going hurt patients.  Open the doors."  And they said

15  that, and everyone agreed that would be fine.

16          I think kind of dialog can occur again in good faith

17  and with the pole star being the protection of people's health.

18          THE COURT:  Okay.  So this is what I am going to do.

19  I am not going to impose any injunction, you know, injunctive

20  relief today for sure.

21          I am going to set it for a hearing, and we will give

22  you a briefing schedule.  Hopefully you guys will come up with

23  an agreement in the meantime.  But we are going to need time to

24  brief it, the TRO, let you folks brief it and then hold a

25  hearing.  What I understand that you folks are thinking about

1    is that affidavits will be enough.  If you want to

2    cross-examine a particular witness, I will set deadlines, and

3    you need to bring that witness live.  And then I will make a

4    decision that day of the hearing.

5              I am thinking then of setting the hearing in like 10

6    to 14 days.  During that period of time, you guys are going to

7    have to work on a case-by-case basis on each of these patients,

8    so it behooves you folks, you know, to come up with that kind

9    of agreement with regard to that.

10             So, on that type of schedule, Warren, what have we

11   got available?

12             COURTROOM MANAGER:  Wednesday, February 15,

13   10:00 o'clock for the hearing.  No good?

14             MR. SEITZ:  I have got a Ninth Circuit case that day.

15   The Ninth Circuit is in town that week.  What I would like to

16   do without -- if Mr. Alston would not object, is I would like

17   you to grant my petition to intervene, but if it becomes moot,

18   then we will withdraw it.

19             But right now, as I said, I am still concerned that

20   we should be allowed to intervene, or else if you want to just

21   simply defer it until the date of the hearing, I am agreeable

22   to that as well.

23             THE COURT:  Mr. Alston.

24             MR. ALSTON:  I would suggest you defer it, Your

25   Honor.  We have committed to provide the facilities for

 1  Mr. Seitz's client, and if he's got another client, we will
 2  take that up with him.  There is no need to intervene right
 3  now, and I think, you know.
 4          MR. SEITZ:  That's fine.  I am agreeable to just
 5  defer it until later.
 6          THE COURT:  All right.  Very good.
 7          MR. DAVIS:  Your Honor.
 8          THE COURT:  Yes.
 9          MR. DAVIS:  You know, what I would suggest is that
10  the Court impose a -- because we have the immediate problem,
11  of -- I mean, if there's no injunctive relief, and of course we
12  can take Mr. Alston's representations as what, you know,
13  Queen's new position is on this matter.
14          But technically, you know, our clients are denied
15  their privileges as of midnight tonight.  So does it not make
16  sense to just agree to a 48-hour standstill?  I mean just, you
17  know, keep the same relationship that's been going on for the
18  past 40 years and say, "Let's get together."  Because we can
19  describe the procedures, I am certain of that, with their
20  clients and our clients.  These are the procedures that are
21  only available at Queen's.  And we can list them off, and
22  describe them, and then report back to the Court in 48 hours
23  that we have some type of an agreement.
24          Because otherwise, if we, you know, leave this
25  courtroom today, effectively, other than the representations

1  that, you know, Mr. Alston has made, you know, our client's

2  privileges are completely terminated.  They can't even see

3  anybody.  They have been told that they can't visit a patient,

4  go to a bedside to check a skin rash, you know, from the

5  radiation.  And I am -- I mean, Mr. Alston said that, well,

6  he's, you know, not sure of which procedures fall within this

7  category.  But we -- you know, I assure you we can get this

8  worked out and identified and determine whether in fact we have

9  a dispute.

10         Because maybe what Mr. Alston is saying with regard

11  to these procedures that they are going to view on a

12  case-by-case basis, then it's a question of describing what the

13  procedures are.  And if he says that, well, it's not up to

14  Dr. Lederer and their patient to decide what the appropriate

15  procedure is, I take issue with that.  It is exactly up to the

16  patient and the physician to determine what the best course of

17  care is without any interference by the doctor or any economic

18  considerations.

19         So, you know, I don't think it requires, you know,

20  any type of injunction.  Just, you know, let's take a breath

21  for 48 hours and see if we can sit down and try to hammer these

22  things out.  If we cannot, you know, we can report back to the

23  Court for, you know, 48 hours, and you can do whatever the

24  Court is prepared to do.

25              THE COURT:  Mr. Alston.

1          MR. ALSTON:  I am certainly, certainly happy to try

2   to document this understanding within the next 48 hours.  And

3   if we have difficulties, certainly happy to come back to the

4   Court.

5          I did not say that The Queen's staff would intervene

6   between Dr. Lederer and his patients to say something else was

7   appropriate.  What I said was they weren't prepared to let

8   Dr. Lederer and his colleagues decide when they -- they needed

9   access as opposed to whether there -- as opposed to having the

10   staff consider whether in fact there were alternatives

11   available to Dr. Lederer.

12          THE COURT:  Right.  Well, both sides don't want to

13   give carte blanche to the other side to make that

14   determination.

15          MR. DAVIS:  We don't have any issue about scheduling

16   if that's the issue.

17          MR. ALSTON:  The other thing is Mr. Davis said that

18   his doctors have been told that they can't go in and check

19   patients who are presently in Queen's.  In fact on

20   January 18th, Queen's wrote to the doctors that they would be

21   allowed to continue to treat patients in Queen's on

22   February 1st.  There is no reason to believe that that's not

23   accurate.

24          THE COURT:  Okay.  You folks come back in 48 hours.

25   That will be Thursday, February 2nd, at 10:00 o'clock.

 1          MR. ALSTON:  Fine.

 2          THE COURT:  We vacated those sentencing, right,

 3   Warren?  We didn't have anything in the morning, did we?

 4       (Discussion with Courtroom Manager.)

 5          THE COURT:  So we will do it at 11:00 Thursday,

 6   February 2.

 7          MR. DAVIS:  Can we agree at least between now and

 8   February 2nd that everything will be a standstill?

 9          MR. ALSTON:  No.  Everything will be exactly as I

10   described it.  You will have the opportunity to provide

11   services to the patients who are there.  Anybody who has to be

12   treated before now and then will be allowed to be treated.

13          MR. DAVIS:  So, the question is --

14          THE COURT:  You have to go through Queen's.  Your

15   clients have to go through Queen's, yeah.

16          MR. DAVIS:  I understand, and we are prepared to do

17   that.

18          THE COURT:  Okay.

19          MR. DAVIS:  I am just trying to say as of tonight,

20   you know, why don't we just keep the status quo exactly the way

21   that it is until we are back here and we can do that?

22          THE COURT:  If they will agree to do that, that's

23   fine.  If not, then their privileges are terminated, and they

24   have to apply on a case-by-case basis to Queen's to treat their

25   patients.

1              Now if that -- you folks feel in the next 48 hours

2     indicates that patients' health and safety have been

3     compromised, i.e., new patients diagnosed have been refused

4     treatment that they believe can only be received at Queen's,

5     then that's what you need to be prepared to show the Court on

6     Thursday.  And at that point, I may take action by the Court

7     with regard to imposing something.

8              But right now, based on Mr. Alston's representations,

9     I don't see a basis to do that.  But why I am scheduling that

10    hearing for February 15th is that we will set out the briefing,

11    and that may result in the Court imposing, you know, its ruling

12    upon one or both parties.

13             MR. DAVIS:  Okay.

14             THE COURT:  So if we have the hearing on the 15th

15    then, you folks -- the plaintiffs have already submitted their

16    motion for temporary restraining order, so the -- and what I

17    would ask is we need to schedule a response, a reply, and then

18    if you folks are going to submit any affidavits in addition to

19    what you folks had submitted with the plaintiff's original

20    motion, and then a deadline for the same kind of affidavits for

21    the defense.

22             So, Mr. Alston, what are you thinking about in terms

23    of a response and time to provide that?

24             MR. ALSTON:  I believe we can provide everything by

25    Friday, Your Honor.

1          THE COURT:  Okay.  That would be February 3, and then

2     a reply by the 8th, that would be the week before, as well as

3     any affidavits and exhibits that you wish the Court to take

4     into account.  And then I want you folks to meet and confer and

5     decide whether or not you need any live witnesses for

6     cross-examination.

7          In other words, all the affidavits due on the

8     8th should be the direct examination of any witnesses that you

9     feel support your position so I could read those through.  And

10    then meet and confer and advise the Court by letter,

11    4:00 o'clock on the 10th, as to whether or not you require any

12    witnesses live for cross-examination.  So this would be

13    obviously the other parties' witness.  And then we will hold a

14    hearing on on the 15th.

15          MR. ALSTON:  Actually, I thought Mr. Seitz had a

16    conflict on the 15th.  We were going to move to it perhaps to

17    the 16th.

18          THE COURT:  It sounds like he's not objecting to you

19    intervening if you have to, and they are going to give that

20    person -- do you want us to --

21          MR. SEITZ:  Well, if it's convenient for everybody on

22    the 15th, I may not be able to be here, because I have to argue

23    at the Ninth Circuit, but I will send somebody or we will

24    address that issue.

25          MR. ALSTON:  That's fine.

 1            MR. SEITZ:  Hopefully I will not have to be a further

 2   participant, but if that changes we will deal with that

 3   appropriately.

 4            THE COURT:  Okay.  So just call if you need a status

 5   conference with regard to that.

 6            MR. DAVIS:  So, will there -- will there be a minute

 7   order entered that will contain Mr. Alston's representations?

 8            THE COURT:  The deadlines.

 9            MR. ALSTON:  I will be happy to confirm my

10   representations in a letter to Mr. Davis --

11            THE COURT:  Okay.  Very good.

12            MR. ALSTON:  -- with an outline of the hospital's

13   proposal and use that as a vehicle to start the discussions we

14   are going to have over the next 48 hours.

15            THE COURT:  Good.

16            MR. ALSTON:  Okay.

17            THE COURT:  You will get that to him today?

18            MR. ALSTON:  I will, Your Honor.

19            THE COURT:  All right.  And then Warren will provide

20   the disclosure form, and if you could return that by tomorrow,

21   February 1, by or before 4:00 p.m.

22            MR. ALSTON:  All right, Your Honor.

23            THE COURT:  Okay.  So to recap, we have a status

24   conference in 48 hours.  By tomorrow you need to give me the

25   disclosure form, your response to that.  We have a hearing

1    scheduled currently for February 15.  Did we give them a time,

2    Warren?

3              COURTROOM MANAGER:  10:00 o'clock.

4              THE COURT:  10:00 o'clock.  The defendant's response

5    to the motion for temporary restraining order is due February

6    3rd, Friday.  Reply is due the 8th, February 8th.  Both parties

7    shall submit any affidavits of direct testimony by the 8th as

8    well as any exhibits.

9              Parties shall meet and confer and advise by

10   February 10, 4:00 p.m., of the need for any live witnesses to

11   be brought to court for any cross-examination purposes, and to

12   advise the Court accordingly by letter February 10.  And we

13   will have the hearing on February 15.  Any questions?

14             MR. DAVIS:  You also set a February 2nd.

15             THE COURT:  Yes, that's the status conference or the

16   further conference.  Right.

17             COURTROOM MANAGER:  11:00 o'clock.

18             THE COURT:  Any questions, clarifications?

19             MR. ALSTON:  No, Your Honor.

20             MR. DAVIS:  No.

21             THE COURT:  All right.  Thank you very much.  Good

22   day to all of you, and we are adjourned.

23         (Recess, 11:22 a.m.)

24

25

1                              --oOo--

2                    COURT REPORTER'S CERTIFICATE

3

4        I, KATHERINE EISMANN, Official Court Reporter, United

5   States District Court, District of Hawaii, Honolulu, Hawaii, do

6   hereby certify that the foregoing is a true, complete, and

7   correct transcript of the proceedings had in connection with

8   the above-entitled matter.

9

10  Date:  January 31, 2012.

11                           /s/ *Katherine Eismann*

12                        Katherine Eismann, CSR CRR RDR

13

14

15

16

17

18

19

20

21

22

23

24

25