1              IN THE UNITED STATES DISTRICT COURT

2                   FOR THE DISTRICT OF HAWAII

3    PACIFIC RADIATION ONCOLOGY, )
     LLC, a Hawaii Limited        )
4    Liability Corporation, et    )
     al.,                         )
5                                 )      Civil No. 12-00064 LEK-KSC
                Plaintiffs,       )
6                                 )      Honolulu, Hawaii
          vs.                     )      February 2, 2012
7                                 )      11:14 a.m.
     THE QUEEN'S MEDICAL CENTER,  )
8    a Hawaii Non-Profit          )
     Corporation, et al.,         )
9                                 )      Status Conference
                Defendants.       )
10   _____)

11                   TRANSCRIPT OF PROCEEDINGS
            BEFORE THE HONORABLE LESLIE E. KOBAYASHI
12             UNITED STATES DISTRICT COURT JUDGE

13   APPEARANCES:

14   For the Plaintiffs:        MARK S. DAVIS, ESQ.
                                LORETTA A. SHEEHAN, ESQ.
15                              CLARE E. CONNORS, ESQ.
                                Davis Levin Livingston
16                              851 Fort Street
                                400 Davis Levin Livingston Place
17                              Honolulu, Hawaii 96813

18   For the Defendants:        PAUL ALSTON, ESQ.
                                CLAIRE WONG BLACK, ESQ.
19                              Alston Hunt Floyd & Ing
                                American Savings Bank Tower
20                              1001 Bishop Street, 18th Floor
                                Honolulu, Hawaii 96813
21
     Also present:             ERIC A. SEITZ, ESQ.
22                              820 Mililani Street, Ste. 714
                                Honolulu, Hawaii 96813
23

24

25

2

1    Court Reporter:              Katherine Eismann, CSR, CRR, RDR
                                  United States District Court
2                                 300 Ala Moana Boulevard, C-338
                                  Honolulu, Hawaii 96850
3                                 (808)554-5652  ke@hid.uscourts.gov

4    Proceedings reported by machine shorthand, transcript produced
     by computer-aided transcription.
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    (Thursday, February 2, 2012, 11:14 a.m.)

2    --oOo--

3    COURTROOM MANAGER:  Civil 12-00064 LEK-KSC, Pacific

4    Radiation Oncology, LLC, et al., versus The Queen's Medical

5    Group, et al.  This case has been called for a further status

6    conference.

7    Counsel, your appearances for the record, please.

8    MR. DAVIS:  Good morning, Your Honor.  Mark Davis,

9    Clare Connors, with Loretta Sheehan for the plaintiffs.

10    THE COURT:  Good morning.

11    MR. SEITZ:  Good morning, Judge.  Eric Seitz for

12    intervenor John Doe.

13    THE COURT:  Good morning.

14    MR. ALSTON:  Good morning, Your Honor.  Paul Alston

15    and Claire Black appearing for Queen's Medical Center, Queen's

16    Development Corporation, and the trustees.

17    THE COURT:  Good morning to all of you.  You may be

18    seated.

19    MR. ALSTON:  Your Honor, Mr. Nakamura just handed up

20    to you the most current version of our proposal.

21    THE COURT:  All right.  Very well.

22    MR. ALSTON:  It was an earlier -- there may have been

23    an earlier version, I am not sure, attached to what Mr. Davis

24    submitted.  I wanted you to have the most current version.

25    THE COURT:  All right.  Thank you very much.  Okay.

1    I think we have two issues, one of course -- to discuss today.

2    One has been the subject of discussion between the parties in

3    the last 48 hours, so we will certainly address that.  But

4    another issue is one that the Court would like input from you

5    folks on, and that is the remand and the basis for federal

6    jurisdiction.

7           I know there's a general allegation that it's a

8    violation of the United States Constitution, but looking just

9    preliminarily at *Silver versus Castle Hospital*, *Silver versus*

10   *Queen's*.  In *Dyson versus Hawaii Permanente Medical Group,*

11   *Inc.*, the Kaiser group, the Ninth Circuit in an unpublished

12   decision found as to Dyson's due process claim, based on *Silver*

13   *Versus Castle Medical -- Memorial Hospital*, and so forth, that

14   there was not a basis, because Kaiser is not a public or

15   quasi-public hospital.

16          So I wanted to hear your folks input with regard to

17   Queen's and the fact that, you know, is it -- is it quasi

18   public?  It's not public.  Clearly it's not a public hospital,

19   a state hospital.  But is it enough of a quasi-public hospital,

20   is it taking Medicaid, Medicare funds?  Is there enough, in

21   other words, for federal jurisdiction?

22          Because I don't think any of us want to go down the

23   road with regard to me deciding this, and then later on

24   determining during the process or thereafter that the federal

25   court does not have jurisdiction.  That it rightly was filed in

 1 | the state court and should have remained there.

 2 |       So those are the two general issues I'd like us to

 3 | cover today.  Obviously, if there are other issues, we should

 4 | talk about that.

 5 |       MR. SEITZ:  Can I at least initially request that the

 6 | Court grant my petition to intervene?  It really shouldn't be

 7 | controversial, at least -- because I would like to be able to

 8 | address some of those questions insofar as they pertain to my

 9 | client.

10 |       And I will alert the Court that I have also been

11 | retained now by a second patient who is in a similar situation,

12 | although a little bit more critically because he's on an outer

13 | island.  So, I'm not aware that there ought to be any

14 | opposition to my motion to intervene.  And if there isn't, I

15 | would like to have the Court simply grant it at this stage.

16 |       THE COURT:  Any objections?

17 |       MR. ALSTON:  Yes, Your Honor.  We think it is moot as

18 | to John Doe.  We told Mr. Seitz before he had attempted to

19 | intervene in this Court that what his client needs at Queen's

20 | will be provided.  There is no basis for him to participate.

21 |       With respect to this second person, if it's the same

22 | person, I believe, that I'm aware of, and I have some belief

23 | that that's correct from my discussion with Mr. Seitz, he is in

24 | the same position as John Doe.  He will get what he needs at

25 | The Queen's facilities.  There is no need for him to

 1   participate either.

 2            THE COURT:  Okay.

 3            MR. ALSTON:  So, you know, they have no -- since they

 4   have no complaint, because they are going to get what they

 5   want, they have no standing; therefore, they shouldn't be

 6   allowed to intervene.

 7            THE COURT:  All right.  So I am going take up the

 8   motion to intervene on a briefing schedule, but I will permit

 9   you to --

10            MR. SEITZ:  Thank you.

11            THE COURT:  -- argue today --

12            MR. SEITZ:  Thank you.

13            THE COURT:  -- with regard to that.

14            MR. SEITZ:  Thank you.

15            THE COURT:  So, if you don't mind, I would like to

16   talk about the jurisdictional issue first.

17            MR. DAVIS:  So I would suggest, Your Honor, that

18   Mr. Alston assert his claims for the removal.  I definitely

19   have some thoughts on it but maybe since he filed --

20            THE COURT:  He can lead, yes.

21            MR. DAVIS:  -- let him.

22            THE COURT:  I agree.

23            MR. ALSTON:  Two things, Your Honor.  There is in the

24   complaint an explicit allegation that Queen's has violated the

25   plaintiff's First Amendment -- or excuse me -- federal

1    constitutional rights in addition to violating the state

2    constitutional rights.

3              THE COURT:  Yes.

4              MR. ALSTON:  That claim provides the basis for

5    jurisdiction.  We recognize the unciteable and perhaps

6    unmentionable *Dyson* case, but thought that perhaps the

7    plaintiffs believe that there are factual circumstances which

8    would take Queen's out of being a purely private institution

9    into the realm of being a quasi-public institution which would

10   trigger, arguably, their federal constitutional rights.  So

11   given that they made that allegation, you know, we figured that

12   that was an appropriate basis.

13             Independently of that, Your Honor, with respect to

14   their unfair competition claim, as you probably remember, they

15   pleaded that there was a violation of the Stark Act, the

16   federal anti-kickback law which was a specific basis for their

17   claim of damages.

18             The *Grable* case which we cited in the petition for

19   removal says that basically you don't have to state that the

20   claim is grounded entirely or only on a federal statute.

21             THE COURT:  Right.

22             MR. ALSTON:  It simply has to be an important lynch

23   pin in establishing liability.  So independently of the dubious

24   constitutional proposition, although they didn't state a claim

25   for damages under Stark itself, because in fact there is no

1    private right of action under Stark --

2              THE COURT:  Right.

3              MR. ALSTON:  -- they have made it a lynch pin of the

4    480-2 claim.  And when federal law provides, you know, a lynch

5    pin for the claim, that's an independent basis for removal of

6    jurisdiction.

7              THE COURT:  Okay.  Mr. Davis.

8              MR. DAVIS:  I agree actually with his

9    characterization of our claims.  We didn't assert any

10   individual -- individual cause of action created by a federal

11   statute.  But like any 480 claim in state court, you may cite

12   or rely on any illegal, improper act which may be -- which

13   conduct may be governed by federal criminal laws or other

14   things.

15             THE COURT:  Right.

16             MR. DAVIS:  So as I understand the law at this point

17   is that we have within 10 days of removal to file a motion to

18   remand.

19             THE COURT:  Right.

20             MR. DAVIS:  And then secondarily, I think the Court,

21   what you brought up, is that if jurisdiction is an issue, then

22   you may remand sua sponte regardless of what we want.

23             THE COURT:  Correct.

24             MR. DAVIS:  And with regard to our intent to remand,

25   you know, honestly, I reported to you two days ago that we were

1    not in a position to make it.

2             THE COURT:  Right.

3             MR. DAVIS:  And we are still not.  And the problem is

4    that we are getting kind of whip sawed with regard to our need

5    for temporary relief.  I mean we were within one hour of having

6    our hearing in front of the Court until we dumped these load of

7    papers on the Court's desk from the removal.

8             So we get into court an hour later, and obviously

9    there's not been any kind of reasonable opportunity for you to

10   evaluate anything that we have asserted other than, you know,

11   representations and so on.  And so the Court, of course, now

12   has set this hearing for 14 days now downstream.

13            THE COURT:  Right.

14            MR. DAVIS:  And again, you know, we are primarily

15   motivated at this moment by the impact that -- the impact that

16   the denial of any kind of injunctive relief or the elimination

17   of these procedures for our patients, the impact that they are

18   going to have.

19            So at this point in time, of course, you know,

20   whatever the Court is going to do sua sponte, the Court is

21   going to do.  But from our position is that we are, you know,

22   are looking for the relief that we can as quickly as possible

23   get some kind of determination on our extraordinary relief.

24            Because despite where we are today, it has not come

25   about because either of us have ignored the issues.  I mean I

1  have been doing and Miss Connors has been doing nothing but,

2  you know, trying to figure out what are these procedures, where

3  are they available, you know, what is the scientific difference

4  of them, you know, what's entailed, what is the time line, and

5  who's being impacted on these things.

6          So, and of course those arguments all go to a report

7  on the merits which I am ready to talk about whenever.

8          THE COURT:  Okay.  Mr. Seitz, I want to -- before we

9  exhaust the jurisdiction issue --

10         MR. SEITZ:  Judge, I have two -- one who has formally

11 intervened, another one who will -- patients who have cancer

12 that is potentially fatal.

13         THE COURT:  Right.

14         MR. SEITZ:  I cannot begin to describe to you how

15 distressed they are.

16         THE COURT:  Well, no, I want to talk about the

17 jurisdiction.

18         MR. SEITZ:  I am going to get to that.

19         THE COURT:  Okay.

20         MR. SEITZ:  I am going get to that.

21         THE COURT:  We will talk about the objective issue,

22 but I want to clear up this jurisdictional issue.  I am

23 concerned about it.  I don't want us to waste time here if it's

24 supposed to be in state court.

25         MR. SEITZ:  I am going to get to it.  I am going to

1  get to it.

2          THE COURT:  Okay.

3          MR. SEITZ:  Because they are so distressed, I am

4  constrained to argue in favor of jurisdiction where normally I

5  wouldn't really care as long as we can get them what they need.

6  And my argument --

7          THE COURT:  No, but you should care, because if I

8  issue something it may not be valid.

9          MR. SEITZ:  Okay.  I understand.

10          THE COURT:  Because I don't have jurisdiction, and I

11  can never waive jurisdiction.

12          MR. SEITZ:  The *Fisher* case which is cited in the

13  request for temporary restraining order was my case.

14          THE COURT:  Right.

15          MR. SEITZ:  And that was before Judge Fong.  And all

16  of the issues that were relevant in *Fisher* are relevant here.

17  And those issues have to do with the fact that if in fact these

18  doctors are precluded from practicing at Queen's, my clients

19  will not be able to get their treatment that they need, the

20  doctors could in the fact face reports to the data bank as a

21  consequence of what's going on here, and they could in fact

22  then become permanently unavailable because of insurance or

23  other issues that will interfere with the fundamental

24  relationship between the doctors and my clients, the patients.

25          And so I believe that there are issues there, because

1    the data bank is implicated, which is a federal entity, and

2    because of the status of these doctors who we have to rely upon

3    in order to be able to treat my clients.  I think there's an

4    adequate nexus as there was in *Fisher* for you to issue

5    appropriate relief at this stage.

6              THE COURT:  Yeah, but the national data bank is

7    implicated every time there's a malpractice action that's

8    filed, so that doesn't create federal jurisdiction.

9              MR. SEITZ:  No, but in fact in this issue we are

10   talking about a loss of privileges which could in turn make it

11   impossible for these doctors to treat patients, including my

12   clients, for the foreseeable future.  And that's why I start

13   out by telling you the prospect of that to my clients, who

14   could otherwise die, is very serious.

15             THE COURT:  Yeah, but no matter how serious -- I

16   mean, that goes to the analysis with regard to the injunctive

17   relief, the TRO, likelihood of success, and then you also look

18   at irreparable harm.

19             I am with you on the irreparable harm.  I get the

20   irreparable harm.  My concern is because this is unraveling

21   very quickly, you know, we are rushing into this and then

22   taking a look at it and, Hey, wait.  This is not Tripler.  This

23   is not the Hawaii State Hospital.  This is not Kona Hospital.

24   This is Queen's.  And like Kaiser, is it not public and not

25   quasi-public for, you know, the due process claim.

1        Now, Mr. Alston raises the fact that the lynch pin

2    argument and so forth, and it sounds good.  I mean I am going

3    to have to take a closer look at it.  And I just want to share

4    with you folks a concern, because even though what I hear your

5    argument saying, Mr. Seitz, is the lesser of two evils is let's

6    go forward and get some ruling in federal court, because my

7    clients have this great pressing need.

8        I agree with that, but the problem is is that

9    jurisdiction is never waived.  You folks cannot waive

10   jurisdiction and say, "Well, we are in federal court.  Let's go

11   for it."  I don't want to then be in the position of issuing

12   something that I don't have jurisdiction to issue.  And that's

13   why I am just asking you these questions.

14       If I knew the answer, I wouldn't be asking you, quite

15   frankly, you know.  As Mr. Davis points out, I could sua

16   sponte, you know, remand it back to state court.  I'm not

17   saying that I am going to do that.  I just want us to proceed.

18   Because quite frankly, you know, as to the second issue, the

19   injunctive relief issue, the TRO, if you folks aren't able to

20   work something out today, like in the next 30 minutes, I am

21   going to -- I am prepared to issue a TRO today to maintain the

22   status quo until we have the hearing and I issue my ruling,

23   because that's what TROs are all about.

24       Now that's not really addressing so much the

25   likelihood of success but more the irreparable harm at this

1    point which is basically what TROs do, maintain the status quo.

2           But again, I don't think that helps any of us if I am

3    issuing something that I have no jurisdiction to do.  And

4    that's why I want to put it on the table, because I know you

5    folks have been working very hard.  I know you folks are all

6    sincere in your efforts and your clients have been working on

7    this for months.

8           But I don't want, you know, us to rush in and then be

9    on, you know, very weak ground with regard to whatever the

10   outcome is when -- if the Ninth Circuit or whoever says, "You

11   know what?  Judge Chang should have ruled on this in state

12   court."  At the end of the day, I don't think that behooves any

13   of us, and that's all I am raising right now.

14           MR. SEITZ:  And let me just contribute one other

15   thought.

16           THE COURT:  Okay.

17           MR. SEITZ:  And that is from previous litigation, I

18   am aware that Queen's receives federal funds from any number of

19   sources for programs and trials and researches -- research

20   projects on which they are engaged on a regular basis,

21   including massive amounts of federal funds that ultimately are

22   channeled through Medicare and Med-QUEST to patients that they

23   treat.

24           So my sense is that an application or a further

25   substantiation could be made that would demonstrate that they

```
 1   are in fact engaged in treating patients based upon federal
 2   funding which would make them susceptible to jurisdiction for
 3   these kinds of arguments here.
 4            THE COURT:  And that might be enough to make it
 5   quasi-public.  Although, you know, I don't know this for a
 6   fact.  I only know from personal knowledge from Queen's Medical
 7   Center being involved in litigation challenging certain aspects
 8   of their receipt and accounting of Medicaid funds and Medicare
 9   funds that they do in fact receive these kind of federal
10   funding.
11            I am assuming that Kaiser does also, and yet they
12   found that they are not a quasi-public hospital.  I don't know.
13   You know, like I said, we are trying to do this research and
14   take a look at this.  So that's a concern that I think affects
15   all of us.
16            Okay.  Before we leave the issue of jurisdiction,
17   anyone have anything else?
18            MR. ALSTON:  Just one further comment, Your Honor.
19            THE COURT:  Yes.
20            MR. ALSTON:  With respect to the *Grable* case, that
21   case says that there is federal question and there would be
22   federal question raised if the federal law provides the
23   substantive basis for the claim.  And given what Mr. Davis has
24   described about how he's linking the Stark Act to the damages
25   claim, I think it does provide a substantive basis.
```

```
 1            THE COURT:  Yes.  See, I am happy with that.  I mean
 2    that's very helpful.  I hadn't thought about that in terms of
 3    looking through this, but that's certainly -- because we are
 4    sort of focusing on the whole hospital privileges issue, but
 5    that's a very good point.  And so quite frankly, I feel more
 6    assured that we are kind of going down the correct path.
 7            Okay.  So if we don't have anything more on the
 8    jurisdiction, then I can turn to Mr. Alston.  I have heard -- I
 9    have read through Mr. Davis' report, and I'd like to hear from
10    you.
11            MR. ALSTON:  Unfortunately, Your Honor, you
12    haven't -- because our brief is not due until tomorrow, you
13    haven't had the benefit of our analysis or the testimony from
14    our clients.
15            THE COURT:  Right.
16            MR. ALSTON:  If it would be helpful to you --
17            THE COURT:  Yes.
18            MR. ALSTON:  -- I could accelerate that and get it to
19    you this afternoon, because I think when you said earlier you
20    are prepared to issue a TRO, I think that would be a grave
21    mistake for a number of reasons.
22            THE COURT:  Okay.
23            MR. ALSTON:  First it would be a grave mistake
24    because in fact we have offered and will fulfill the offer to
25    make available Queen's facilities for anyone who is in urgent
```

1    need of services that have to be provided at Queen's between

2    now and your decision, not just February 15th, but your

3    decision on the motion.

4          If they have got a patient, whether it's Mr. John

5    Doe, or John Doe II, who is in the circumstance where they have

6    to get some treatment at Queen's, they will get it.  There is

7    no reason to believe that anyone is going to suffer harm much

8    less irreparable harm because of this change of policy pending

9    your decision on the TRO.

10         Mr. Seitz talks about anxiety, et cetera, et cetera.

11   The fact is from the moment we learned of his clients' identity

12   and their circumstance, we have made clear that there is no

13   need to intervene.  There is no need for litigation.  They will

14   get what they need.  And the same will be true with respect to

15   any others that they have not yet identified for us who are in

16   a course of treatment or need imminent treatment between now

17   and when you rule.  There is simply no reason to do -- to enter

18   a TRO that requires us to do that, because we are going to do

19   it in any event.

20         The second thing, Your Honor, is -- with respect to

21   this is that as you will see when you read our papers, there is

22   in fact overwhelming case law that allows hospitals to make

23   exactly these types of decisions without implicating any due

24   process rights, because they have made what amounts to a

25   legislative decision, if you will, that reflects a change in

1  operating policy designed to enhance patient care.  And they

2  haven't made any determination about the competency of these

3  doctors.

4       If they thought the doctors were incompetent, they

5  would not have offered them all jobs as they did.  But they

6  have offered them jobs.  The doctors, for whatever reason, have

7  chosen not to accept those positions.  And so there is nothing

8  then that requires reporting.  There is nothing that requires

9  any -- that reflects negatively on their professional

10  abilities.

11       It's simply that Queen's believes that patient care

12  can be better delivered, patient satisfaction will be

13  increased, patient outcomes will be improved and controlled and

14  managed better because, with a closed system, Queen's can

15  insist on following certain protocols, Queen's can insist on

16  doctors, you know, collaborating effectively together and so on

17  and so forth.  It's just better.  Okay?

18       And if you would wait before making any decision to

19  read our papers, I think you would get a very different picture

20  of what's at stake.  But the most important thing, as I said,

21  is no one who urgently needs treatment is going to be denied

22  treatment that they can't find elsewhere before -- before we

23  get your ruling.

24       And if we have a dispute about that, I'm prepared to

25  come in.  I'm prepared to respond day or night, seven days a

1  week, to get the answers.  And if they have somebody who they

2  think qualifies for or needs emergency treatment, and we can't

3  resolve it, and I have every confidence we could, if we can't,

4  then we can come back to Your Honor in that particular

5  circumstance.

6           But right now granting a TRO that maintains the

7  status quo, when there is no one who is not going to get

8  treatment if they urgently need it, simply protects the

9  doctor's pocketbooks.  Simply protects their ability to

10  generate the income that they would like to generate.  It

11  doesn't help any patient; and, therefore, there's no reason to

12  provide a TRO.

13           THE COURT:  Okay.  I'm familiar with those -- we are

14  starting to take a look at those cases with regard to hospitals

15  and their ability to make basically employment decisions.

16           What the concern is is really the irreparable harm.

17           MR. ALSTON:  Right.

18           THE COURT:  And I guess my concern or a bell sort of

19  goes off when you say "any patients who urgently need care".

20  One of the arguments that they made the other day was it's not

21  just a matter of patients who have already been put on a

22  treatment plan, it's those that are diagnosed between now and

23  when I make a decision.

24           MR. ALSTON:  Right.

25           THE COURT:  Who can only receive treatment or whose

```
 1   best course of treatment is to receive it at Queen's.

 2              MR. ALSTON:  Right.

 3              THE COURT:  That's the concern.  And so, you know --

 4              MR. ALSTON:  And --

 5              THE COURT:  -- where is -- where is Queen's on that?

 6   It's not just those that need it, that are in it, that have --

 7              MR. ALSTON:  Sure.

 8              THE COURT:  -- surgery planned and so forth, those

 9   that are going to be diagnosed between now and February 15th.

10              MR. ALSTON:  Right.  And the answer is, Your Honor,

11   if there is a medical need to provide treatment at Queen's

12   before you rule, then they will be accommodated.  Okay?

13              THE COURT:  Who makes the decision about medical need

14   to be treated at Queen's?

15              MR. ALSTON:  I believe it would be in discussion

16   between the physicians and ultimately, if necessary, the

17   lawyers.  But, you know, let me just go and backup a second.

18   And I admit to being a neophyte with respect to radiation

19   oncology.  I think we all are.

20              THE COURT:  Yes, and happily so.

21              MR. ALSTON:  Yes, fortunately so.

22              THE COURT:  Yeah.

23              MR. ALSTON:  As I understand it, there are few if any

24   circumstances where someone is diagnosed today and needs

25   radiation oncology tomorrow, the next day, or even in two
```

1    weeks, or needs the kind of oncological services that can only

2    be provided at Queen's within that sort of timeframe.

3          There is often, for example, a multi-week workup and

4    implemented of therapies that lead up to the implementation of

5    seeds or up to the implementation of other like services such

6    as the HDR brachytherapy which involves circulation --

7    circulating radioactive material in and through the prostate.

8          It's not just something that happens overnight.  It

9    happens after a period of time.  But if somebody -- if there is

10   somebody who needs that time, needs that sort of attention,

11   they will get it before -- before you rule.

12         I think the evidence will show that that's not the

13   case, but if it is, you know, we are -- as I said the other

14   day, we are not going to compromise the lives or the safety or

15   well-being of any patients because of this dispute.  And we

16   think that the schedule you set up, which is compressed as it

17   is --

18         THE COURT:  Right.

19         MR. ALSTON:  -- you know, is the appropriate way to

20   address it.

21         THE COURT:  Okay.  All right.  Mr. Davis, what are

22   your thoughts with regard to the proposed procedure for

23   treating patients?

24         MR. DAVIS:  When Mr. Alston two days ago said that

25   nothing would happen in this lawsuit that would impact the

1   patient --

2                THE COURT:  Right.

3                MR. DAVIS:  -- and that every patient would -- who

4   needed the treatment at Queen's, we walked out of this

5   courtroom feeling pretty good.

6                THE COURT:  Right.  He said nothing would be done to

7   jeopardize.  Not --

8                MR. DAVIS:  Correct.

9                THE COURT:  But to jeopardize.  Okay.

10               MR. DAVIS:  Then within two or three hours, we got

11  their proposal.  And I am not going to go to the original

12  proposal but the one that I got as early as 6:00 o'clock this

13  morning --

14               THE COURT:  Okay.

15               MR. DAVIS:  -- or earlier this morning, and his

16  proposal, which I said, "Okay, it sounds like that we are on

17  the same page.  So why don't we just get an injunction agreeing

18  to the things that you have represented in court orally?"

19               THE COURT:  Yeah.

20               MR. DAVIS:  And we carried on, and we, you know, we

21  had a conversation an hour ago about this.  And what they have

22  put in the proposal is that the only thing that is available at

23  Queen's was the implantation of seeds.  This is in response to

24  our stipulation listing the procedures that they are only

25  available at Queen's.

1          So they agree that the implantation of seeds may be

2     done at Queen's, but they have eliminated the volume studies

3     for implants that is the precursor procedure that must be done.

4     They won't allow that done at Queen's.  And it must be done on

5     the same machines for the same calibration and so on.

6          They have also said that it applies -- the HDR

7     brachytherapy -- I am going to let -- I am going to turn this

8     over to Miss Connors in a moment, because she has kind of made

9     a study of this thing.

10         The one thing that Mr. Alston and I agreed about was

11    that neither of us know very much about it other than what we

12    are getting from our clients, and this ought to be made by, you

13    know, the medical people.  Because, you know, our contention

14    is, as you may see from our papers, is that if they had gone

15    through the due process, which required the input of the

16    medical committee, the medical executive committee, the

17    oncology committee, and there are physicians recognizing the

18    impact on patient care, we wouldn't be here.

19         THE COURT:  Well, but we are.

20         MR. DAVIS:  But we are.

21         THE COURT:  Yes.

22         MR. DAVIS:  So those are the only procedures.  And

23    the HDR brachytherapy treatment, this hospitalized input --

24    implant that he described that involves radioactive treatment,

25    according to his written proposal, says it's only for those who

1    have started their radiation treatment as a precursor to

2    brachytherapy before February 1st.

3           So we have got -- we have five more patients in the

4    past 24 hours that have come in in need of additional treatment

5    and saying, "When can you schedule this?"

6           THE COURT:  Okay.  So you would be okay if it doesn't

7    have that limitation, "Who started their radiation treatments."

8    Is that right.

9           MR. DAVIS:  Well, yes.  That's one part of it.

10          THE COURT:  Okay.

11          MR. DAVIS:  There are other procedures that are

12   listed in our stipulation that I -- that it is my understanding

13   is -- can only be done at Queen's because of, you know, what

14   they have and et cetera.

15          THE COURT:  Okay.

16          MR. DAVIS:  One of which is pediatric radiology.  Our

17   group does all of the pediatric radiation that exists in

18   Hawaii, maybe 90, 95 percent.  And everybody in this room, if

19   they had that -- would be in that position, would send their

20   child to this group.  And it requires anesthesia for a child.

21          THE COURT:  Yes.

22          MR. DAVIS:  Which requires an operating room.

23          THE COURT:  Okay.  So let's do this.  Let's take that

24   first contention with regard to comparing your stipulation,

25   your stipulation -- without addressing that it should be a

 1    stipulation for a temporary injunction versus an agreement, I

 2    guess, is what they are providing.

 3              Mr. Alston, with regard to paragraph two of the

 4    proposal by the plaintiffs.

 5              MR. ALSTON:  This?

 6              THE COURT:  Yeah.  Can we first start with that

 7    rather than -- you know, where they are coming from is they

 8    want all of these things in addition to the brachytherapy.

 9              MR. DAVIS:  Could I make one comment?

10              THE COURT:  Yes.

11              MR. DAVIS:  It occurs to me that, you know, for

12    example in my conversation -- I hope I represent this

13    accurately -- I said this can only be done at Queen's.  And he

14    says, "Well, that's not my understanding."

15              THE COURT:  Yeah.

16              MR. DAVIS:  And there is like a certain type of

17    procedures that --

18              THE COURT:  Right.

19              MR. DAVIS:  So there is a factual disconnect between

20    some of the things he thinks can't be done at Queen's and can

21    be done at Queen's.  And that's why, you know, it makes just

22    imminent sense especially in his representation that, you know,

23    they are going to take care of all the people that need to be

24    taken care of, which this -- their agreement doesn't say.

25              To just do a TRO holding the status quo, which will

```
 1    allow their medical people and our medical people to get

 2    together and figure out which of these are things that really

 3    can only be done at Queen's, because I think there are -- there

 4    are factual things that I think is just clear.  It either is or

 5    it's not.  It's not an interpretation.  It's not something the

 6    lawyers ought to be doing.

 7              But if that's done, just a TRO that maintains the

 8    status quo of their privileges, at least until we get to what's

 9    essentially going to be a preliminary injunction hearing on the

10    15th, you know, at least we know that Mr. Seitz's patients,

11    that the other four or five patients that are --

12              THE COURT:  Okay.  No, I understand.  But if you are

13    able to work out an agreement, obviously, then it's clearer,

14    and I don't want you guys running back and forth on the thing.

15              But it's like speed dating.  You know, we are either

16    going to come to an agreement in the next 15 minutes or not.

17    And if we aren't, then we will deal with that.

18              MR. ALSTON:  Can I offer another suggestion, Your

19    Honor?

20              THE COURT:  Yes.

21              MR. ALSTON:  The first part is Mr. Davis is right.

22    He and I are, as lawyers, talking about things that we have at

23    best an imperfect understanding about.

24              THE COURT:  Yes.

25              MR. ALSTON:  I would suggest that you direct the
```

1  parties to get together this afternoon.

2          THE COURT:  I agree.

3          MR. ALSTON:  And to see if we can come to an

4  agreement with respect to these things.  We may be able to.  I

5  mean certainly I will take back to them your comments of this

6  morning and see if we can't agree that between now and your

7  ruling on the 15th or following the 15th --

8          THE COURT:  Right.  And it will be shortly

9  thereafter.  I mean I recognize it's not going to be like a

10  month after that.  That's my suggestion.

11          MR. ALSTON:  I would say rather than say that the

12  lawyers should come to an agreement that may not make any sense

13  to the doctors, if you would direct that the parties get

14  together.  I suggested that we do that.  Mr. Davis said his

15  client wasn't available for whatever reason.  Perhaps he's

16  doing a surgery or something.

17          But I know sometime today we can get everybody

18  together.  No one is saying today that there is somebody who

19  needs any of these services today, tomorrow, so forth.  So if

20  we can get together today and report back to you by 4:30, you

21  know, or by 4:00 o'clock --

22          THE COURT:  I will have you guys come back, actually.

23          MR. ALSTON:  Yeah.  We can come back.

24          THE COURT:  Because if you are not able to come to an

25  agreement, then I will issue something.

1          MR. ALSTON:  And the other thing is we will get our

2    papers to you this afternoon, so you will have a chance to read

3    them before 4:00 o'clock, so you can see what our view is both

4    factually and legally with respect to these matters.

5          MR. DAVIS:  Your Honor, may I comment?

6          THE COURT:  Okay.  Well, on the briefing aspect of

7    it, you know, quite frankly, if you guys aren't able to come to

8    an agreement by tomorrow afternoon, I will be prepared to issue

9    an order.

10         I don't know if you need to actually like kill any

11   associates in order to get the briefing earlier than that,

12   because what I am really focusing on, I generally understand

13   what your arguments are on the likelihood of success.  But as

14   you know on the TRO, that's not as high -- in this particular

15   case, for the irreparable harm, what I see in terms of the

16   therapy --

17         MR. ALSTON:  Of course.  Let me ask you this

18   question.

19         THE COURT:  Yes.

20         MR. ALSTON:  Given that we are willing to accommodate

21   without equivocation Mr. Seitz's two clients --

22         THE COURT:  Right.

23         MR. ALSTON:  -- who else is in need of this sort of

24   treatment?  I mean is it in fact anybody?

25         MR. DAVIS:  We have five others that we know about.

1            MR. ALSTON:  What's that?

2            MR. DAVIS:  We have four or five others.

3            MR. ALSTON:  Tell me about them.  If there is anybody

4    they can say has to have treatment of these kind within the

5    next three weeks, then we can deal with it.  But now we are

6    just talking in the air, and they haven't identified -- they

7    have identified the possibility but not the reality.

8            So let's talk -- you know, if they have got four or

9    five patients, tell me who they are, and we will see what we

10   can work out.

11           THE COURT:  Right.  Absolutely, and that's part of

12   the discussion I think you guys need to have today.  But for

13   instance, I guess if I were them I would argue, "Well, you

14   know, the patients that need general anesthesia for external

15   radiation including pediatric external beam radiation."

16           MR. ALSTON:  Right.  And the reason why we declined

17   to do that is because it is our understanding that they have,

18   at the Cancer Center of Hawaii and perhaps elsewhere,

19   facilities that are well suited to doing that.

20           And I can't say whether they have done it, but I can

21   say they have -- in our view, they do.  Now they may be able to

22   say to the people at Queen's, "No, you are wrong, and here are

23   the reasons why our facilities don't work," in which case given

24   we are talking about children, I can assure you are that, yeah,

25   we will take that to heart.

```
 1              THE COURT:  Right.

 2              MR. ALSTON:  We are not --

 3              THE COURT:  But I think you guys need to have that

 4    discussion with regard to all of those things and then come

 5    back tomorrow afternoon.

 6              MR. DAVIS:  Your Honor, may I?

 7              THE COURT:  Yes, you may.

 8              MR. DAVIS:  I appreciate the fact that this is Ground

 9    Hog Day, but it seems like this is the same discussion we had

10    two days ago in which -- in fact, I brought the transcript and

11    the representations, "We are going to take care of every

12    patient," et cetera.

13              And then despite our efforts for 48 hours to, you

14    know, put that down into a document that would be a stipulation

15    enforceable by the Court, all we have got, up until this

16    morning, was something that flies absolutely in the face of the

17    representations that they have made.

18              So, you know -- and I am not sure --

19              THE COURT:  Well, I am not sure that's true in all

20    fairness.  I mean they are not agreeing to everything that you

21    folks have put in yours, because they are saying that, you

22    know, other arrangements can be made.  So it's not only -- but

23    they are standing by their -- I don't know, because these are

24    medical determinations.

25              MR. DAVIS:  Exactly.
```

1    THE COURT:  Which is why you guys need to get your

2    people to the table and saying, you know, On the pediatrics,

3    well, we need this because -- Well, you can do it at your

4    facility.  Well, that's true, but if anything untoward happens,

5    we are going to need automatic hospitalization, and that's why

6    it needs to be done in a hospital setting as opposed to -- I

7    don't know.  I am making this up.

8    MR. DAVIS:  Your Honor, we are completely ready and

9    eager to have that conversation.

10    THE COURT:  Great.

11    MR. DAVIS:  In fact I had proposed that before we

12    filed the lawsuit and said, "Let's sit down.  Let's have a

13    standstill."

14    What I fear is that these issues are -- they are

15    somewhat complicated, because it's comparing the treatment by

16    this machine versus that machine.  And I have all my people in

17    there with all the Queen's people, and we can talk about this

18    and work out, you know, something consistent with their -- and

19    frankly it shouldn't be crammed into, you know, an afternoon to

20    try to get all of this worked out.

21    But if, for example, the Court were prepared just to

22    say, "Okay.  Standstill.  Status quo."  We will then have 14

23    days before we have to come before this Court to get this all

24    worked out.

25    And they will then have an incentive, which they

1   never had before the Court indicated that, you know, maybe

2   there is a TRO in the air, to come to the table to do that,

3   because we have been begging them to do that.  But if you do it

4   now, at least we will have some reasonable period of time in

5   which we can really sort these things out.

6        Because it sounds like that if they really, really

7   want to, you know, protect the patients and make sure that

8   these kids -- that the kids and all these cancer patients are

9   treated, and they won't impact the patient care, it seems like

10  they shouldn't disagree with a TRO, because all you are doing

11  is really saying, you know, "Let's just maintain the status quo

12  which we have had for 40 years."

13       THE COURT:  Right.  But they don't want your people

14  unless they are on certain terms, and that's why there is a

15  lawsuit, and that's why we are here today.

16       The thing is I am going to give you folks until

17  tomorrow, and I am going to come back.  Hopefully, Warren, we

18  have -- I know we have some sentencings tomorrow.  Is there

19  something around 2:00?

20       COURTROOM MANAGER:  2:00.

21       THE COURT:  Okay.  So 2:00 or 3:00 o'clock?

22       MR. DAVIS:  Okay.

23       THE COURT:  Okay.  To give you folks enough time.

24       MR. DAVIS:  Okay.

25       THE COURT:  And if you aren't, I will issue a TRO.

1    But you know what's going to happen is neither of you, I

2    promise, will be happy with it, because it's not going to be

3    entirely what the plaintiff wants and it's going to impose on

4    Queen's much more than they want.

5              So that's why this is a great opportunity to express

6    to your clients that the judge has no idea what she's doing in

7    terms of medicine, and that all of them and their learned

8    ability would be far better off coming to a medical

9    understanding and decision, with compromise on both sides, how

10   to proceed basically for the next 14 days, 15 probably -- I

11   need a day to issue that -- than have me make decision on what

12   and how they are going to do it.

13             And that's what happens all the time in these IDEA

14   cases.

15             MR. DAVIS:  We are happy to do that.

16             THE COURT:  The special ed teachers are like, "Wow,

17   this just really doesn't make sense."  And the parents are

18   like, "This is not at all what I wanted to have."  That's what

19   happens when you have a Court make a decision.

20             MR. ALSTON:  A couple things, Your Honor.  I don't

21   want Mr. Davis talking about me supplying something to him at

22   6:00 o'clock this morning.  In truth Tuesday afternoon at

23   2:00 o'clock I sent him my first draft, so we have been working

24   diligently to get a proposal in their hands and to try to work

25   it through.

1    THE COURT:  Well, I certainly know your office and

2    know that you work very diligently.

3    MR. ALSTON:  Thank you, Your Honor.  I will go back

4    when I leave here day, and we will talk with the staff.  And I

5    will make people available for a discussion as soon as the

6    plaintiffs are prepared to do that.

7    THE COURT:  Yes.  Sit down, try to hash it out, and

8    if you have a partial agreement with regard, that's helpful to

9    me.  Give me what you guys got.  It's -- you know, yes,

10   Mr. Seitz.

11   MR. SEITZ:  I, too, walked out of court two days ago

12   and felt fine that my clients were going to be taken care of.

13   So I called them and I called the primary care physician for

14   the one on the Big Island and explained to them that they could

15   just go ahead now and schedule things.

16   THE COURT:  Yes.

17   MR. SEITZ:  And to contact Dr. Lederer's office,

18   which is their point of contact, and find out when they are

19   supposed to come in for whatever procedures, which they did.

20   Then I got a series of emails and calls back saying,

21   "Well, we have now been contacted by people from Queen's who

22   are telling us that we can only maybe do part of this process.

23   We may not be able to do the full amount.  It's going to drag

24   out over several weeks, and there is some question about

25   whether Dr. Lederer is going to be able to continue the

1  process."

2          Now, that may or may not have been accurate

3  information.  But the problem is for fragile clients who are

4  scared to death they are getting whip sawed between Queen's and

5  Dr. Lederer's office because of these problems, and that, in

6  and of itself, is unacceptable.  And so --

7          THE COURT:  Right.  But let me ask you this.  If we

8  have the hearing as scheduled and if I deny the motion for --

9  you know, basically for preliminary injunction at that point,

10  isn't that true that Dr. Lederer will not be able to continue?

11          MR. SEITZ:  I guess so, but I don't foresee that

12  happening.  But I do foresee that in the ambiguity of the

13  situation, which is why I tend to concur with Mr. Davis that if

14  we could have a standstill, for some period of time, at least

15  these patients who are very sick would not have that ambiguity

16  in their lives.

17          THE COURT:  We are only talking about two weeks.

18          MR. SEITZ:  And I understand what's been said.  But

19  Mr. Alston says my clients' claims are moot.  They are hardly

20  moot given the somewhat ambiguity.

21          And so again, what I'd like to do -- I don't want to

22  be a major player in this if it's not necessary.  I would like

23  to have -- if they are not willing to stipulate to my

24  intervention, I would at least like to have them stipulate to

25  shortened time, so that we could come back and argue the

1   intervention and get that resolved.

2          I will supplement with regard to the second patient

3   or anyone else who comes to me in the meantime, so at least we

4   can have that part of it resolved.  And then they can sit down

5   and talk, and I would certainly hope that they will come to a

6   resolution that would make my clients feel at ease that the

7   care they need is going to be forthcoming.

8          THE COURT:  Okay.

9          MR. ALSTON:  May I, Your Honor?

10         THE COURT:  Yes.

11         MR. ALSTON:  This is the first I am hearing about any

12  possible ambiguity.  I am sure that if it were a serious issue,

13  Mr. Seitz would have called me as I would have called him under

14  similar circumstances.

15         There is no reason for anyone to be in doubt about

16  what we have represented.  So I will talk with my clients.  I

17  will resolve his concerns about ambiguity today.

18         THE COURT:  Okay.

19         MR. ALSTON:  Period.

20         THE COURT:  Okay.  On the motion to intervene, for

21  the first one, I can't talk about the second one --

22         MR. SEITZ:  Right.

23         THE COURT:  -- since it hasn't been filed yet.  I am

24  prepared to do it off the briefing and not have a hearing with

25  regard to that.

1              MR. SEITZ:  That's fine.

2              THE COURT:  I mean we are talking about a short

3    period of time.

4              MR. ALSTON:  That's fine.  We can submit the brief

5    Monday, Your Honor.

6              THE COURT:  Okay.  All right.  So they are going to

7    do their opposition on Monday.  I am not going to get a reply.

8    I am just going to issue an order with regard to that.

9              MR. ALSTON:  Thank you.

10             MR. SEITZ:  Thank you.

11             MR. DAVIS:  So are we coming back tomorrow?

12             THE COURT:  Coming back tomorrow 2:00 o'clock.  Is

13   that sufficient?

14             MR. ALSTON:  See you then.

15             THE COURT:  All right.  We will see you then.  All

16   right.  Good day to all of you.

17        (Recess, 11:56 a.m.)

18

19

20

21

22

23

24

25

--oOo--

COURT REPORTER'S CERTIFICATE

    I, KATHERINE EISMANN, Official Court Reporter, United States District Court, District of Hawaii, Honolulu, Hawaii, do hereby certify that the foregoing is a true, complete, and correct transcript of the proceedings had in connection with the above-entitled matter.

Date:  February 7, 2012.

                              /s/ *Katherine Eismann*

                              Katherine Eismann, CSR CRR RDR