```
 1                IN THE UNITED STATES DISTRICT COURT

 2                  FOR THE DISTRICT OF HAWAII

 3                                )
     PACIFIC RADIATION ONCOLOGY,  )  CV 12-00064 LEK-KSC
 4   LLC, a Hawaii Limited        )
     Liability Corporation, et al.,)  Honolulu, Hawaii
 5                                )  February 14, 2012
              Plaintiffs,         )  2:30 P.M.
 6        vs.                     )
                                  )  Plaintiff's Motion for
 7   THE QUEEN'S MEDICAL CENTER,  )  Preliminary Injunction
     a Hawaii Non-Profit          )
 8   Corporation, et al.,         )
                                  )
 9           Defendants.          )
     _____)

10

11                  TRANSCRIPT OF PROCEEDINGS
          BEFORE THE HONORABLE LESLIE E. KOBAYASHI
12               UNITED STATES DISTRICT JUDGE

13   APPEARANCES:

14   For the Plaintiffs:        MARK S. DAVIS
                                LORETTA A. SHEEHAN
15                              CLARE E. CONNORS
                                Davis Levin Livingston Grande
16                              400 Davis Levin Livingston
                                  Grande Pl.
17                              851 Fort Street
                                Honolulu, HI 96813
18
     For the Defendants:        PAUL ALSTON
19                              CLAIRE WONG BLACK
                                Alston Hunt Floyd & Ing
20                              ASB Twr.
                                1001 Bishop St., Ste. 1800
21                              Honolulu, HI 96813

22                              DANIEL M. MULHOLLAND III
                                Horty Springer & Mattern
23                              4614 Fifth Ave.
                                Pittsburg, PA 15213

24

25
```

```
 1    APPEARANCES (Continued):

 2    Official Court Reporter:      Debra Kekuna Chun, RPR, CRR
                                    United States District Court
 3                                  300 Ala Moana Blvd. Ste. C285
                                    Honolulu, HI 96850
 4                                  (808) 534-0667

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
      Proceedings recorded by machine shorthand, transcript produced
25    with computer-aided transcription (CAT).
```

```
 1   TUESDAY, FEBRUARY 14, 2012            2:32 O'CLOCK P.M.

 2            THE CLERK:  Civil 12-00064 LEK-KSC, Pacific Radiation

 3   Oncology, LLC, versus The Queen's Medical Center, et al.  This

 4   hearing has been called for Plaintiff's Motion for Preliminary

 5   Injunction.

 6            Counsel, your appearances for the record.

 7            MR. DAVIS:  Good afternoon, Your Honor.  Mark Davis,

 8   Loretta Sheehan, Clare Connors for all -- representing the

 9   plaintiff.  And for the record Dr. John Lederer is present in

10   the courtroom.

11            THE COURT:  All right.  Good afternoon to all of you.

12            Mr. Alston.

13            MR. ALSTON:  Good afternoon, Your Honor.  Paul Alston

14   and Claire Black, appearing for Queen's Medical Center and the

15   other defendants.  Also present, Your Honor, appearing pro hac

16   vice is Mr. Dan Mulholland.

17            MR. MULHOLLAND:  Hello, Your Honor.

18            THE COURT:  All right.  Good afternoon to all of you.

19            All right.  You may be seated.

20            THE COURT:  All right.  So I have received the

21   following, and then I want to address some of the recent

22   submissions to get your positions with regard to that.

23            So I have the Plaintiff's Motion for Temporary

24   Restraining Order or, in the Alternative, for Preliminary

25   Injunction, filed January 27, 2012.  I have defendants'
```

1    memorandum in opposition, filed February 2, 2012; defendants'

2    submission of affidavits for direct examination, filed

3    February 9, 2012; compendium of plaintiff's evidence, filed

4    February 9, 2012; reply to defendants' memorandum in opposition

5    to plaintiff's motion, filed February 8, 2012; defendants'

6    notice of supplemental authority in support of opposition to

7    plaintiff's motion, filed February 10, 2012; defendants'

8    submission of supplemental affidavits for direct examination,

9    filed February 13, 2012; and then today I received just now in

10   chambers a request for judicial notice, declaration of Claire

11   Wong Black.  That's filed February 14, 2012.  And just now I

12   was handed a draft of defendants' proposed Findings of Fact and

13   an outline of what's entitled PRO Allegations and QMC

14   Rebuttals.

15         Okay.  So setting aside those that were filed between

16   January 27, 2012, and February 13, 2012, I think they'll speak

17   for themselves, and are there any objections or comments with

18   regard to that, Mr. Davis?

19         MR. DAVIS:  You did not mention, I believe,

20   plaintiff's second submission of affidavits, filed

21   February 13th, which was the affidavits --

22         THE COURT:  Yes.  I'm sorry.  I do have that as well.

23         MR. DAVIS:  Okay.  I think that accurately states

24   everything that's filed.

25         THE COURT:  With regard to the request for judicial

1    notice that the court received today, did you also receive a

2    copy?

3         MR. DAVIS:  I did, Your Honor.

4         THE COURT:  All right.  Do you have any objection to

5    the court receiving it?

6         MR. DAVIS:  I do.

7         THE COURT:  And you may state it for the record.

8         MR. DAVIS:  Basically, Your Honor, the website was

9    the -- I think it's Cancer Center of Hawaii's website, which

10   our clients own, you know, one third of.  And it was prepared

11   in mid-2011, and the only update that's been on there after

12   2011 was a statement that we're still open even though St.

13   Francis closed.  So if the court is asking to take judicial

14   notice of it, I think we have no objection to that.  There is

15   certainly evidentiary issues associated with it.

16        THE COURT:  All right.  So what -- I take you to say,

17   then, you don't have any objection to the court taking --

18        MR. DAVIS:  I don't have any objection to the court

19   taking judicial notice of a website.

20        THE COURT:  All right.  Mr. Alston, then I hear

21   there's no objection.

22        MR. ALSTON:  That's all we've asked for.

23        THE COURT:  All right, then.  And then the court will

24   both receive it as well as take judicial notice of exhibits A

25   through F that are attached thereto.

1          And then the proposed Findings of Fact and the

2     outline, any objection to the court receiving them?  I'm not

3     adopting, of course.

4          MR. DAVIS:  Yeah, we have not read them.  I think it

5     would be -- if you're going to call for proposed findings, I

6     think it should be a mutual submission.

7          THE COURT:  I agree.  All right.  Any objections to

8     this summary or outline?

9          MR. DAVIS:  As I understand, it's just argument;

10    so --

11         MR. ALSTON:  That's right, Your Honor.  It's just

12    really an aide of my argument to you about the record.

13         THE COURT:  All right.  Very well.

14         All right.  Then let's proceed.  My understanding is

15    that the parties wish to make argument and point out to the

16    submissions but that no witnesses are going to be called live

17    for cross-examination.  Is that correct, Mr. Davis?

18         MR. DAVIS:  That's correct, Your Honor.

19         THE COURT:  Is that correct, Mr. Alston?

20         MR. ALSTON:  It is, Your Honor.

21         THE COURT:  All right.  Then we'll proceed first,

22    Mr. Davis, will you be making the presentation for the

23    plaintiff's?

24         MR. DAVIS:  Thank you.  I don't know if there are

25    time limits.  I don't expect to be a long time.  I would like

1    to save some time for rebuttal.  We are the movants in the

2    case.

3          I want to, first of all, address myself to some

4    initial issues that the court needs to review.  First of all,

5    with regard to likelihood of success on the merits, when we

6    began these proceedings throughout our multiple hearings and

7    status conferences and so on, the claim by Queen's by way of

8    defense was that this had nothing whatsoever to do with any

9    professional qualifications or misconduct on behalf of the --

10   by the plaintiffs here, but, in fact, it was pretty much an

11   economic decision, and based upon that then it would not

12   implicate due process concerns raised in Silver and so on.

13   However, as we progressed, as the court has seen, there have

14   been multiple allegations of professional wrongdoing with

15   regard to the transfer of patients, Medicare patients, and so

16   on, which our clients, as the court's aware from their

17   declarations, you know, steadfastly object.

18         To the extent that the allegations of this nature

19   involve inadmissible hearsay we would urge the court not to

20   accept it and ask that it be stricken because almost all of the

21   allegations involved, you know, we heard complaints, we

22   overheard phone conversations, we received phone calls, et

23   cetera, et cetera, and so -- so I address myself to what is the

24   admissible evidence before the court.

25         THE COURT:  May I interrupt you just on that point.

1          MR. DAVIS:  Yes.

2          THE COURT:  So you're objecting on the basis of

3   inadmissible hearsay for the truth of the matter.

4          MR. DAVIS:  Correct.

5          THE COURT:  But the court certainly can take that

6   evidence with regard to state of mind as to why Queen's may

7   have taken the position that it was going to go to the closed

8   facility and to the issue of whether or not this whole thing

9   about either you come with the closed facility and you retain

10  your privileges, or, if you don't, you're not going to have

11  privileges at Queen's for the issue of whether or not they're

12  entitled to due process because, even if it's not taken for the

13  truth of the matter, i.e., I'm not making a determination

14  whether or not there was care that was given below the standard

15  of care, I'm not taking that information for that purpose, but

16  I would take it for the purpose of was Queen's making at least

17  in part a determination about the --

18          MR. DAVIS:  Professional.

19          THE COURT:  -- medical ability and professionalism.

20  If so, then that would trigger due process rights.

21          MR. DAVIS:  Right.  And I think that that's an issue

22  which they have clearly admitted, and the only thing we object

23  to is any factual finding that would rely on hearsay

24  statements, complaints, and so on which are asserted to prove

25  that those were accurate.  In my opinion what is relevant, and

1   I think the court had centered on that, is the fact that

2   Queen's now say that we are talking about professional

3   misconduct that led our decision.  And whether that's based on

4   factual stuff or not, I think that is a, you know, concession

5   or admission by Queen's that that's what partially at least

6   motivated their decisions.

7           THE COURT:  I agree.  I don't think I can rely on

8   that type of -- nor do I think it's called for in this motion

9   for me to make any factual determinations of whether or not the

10  standard of care was breached.

11          MR. DAVIS:  Exactly.  Exactly.

12          THE COURT:  Okay.

13          MR. DAVIS:  So I will now then turn to the issue of

14  what they have raised with their acknowledgement that it's

15  professional misconduct that, in part, motivated their -- and,

16  of course, Queen's has filed a ton of cases for the proposition

17  that the board of directors had the right to make these -- make

18  this decision to go to a closed shop, and they've cited case

19  after case all over the country.  The only -- and it's not

20  really a concess -- it's not a claim in the underlying lawsuit,

21  I might add.  The claim is -- in the underlying lawsuit is that

22  the process by which they came to the decision, whether it is

23  to close shop that resulted in the termination of their

24  privileges or just a disciplinary matter, there is a set of

25  rules and standards articulated by the Hawai'i Supreme Court in

1    Silver and also by the bylaws associated with Queen's -- now

2    that it is clear that part of what they are arguing is

3    professional misconduct -- that would have triggered a process.

4    And like any due process case one is not attempting to question

5    the ultimate decision of the board of directors; it only allows

6    process by which the plaintiffs could have provided

7    information.

8         And if Queen's, you know, stands true to their

9    platitudes about, you know, standing up for patients and doing

10   whatever's necessary for patients, then we can't imagine why a

11   consultative process, which would have clearly revealed things

12   that have come forward during the course of these hearings --

13   that is, the potential damage to patients and patients

14   attempting to intervene, cancer patients calling their --

15   trying to get their treatment -- to me the whole purpose of the

16   process that is established by Queen's, established by their

17   bylaws, and recognized by our Supreme Court all has to do with

18   some kind of a process feedback and give and take, which I

19   think would have completely eliminated the potential claims or

20   the necessity to file this lawsuit.

21        Therefore, the issue we think, you know, now before

22   the court, at least with regard to that issue, is not whether

23   they ultimately had the ability to make the decision that they

24   did, which is an issue that will be resolved, you know, later

25   on, but the claim as articulated in the lawsuit that the way

1   they implemented them violated not only their own bylaws and

2   due process.  And I think that, as I mentioned, classically

3   this is precisely the type of process or decision and

4   transition, even if the board of directors were to reject

5   entirely all of the hearings and all of the information

6   articulated during the hearing process, that at the very least

7   there is a great value to the information that would have

8   allowed for a transition in a manner that would not have harmed

9   patients.  And that's our claim.  Not that they didn't

10  ultimately have the right to implement it by act of the board

11  of directors or to even make the wrong decision.

12          As in Silver, you know, the issue was not Dr.

13  Silver's qualifications; it's only the process by which they

14  opted.  And that's why -- and that's what the claim is.  And,

15  you know, I would submit to the court that in light of the fact

16  that they have now conceded that it has professional misconduct

17  and tried to, you know, then I think it's appropriate under the

18  circumstances that the due process requirements, the bylaw

19  requirements are triggered.

20          THE COURT:  Well, I mean that's your argument with

21  regard to but not that the court would find that.

22          MR. DAVIS:  No.  Just --

23          THE COURT:  No.  Right.

24          MR. DAVIS:  I think what the argument is that with

25  regard to success on the merits the only thing the court needs

1    to, you know, look at with regard to that issue is whether in

2    light of the claims of professional misconduct, whether that

3    should have triggered it.  And if we ultimately try that issue,

4    then we would likely prevail on their right to have this

5    process.

6              THE COURT:  Speaks to reasonable likelihood of

7    success on the merits as to that claim, and I don't have to

8    find it to all the claims made.

9              MR. DAVIS:  Exactly.  Exactly.  And in addition to

10   that, of course, the ultimate, you know, we've looked at the

11   cases that have been cited -- the numerous cases that have been

12   cited by Queen's and have been unable to find a single one in a

13   circumstances such as this in which there was no available

14   option and other hospitals have closed.  And that certainly

15   throws, you know, some light in the decisions because I believe

16   that in this particular case, when the decision was ultimately

17   made and other -- and St. Francis or Hawai'i Medical Center and

18   hospitals were still present and these services could have been

19   provided there, you know, it was really not much of an issue.

20   It was -- as it then presented by virtue of the closing on

21   January 5th of these hospitals.

22             THE COURT:  But that goes to irreparable harm.

23             MR. DAVIS:  Exactly.  That does indeed go to

24   irreparable harm.

25             I point out to the court that on the record before

1    you we have also made allegations of an intentional

2    interference of the patient-physician relationship as an

3    intentional interference with contact.  We have submitted to

4    you affidavits which are uncontested at this point from cancer

5    patients where they're calling up Queen's, demanding their, you

6    know, to have their services, and they being told by a

7    physician or administrator at Queen's that they need to fire

8    their physician.  That is an allegation which is uncontested on

9    the record for you and also something that would fall into the

10   category of likelihood of success on the merits.

11          Additionally, we have filed a number of other, you

12   know, claims for relief, including the intent to interfere with

13   PRO's contractual relationships with the Cancer Center of

14   Hawai'i because they have unquestionably in writing solicited,

15   you know, the termination of their contract and urged them to

16   you know, violate their contract and come over to Queen's.

17   Also an issue that is substantially -- in writing substantially

18   uncontested with regard to the interference.

19          There is also -- and we also, of course, have a 480

20   claim, and the court could very well take a look that among the

21   claims that is another one that is most likelihood of

22   prevailing on the merits.  And, of course, in our -- we added

23   in our brief a discussion of 480, but the issue that is

24   submitted to a jury on a 480 claim, using the words of our

25   court, is whether the acts offends public policy, are immoral,

1    unethical, oppressive, unscrupulous, or substantially injurious

2    to consumers.   That comes right from jury instructions that

3    have been submitted in state court in 480 claims.

4            So if one could reasonably conclude that the

5    termination of the privileges of the plaintiff resulted in

6    something that is substantially injurious to consumers by

7    virtue of the fact that they will be denied their cancer

8    treatment -- and I cannot imagine how a jury would

9    automatically -- would reject a proposition to that nature -- I

10   think the court can reasonably conclude that on that claim also

11   we have a likelihood of succeeding on the merits.

12           THE COURT:   Well, isn't the UMOC claim not only that

13   they be rejected in terms of having continuous cancer treatment

14   at Queen's but also that they'd be deprived of their

15   relationship with the radiation oncologist that they started

16   with?  So this is -- goes to both to the UMOC and to the

17   irreparable harm element is that, when you look at the

18   patients, you can't really lump them all together.  At the very

19   least you have two tiers, if not three  One tier would be those

20   who the plaintiffs have treated as radiation oncologists and

21   come up with a plan of treatment and they are in that course of

22   treatment and would be expected, if everything else remained

23   the same, to do follow-up with them.

24           The second tier would be those who have been

25   diagnosed -- have consulted with plaintiffs as radiation

1   oncologists and are preparing to start their radiation

2   treatment but have not yet started at Queen's Medical Center.

3          MR. DAVIS:  Correct.

4          THE COURT:  And then either part of that tier or a

5   third tier would be those patients who every day are being

6   diagnosed but perhaps have not yet consulted with plaintiffs or

7   others in terms of a radiation oncology consultation to come up

8   with a plan with regard to that.

9          So their argument is for the second tier is they've

10  already perhaps developed a physician-patient relationship with

11  the plaintiffs, but they haven't started their treatment at

12  Queen's.

13         MR. DAVIS:  Correct.

14         THE COURT:  Unlike the first tier where they not only

15  have the physician-patient client relationship but also have

16  started at Queen's, they probably have a series of appointments

17  that are already set up to complete that treatment, and so they

18  are in a different boat than these other patients that we've

19  talked about.

20         MR. DAVIS:  Right.  I think that it's important to

21  point out just as pointed out by Dr. Lederer in his affidavits

22  that, you know, when he filed this four or five days ago, I

23  think there were 25 people that had come in since we started

24  this proceeding because, you know, the court's aware that this

25  is the most experienced group, and they're getting great

1    referrals from, you know, the surgeons and the oncologists --

2    the urologists and the oncologists and so on because of their

3    experience and so on.

4         So they -- and there will be -- every day there will

5    be new people coming and seeking to get the, you know, get

6    their treatment with their physician of choice.  So I see

7    little difference between a person -- a patient that already

8    has a relationship or somebody who walks in tomorrow on the

9    referral of their surgeon who wants, you know, this

10   relationship for treatment.  And --

11        THE COURT:  You're saying you don't see a difference?

12        MR. DAVIS:  I don't see a distinction by virtue of

13   the fact that, if the relationship -- if the relationship -- if

14   these are people that can do, as we contend, are the only

15   people that are really experienced in doing these various eight

16   procedures that we're talking about, then to -- and their

17   physician of choice in this particular case are the people that

18   do them the most and are the most experienced and in most cases

19   are the only ones that do them, then I submit that's precisely

20   the category of patients that need to be protected.

21        There has been, you know, declarations back and forth

22   concerning, you know, people's skill and ability, but, as you

23   know, there are -- the three physicians who are employed by

24   Queen's is a -- are people that have had virtually no

25   experience in doing this.  They are licensed and approved to do

1    it.   One person said they participated in 30 of these while he

2    was a resident, but according to Dr. Lederer does not know any

3    time they have ever, you know, done it in Hawai'i.

4         So none of the three physicians have made any

5    suggestion or allegation in any of their declarations that they

6    are experienced or that they're really able to actually -- they

7    only say that they are licensed and approved to do the

8    procedures, just as I am licensed to do a death penalty

9    defense, but I would certainly not be competent or experienced

10   to do that.   And I think that is, you know, very much of a, you

11   know, of a very key issue.

12        So as a result of this, I want to turn for a moment

13   with regard to the nature in which we have narrowed down our

14   preliminary injunction request.   As the court knows, the

15   primary concern, which I believe is the predominant balance of

16   equities here, is, you know, potential irreparable harm.   And

17   unlike any injunction proceeding I've been involved in, we're

18   talking about irreparable harm in the denial of cancer

19   treatment to, you know, patients that need it, life and death

20   issues that I think it's inconceivable that the balance of

21   harm -- and we urge the court to, you know, recognize this as

22   you did in the TRO -- that whatever the economic problems that

23   exist between Queen's and our group, that the cancer patients

24   who are in desperate need of this treatment cannot be, you

25   know, pawns on the sidelines and made to forego their treatment

1  or forego their physician of choice at least with regard to the

2  procedures that are only available by our clients and at

3  Queen's.

4          So from our perspective the irreparable harm is

5  clearly something that is so serious that it tips the scales,

6  you know, tremendously in favor of the issuance of an

7  injunction because what we ask in terms of the injunction is

8  that the eight procedures which have previously been enjoined

9  be part of a preliminary injunction so that they may continue

10  with that and only for a period of time until the plaintiffs

11  have been able to make alternative resources and machinery and

12  other things available to substitute the services that are

13  available now only at Queen's.

14          So -- and we've provided the estimates we think that

15  some of these services might be as early -- available as early

16  as three or four months, and some of them may require as much

17  as 10 months, but, you know, we're talking about -- we are

18  talking about the termination of a 40-year relationship in

19  which the -- which -- and only asking that it be extended as to

20  these procedures in order to protect the patients up for a

21  short period of time until we can do this.

22          Now, I recall, of course, that up until January 5th,

23  which was three -- roughly three weeks before the February 1st

24  deadline, you know, all these procedures could have been done

25  at Hawai'i Medical Center.  And so suddenly with the closing of

1  these hospitals our clients have gotten in high gear to try to

2  make these facilities otherwise available.  And my feeling

3  about the preliminary injunction at this point, given the fact

4  that we're not asking for a permanent injunction, it is our

5  client's intent to move off campus from Queen's, and for every

6  procedure they can do that they will move off as quickly as

7  possible.  Then I think that, if you enter the injunction, Your

8  Honor, we face a situation in which no patient will be injured

9  because the full access of resources will continue to be

10  available to them.  The plaintiffs will not be injured because

11  they will continue to be able to treat their patients.  And,

12  thirdly, Queen's will not be injured because to the extent that

13  this is -- there are treatments that are going to be performed

14  at Queen's, as Queen's admitted they receive approximately 85

15  percent of every radiation oncology dollar that's spent; so

16  they won't be harmed either economically -- in fact, you know,

17  they will do better.  It will simply delay with regard to

18  certain procedures this particular -- the instance of this

19  particular determination.

20        And, you know, I also think that an appropriate part

21  of a preliminary injunction which allows the plaintiff to

22  continue to do these eight procedures, you know, might be also

23  a reference to either a special master or the magistrate for

24  status on the plaintiff's ability to obtain the alternative

25  facilities.  I think -- you know, I've always thought it was

1    appropriate for the court to order mediation in this case

2    because we had requested that early on, and I just can't

3    believe that an orderly transition that protects the

4    plaintiffs, you know, can't be worked out.  And I'm sure there

5    are other issues that have come up along the way.  Some of

6    those have come up.  Mr. Alston and I have, you know, exchanged

7    e-mails responding to, you know, these issues.

8           So, on the other hand -- so if you grant the

9    injunction -- if you grant the injunction, you have a situation

10   where no patient will be injured and no party to this

11   litigation will be injured.  If you deny the injunction,

12   however, you will have a situation in which you may create a

13   significant damages claim for the plaintiff because they're

14   going to lose a part of their practice, and there's -- and most

15   importantly, and more importantly than anything else, is that

16   the patients who are in need of their cancer treatments are

17   going to be deprived of receiving their treatments that they

18   require with experienced physicians of their choice, which they

19   obtained through the referrals of their oncologist or urologist

20   or whatever.

21          THE COURT:  Right.  But in terms of economic loss,

22   though, for purposes of irreparable harm that's something that

23   doesn't carry that burden.  But, certainly, I understand your

24   argument with regard to, you know, the patients who are

25   currently undergoing cancer treatment and have an ongoing

 1    physician-patient relationship.  That's that first tier I

 2    talked about.

 3            MR. DAVIS:  Right.

 4            THE COURT:  And I can see your argument with regard

 5    to the second tier, who may have already developed a

 6    physician-patient relationship but have not yet started their

 7    treatment at Queen's.  I can see your argument.

 8            I guess it's that third tier, except for those who

 9    you argue, which Mr. Alston doesn't agree with, that -- who are

10    patients that may not have met or established a relationship

11    with plaintiffs but for whom you're contending their conditions

12    can only be treated by plaintiffs.  There are no other

13    experienced and qualified physicians in Hawai'i who could do

14    that, which is disputed by Queen's.

15            MR. DAVIS:  Right.

16            THE COURT:  The other question I have for you -- I'm

17    sorry.  Is that all right if I ask you the question now?

18            MR. DAVIS:  Sure.

19            THE COURT:  I did note when you said, you know, if

20    you grant the preliminary injunction, then, basically, the

21    status quo is maintained and the patients could continue

22    receiving care.  I'm concerned that that may not necessarily be

23    the situation.  I did look carefully at Dr. Lederer's

24    declaration.  This is second declaration, I think, it's at page

25    15, paragraph 26, which -- in which he states that Queen's

```
 1    Medical Center currently is actively interfering with

 2    continuity of care and the physician-patient relationship.   On

 3    February 6, 2012, I requested to see my own patient's records

 4    to see who was scheduled for follow-ups in March 2012 and was

 5    informed by the Queen's Medical Center staff that I could not

 6    see the files of anyone beyond February 2012 and so forth, and

 7    he talks about the need to keep track of patients and the

 8    importance of follow-up care.

 9          So already I have the temporary restraining order

10    which is in place, which indicates, I thought, that they would

11    have continued access to medical records, files, et cetera,

12    necessary in their treatment and care of the patients until I

13    make a decision on the motion for preliminary injunction.   Can

14    you speak to that.

15          MR. DAVIS:   Yeah, there have been -- there have been

16    blips in the implementation of the TRO.   And I don't think it's

17    anything by virtue of a conscious decision.   I mean we have

18    lawyers, we have administrators, and then we have the people

19    that, you know, have access to it.   And there have been --

20    there has been generally put out words prior to the TRO that

21    everything was going to stop on February 1st, and so it's very,

22    very important that they be able to have access.   And I don't

23    think that Mr. Alston denies that.   I mean we had a -- we had

24    an exchange of e-mails when we heard about another problem,

25    and, you know, it seemed to, you know, get sorted out.
```

 1              THE COURT:  Okay.

 2              MR. DAVIS:  So we are aware that the -- it requires

 3    access to it.

 4              And also part of the requirements, even for patients

 5    that have completed their treatment way in the past, there is a

 6    tickler system so that the physician sends out a reminder

 7    saying, "It's time for your one-year follow-up.  Please come

 8    in."  And, you know, there was concern at one point whether we

 9    would have access to the old records, which I believe

10    regardless of what's happened, you know, they should always

11    have access to so they can contact their patients and be able

12    to monitor the follow-ups.  I think they call it the tickler

13    system or something like that.  And, of course, in the absence

14    of access to those records and how those ticklers come up

15    there's no way for our clients, especially if they are off

16    campus, to continue to monitor, you know, patient follow-up,

17    which is a very, very important thing when it comes to

18    radiation therapy.

19              THE COURT:  All right.  Thank you.

20              MR. DAVIS:  Finally, Your Honor, there is a -- I

21    suppose there's quite a bit of information -- contested

22    information about the ability of the three Queen's oncologists

23    to perform these services.  The affidavits and disclosures of

24    these people were -- in terms of experience wise was

25    specifically dealt with with -- in Dr. Lederer's affidavit.

 1    And for a new -- for a doctor who is a urologist or a surgeon

 2    to know that they want to refer a physician to -- a patient to

 3    the absolutely best, most qualified physician should not be

 4    hampered by this interference when the alternative is to --

 5    when the alternative is to have to go to a physician who's had

 6    virtually no experience in doing the service.  And that is the

 7    contention by Dr. Lederer that -- because he was head of

 8    oncology there.  Two of the three people were his former

 9    employees.  He knows everything, you know, about them.  And

10    they haven't even asserted that they have experience or done

11    this and so on.

12           So, certainly, as part of the review of the balance

13    of equities and the harm to the public -- and this does entail

14    a process of you balancing the harms versus the benefits --

15    then I certainly think for those poor patients that are

16    diagnosed next week, that they should somehow have their access

17    either to treatment or to the physician of their choice limited

18    in light of the fact that there is no other alternative, in

19    light of the closing of the other hospitals, which creates a

20    completely different circumstance that these patients are

21    facing, and they should not be, you know, relegated to the

22    position that they can't choose the most experienced and best

23    quality physician for their choice.  Other circumstances, if

24    it's external beam radiation treatment which, you know,

25    everybody does, different story whatsoever.  It's not part of

 1   our list.  It's only with regard to these particular subjects.

 2          THE COURT:  But isn't Queen's argument is, if you

 3   look at their website, the Cancer Center of Hawai'i, they can

 4   do all of those things in a freestanding facility, and so they

 5   don't have to make a choice between a physician of their choice

 6   or receiving treatment at Queen's.  Although, it's interesting,

 7   a lot of the affidavit said you don't want to transfer patients

 8   to these freestanding centers because the quality of care and

 9   the so forth and so on jeopardizes the treatment and care of

10   patients, which is one of our reasons for going into the closed

11   facility.  But at any rate the first part of the argument,

12   though, I mean isn't that why they want me to take judicial

13   notice of the website?

14          MR. DAVIS:  They want you to take judicial notice of

15   the website because our client -- because this particular

16   Cancer Center is advertising their range of skills, which was

17   at the time it was made available at HMC and Queen's.  And

18   that's why I pointed out the fact this happened, you know, in

19   mid-2011 where we posted this.  And it's got nothing whatsoever

20   to do with whether or not -- and they, of course, they were

21   talking about the available services that would be available in

22   conjunction with the Hawai'i Medical Services.

23          And in answer to your question with regard to, you

24   know, what are the -- it's a complicated question, which I

25   don't entirely have my arms around with regard to every one of

 1   these procedures.  There are some of these procedures -- and we

 2   tried to outline them as best we can with regard to the, you

 3   know, what the various procedures are.  And I'm not sure that

 4   it's productive or in anybody's benefit for the court to try to

 5   second-guess that, well, this procedure which can be done

 6   without, you know, motion on-time imaging is a reasonable

 7   substitute for something that requires an onsite -- you know,

 8   one of the issues is it requires a mobile ultrasound exactly

 9   where, you know, to point the beam at the moment you pull the

10   trigger as opposed to just, you know, in a lung.  That's true

11   for brain, spine, and lung radiations.

12          And to me it would not be the kind of fruitful

13   enterprise for the court to try to make those decisions on the

14   basis of this.  It is really a question of, you know, what is

15   the optimal treatment, the best potential for a cure, that

16   patients ought to be offered.  And to the extent that -- and if

17   there were really serious factual issues associated with that,

18   you know, rather than the submission of, you know, affidavits,

19   and, you know, I suggested that we not have cross-examination

20   because the record is so intensely, you know, in conflict and

21   all of these things will get sorted out.  But from my

22   perspective we would urge the court that, when it's coming to,

23   you know, balancing the equities --

24          THE COURT:  Well, first of all, rest assured that the

25   court does not intend to substitute its medical decision for

 1   any of the parties because it has no medical knowledge or

 2   ability to make a medical decision; so I certainly wouldn't

 3   choose in terms of evaluating the appropriate medical course of

 4   treatment for any potential patient.

 5         But I think it goes to what you're arguing is that,

 6   if there is a conflict between plaintiff's presentation as to

 7   optimal patient care and risk of harm to patients and Queen's

 8   position with regard to that adequate and even optimal patient

 9   care can continue with one of the radiation oncologists at

10   Queen's Medical Center, that at best it's a true draw and that

11   there is this significant risk of harm that can be argued with

12   regard to patients.

13         MR. DAVIS:  Exactly.  I mean what we ask is that

14   when you balance the scales in terms of potential risk of harm

15   and who would be harmed by an injunction --

16         THE COURT:  Well, and that the harm is so great; that

17   even if it's not shown by a lot of evidence, that the harm is

18   so great that that weighs on the side of the risk of

19   irreparable harm.

20         MR. DAVIS:  Exactly.  It tips the scale, you know, in

21   favor of the patients, which is allowing them to select and so

22   on -- select their treatment and being able to have their

23   treatment performed, which is the best and optimal treatment as

24   decided by their treating physicians.

25         And so when you look at the overall issues, the

 1   extraordinary harm that might arise out of your failure to

 2   issue the injunction, the fact that we are only asking for this

 3   to be done temporarily until we can scramble around and do

 4   that -- and we are prepared to provide the court or the

 5   magistrate or whoever you may select, you know, status reports

 6   about how this is going to happen.  We are beyond, you know,

 7   our clients are going to get off the Queen's campus as quickly

 8   as they can without harming their patients, and that is

 9   something that Queen's wanted and I think that we ought to be

10   standing here hand in hand, saying, Let's do what's best for

11   the patients and -- which is the reason that I thought all of

12   this -- which I think most of which would have been resolved

13   had there been a hearing and we would have had some kind of

14   consultative process going on.

15          But at this point in time, given the, you know, the

16   way the record is, I think that the balance of equities so

17   intensely moves in favor of patients that are in need of cancer

18   treatment that it just absolutely compels the issuance of a

19   preliminary injunction, and I just want to save a few minutes

20   for rebuttal.

21          THE COURT:  Thank you.  You may.

22          Mr. Alston.

23          MR. ALSTON:  Thank you, Your Honor.

24          At the outset I want to be clear --

25          THE COURT:  Yes.

 1          MR. ALSTON:  -- that QMC is doing what it believes is

 2    in the best interest of its patients.  After all the paper that

 3    has flown back and forth you can be assured that this issue has

 4    been closely reviewed and evaluated by management and that it

 5    is convinced that it made the right decision not because of

 6    questions about the professional competence or skill of the PRO

 7    doctors, who were offered jobs because they are good doctors,

 8    but rather because QMC has an overriding interest in maximizing

 9    the quality of patient care and the delivery of continuous

10    coordinated care to patients, instead of having them move from

11    facility to facility for any reason other than a desire to

12    improve the quality of that care.

13          The plaintiffs, of course, can obtain a preliminary

14    injunction only if they prove four things:  the likelihood of

15    success, the likelihood of irreparable injury to them, the

16    public interest supports supporting a preliminary injunction,

17    and that the balance of harms between the parties is such that

18    it favors injunctive relief.

19          And I'll turn and discuss each of those in turn.

20    Before I get there I want to discuss two issues that I think

21    are of importance to the court.  One is Mr. Davis' allegation

22    that QMC has conceded that it acted based on a desire to punish

23    or sanction these doctors for professional misconduct or

24    something that would trigger the right to a hearing because

25    their privileges are being suspended or revoked.  That is

1    simply not the case.  We have provided information about the

2    backdrop of this to show the state of management's thinking, or

3    the state of mind, if you will, of the members of management

4    and the leadership of QMC, with respect to how they could best

5    manage a patient's care.  It is not because of particularized

6    allegations of wrongdoing.  It's not because they are being

7    sanctioned.  If that were all true, then there would have been

8    proceedings to suspend or revoke their privileges.  But because

9    we offered jobs to them, obviously we didn't think that they

10   were incapable of providing proper care.

11          THE COURT:  So this is the question I have -- and,

12   quite frankly, on likelihood of success I'm inclined to find

13   there is reasonable likelihood of success because of affidavits

14   and declarations submitted by Queen's.  And I specifically

15   would address Darlena Chadwick's declaration attached to the

16   memorandum in opposition at paragraphs 12, 13, 14, 16, and 17.

17   And in it my notes reflect that she set forth that, starting at

18   paragraph 12, In recent years numerous patients complained to

19   Queen's Medical Center that PRO radiation oncologists were

20   transferring patients initially seen at Queen's Medical Center

21   to non-Queen's Medical Center facilities for no apparent

22   medical reason.

23          Paragraph 13.  Referring physicians also contacted

24   Queen's to complain that they were not notified when PRO

25   radiation oncologists transferred patients to PRO facilities,

1    jeopardizing patients' continuity of care.

2         Paragraph 14.  In response to patient and referring

3    physician complaints Queen's Medical Center convened a task

4    force, and it describes a task force that came up with the

5    recommendation that the board of trustees approved.

6         Paragraph 16.  The transfers jeopardized the quality

7    of patient care since Queen's could not assure the quality and

8    safety measures of treatment once patients were transferred to

9    non-Queen's Medical Center facilities.

10        Paragraph 17.  Transfers caused confusion and

11   discord.

12        And, likewise -- let's see.  Oh, Peter

13   Bryant-Greenwood, M.D., affidavit that was submitted by Queen's

14   for the direct examination affidavit.  He, apparently, was an

15   pathologist who served on the task force.  At paragraphs 5, 6,

16   and 7 he indicates at paragraph 6 a criticism that the PRO

17   physicians have refused to spend time necessary to participate

18   in the -- the acronym is PAAROT program which requires input of

19   data concerning patients and treatment to measure and

20   understand outcomes, which is important to care and treatment

21   improvement of cancer patients.

22        Paragraph 7.  Some PRO physicians rarely attend the

23   daily multidisciplinary team meetings held at Queen's to create

24   the best treatment plan for a particular patient.

25        So what it raises to the court and, you know,

```
 1   Mr. Davis has raised a hearsay objection, and I don't think

 2   it's a sustainable hearsay objection because it wouldn't -- I

 3   wouldn't accept it for the truth of what it's being offered for

 4   but to show the state of mind of Queen's in enacting this task

 5   force based in part -- not in whole, in part on concerns about

 6   for lack of a better word competency as it relates to patient

 7   care.  So doesn't that at least go to the -- at the very least

 8   it goes to the due process claim because, if it is a competency

 9   issue, then I guess the argument is they're entitled to the due

10   process procedure set forth in the bylaws and regulations, even

11   though it's a part of why the task force was convened and it's

12   a part of, therefore, the task force's information in coming up

13   with this recommendation to go to the closed facility.

14           MR. ALSTON:  Two things, Your Honor.

15           THE COURT:  Okay.

16           MR. ALSTON:  One is what the management and the board

17   of trustees decided to do was to implement a broad policy

18   decision --

19           THE COURT:  Agree.

20           MR. ALSTON:  -- which applied across the board

21   without regard to the conduct or the actions of any particular

22   doctor so that, if you were -- if you were talking about the

23   kind of professionalism related concerns, then the right to a

24   hearing has to be triggered by concerns about the

25   professionalism of a particular individual.  I mean PRO as an
```

1    entity can't require a hearing.  PRO has no privileges.

2         THE COURT:  No, but the physicians do.

3         MR. ALSTON:  The physicians do, but it's not -- there

4    is no particular -- there is no particularized allegation, in

5    fact very little evidence at all, in the record about five of

6    the physicians here.  For whatever reason we have a wealth of

7    evidence from Dr. Lederer, we have a declaration from Dr.

8    Bieniek about one patient, and nothing from anybody else.

9         THE COURT:  Well, I mean --

10        MR. ALSTON:  And so to the extent that you're saying,

11   you know, don't all the doctors have the right to some

12   protection because of Silver and because of their due process

13   rights, the answer is no because what the board decided to do

14   was not something that was directed at a particular doctor who

15   might have been engaged in a particular practice but instead to

16   say at a policy level, you know, we can better provide care to

17   our patients if we decide this on an institution-wide basis and

18   don't have -- or have a closed model.

19        And so, you know, you might find, you know, Dr.

20   Demare, for example, you know, there's no evidence that he, in

21   particular, was accused of any of these things or did any of

22   these things; so he's not either harmed by or affected in any

23   way by the Silver decision because the actions don't have to be

24   based --

25        THE COURT:  Is that because he hasn't been

1    specifically named, saying, Well, we had a concern about Dr. X

2    because he was changing the location of the care and

3    transferred too many patients.  That's the only thing that

4    would trigger --

5              MR. ALSTON:  No.

6              THE COURT:  What my concern is is that -- I agree

7    with you that the board took this decision, but couldn't an

8    argument be made that the board sanitized from what went into

9    it, and it's really you have to look at what were the reasons

10   for convening this task force?

11             MR. ALSTON:  Uh-huh.

12             THE COURT:  And what did the task force take into

13   account?

14             And here we have the testimony of a doctor that was

15   on the task force who said -- who has testified under oath

16   that -- now, it's true he doesn't name which PRO physicians,

17   but perhaps an argument could be made they're all being tarred

18   by the same brush, all of the plaintiffs are being tarred by

19   the same brush because they are PRO physicians, that they

20   refuse to participate in this program, that Queen's is taking

21   the position because that's also in the chief of their

22   radiation program, who said, you know, "I came up with this

23   program.  It's important.  It's nationally recognized and so

24   forth."

25             MR. ALSTON:  Uh-huh.

```
 1              THE COURT:  And they're refusing -- now, I don't know
 2    who they're saying, but aren't the plaintiffs all being tarred
 3    by the same thing?  And then some PRO physicians rarely attend
 4    the daily multidisciplinary team meetings.  These are key and
 5    integral to the efficiency and the quality of patient care and
 6    outcome of cancer treatment.  So it does go to competency.
 7              Now, the board in making its decision is now saying,
 8    well, we took the recommendation of the task force, okay, but
 9    we have this sanitation -- we have this wall between whatever
10    the reasons or the -- whatever might be the basis for the task
11    force to come up with this final recommendation, and we're
12    looking at it, saying, "Oh, closed facility makes better sense.
13    They do it on the mainland.  It's better patient care outcome.
14    It has all of these things, including -- which I found
15    fascinating.  Thank you for that article about free riding, you
16    know, the whole thing about, as long as physicians refer
17    patients to hospitals and hospitals extend privileges, it's
18    sort of a symbiotic relationship where each get financial
19    benefit from that.  But when you have these freestanding
20    facilities that are owned in part by physicians, they start
21    siphoning off, and then you get this phenomenon called free
22    riding to some aspect.
23              Understand, if it was purely an economic issue,
24    setting aside the UMOC claim, you know, I could see where
25    you're coming from on the due process.  And, quite frankly, on
```

1    the TRO that's what I was kind of indicating, that, you know,

2    I'm questioning the likelihood of success on the due process

3    claim because up to that point I hadn't seen anything bringing

4    in a potential issue about the competency of plaintiffs.  But

5    now with Miss Chadwick's affidavit and Dr. Bryant-Greenwood, I

6    think it's established at least for purposes of preliminary

7    injunction there is a reasonable likelihood of success because

8    it was motivated in part by a concern over the physicians'

9    competency, not competency to be able to do -- well, it is

10   competency to be able to do their job well because they're not

11   attending these daily sessions.

12          MR. ALSTON:  I understand that, Your Honor, but then

13   the question comes what purpose to a hearing?  What would be

14   decided that would affect the business decision?  These

15   doctors, any one of them, might come forward and say, "I

16   participate in PAAROT.  I go to the meetings.  I don't refer my

17   patients."  It doesn't change the business decision.  Some of

18   them might be found to have done all those things.  It doesn't

19   affect the business decision.

20          And that, fundamentally, is the problem.  We have a

21   disconnect between the desire for a hearing to assess their own

22   particular actions or omissions, if you will, and the

23   overriding business decision, which is not connected to what

24   any particular doctor might have done or not done because the

25   management is in a position to make a decision to say, you

 1    know, whether these things happened or not doesn't matter.

 2    We're still inclined to go forward.

 3            THE COURT:  See, that's -- the problem is that, one,

 4    I don't know that you make that leap because once it's based in

 5    part on the competency, arguably -- or, you know, I think

 6    Mr. Davis is arguing then they're entitled to due process

 7    hearing, both sides would be able to bring that out.  I would

 8    say in a perfect world the task force would take that

 9    information and based on all of that information then make its

10    recommendation -- and it may still make the same recommendation

11    to the board.

12            But isn't that the same argument that makes in

13    employment cases where they say, Well, the board made a race

14    neutral determination.  It just happened to be that there's a

15    disparate treatment; so we actually have no women partners and

16    any African American partners, but the board made a race and

17    gender neutral decision.  But the ones making the

18    recommendation to the board and implementing the policy may

19    have, you know, race-based animus or gender animus; right?  And

20    that wouldn't then necessarily, you know -- I mean I don't mean

21    to bring employment law into this.

22            MR. ALSTON:  Right.  Oh, I understand.  And I would

23    suggest the appropriate thing to do is to look at it a bit

24    differently, and that is following on the Cookeville case.

25    This is akin to a legislative decision.  This is akin to people

1    who are beneficiaries of a particular program complaining that

2    individually they didn't do anything wrong, but the

3    legislature, if you will, deciding as a policy matter that it

4    doesn't choose to operate in a way that benefits them.  And so

5    they don't get individualized due process before the

6    legislature.  The legislature changes the rules.  They're stuck

7    without a hearing.

8            And so -- and this is the same.  I mean here, in

9    effect, the board of trustees operates as the legislature.

10   It's gotten -- you know, whether you characterize it as good

11   input, bad input, or incomplete input, they have made a policy

12   decision which no particular one doctor has a right to question

13   or dispute, and so, you know, they can't -- they have no right

14   to a hearing to persuade the trustees that in their situation

15   they acted properly.

16           THE COURT:  Unless in part it was made on a decision

17   as to their competency.

18           MR. ALSTON:  Well, I would suggest that, even if it

19   was motivated in part by some views about their professionalism

20   in the handling and transferring of patients, that doesn't

21   entitle them to a due process hearing to challenge what is

22   ultimately the business decision made about how best to

23   preserve and serve the quality of care.

24           So I think, Your Honor, that there's simply a

25   disconnect.  This is not a case where any one doctor has or any

1  group of doctors particularly has a right to a hearing to clear

2  their name, if, ultimately, the decision is made by others

3  based on a business policy or business model that is certainly

4  rational, it's common, accepted throughout the country as the

5  best way to manage patient care.  The rights under Silver don't

6  extend to broadly giving any doctor or group of doctors the

7  authority to control or even have input into how the business

8  model of the hospital is run, and yet that's what they want.

9  They want you to say, gee, that the board should have

10  considered their individual circumstances before making the

11  business decision.  Well, Silver doesn't say that.

12          THE COURT:  No, I don't -- I agree Silver doesn't say

13  that.

14          MR. ALSTON:  And so that's the disconnect.  I mean

15  that's, you know, we would have a hearing to what end?  So

16  these doctors could say -- could try to argue that they didn't

17  do anything wrong?  Right or wrong, good or bad, it doesn't

18  matter because there's a business decision ultimately that's

19  being made.

20          Now, Mr. Davis referred to a, quote, consultative

21  process.  That's not what Silver requires.

22          THE COURT:  Well, that's not what Silver stands for

23  either, but I think what I took away is he's saying in the due

24  process two sides would be presented.

25          MR. ALSTON:  Right.  But, ultimately, the business

1    decision remains solely in the hands of the board of trustees

2    to be made based on whatever information the board chooses to

3    consider or not consider, and having a hearing serves no

4    purpose.  And it's that disconnect that, I think, is too big

5    for them to leap with respect to trying to prove their due

6    process claims.

7           THE COURT:  Except that it's the intermediate step;

8    it's the task force.  That's what I am concerned about is that

9    the board made its decision based on the task force

10   recommendation.

11          And, you know, not a lot of time was spent on it, but

12   my gist -- and I could be completely wrong in reviewing it, but

13   it appears that they, basically, bought wholesale what the task

14   force recommended.  Then the question is what did the task

15   force take into account in making that recommendation that was

16   adopted by the board?  And it seems clear at least at this

17   point that in part the task force was motivated by -- via

18   Miss Chadwick and Dr. Bryant-Greenwood's --

19          MR. ALSTON:  Concerns.

20          THE COURT:  -- testimony -- a concern over patient

21   care and competency issues at least some of the PRO physicians.

22   They aren't named individually.

23          MR. ALSTON:  Right.

24          THE COURT:  I think at this point we can generally

25   assume they involve some or all of the plaintiffs.  And that's

1    where due process -- I understand what you're saying, and I

2    agree with you.   I don't think Silver -- I know Silver doesn't

3    stand for the proposition that any of these physicians who may

4    be denied privileges because of a business decision -- for

5    instance, if Queen's said, you know, "We only have enough for

6    10 physicians with these qualifications.   We have 20 now that

7    have privileges.   We're going to cut out 10, not because of

8    competency but because it doesn't make economic sense with our

9    business model, and it won't endanger patient care," they can

10   do that.   But if they're saying, "And we're going to pick these

11   10 because we have the most complaints, they failed to, you

12   know, get -- renew their medical license or whatever,

13   competency issues," well, then those things would trigger due

14   process.

15          But, anyway, go ahead.

16          MR. ALSTON:   Two points, Your Honor.

17          THE COURT:   Okay.

18          MR. ALSTON:   First, I think it's important to

19   remember what the bylaws say about this.   The bylaws prescribe

20   specifically when a hearing is required and specifically say

21   that a hearing is not required with respect to a decision that

22   involves an exclusive contract.

23          What the board has moved to with its closed system

24   is, basically, exclusive contracts with its own staff doctors

25   so that, if the bylaws say you can't get a hearing in that

 1   circumstance, then the doctors have, of course, signed off on

 2   the bylaws, agree to be bound by them, and again further agreed

 3   to waive all claims, which is what 12.3-1 of the bylaws

 4   says --

 5           THE COURT:  Right.

 6           MR. ALSTON:  -- then that would foreclose their claim

 7   to a hearing.

 8           The second is that even if the task force were

 9   motivated by these concerns, it is the board alone which has

10   the exclusive authority to operate the hospital, to decide

11   whether to have an open model or a closed model.  And one may

12   criticize the board for not having good input, which, I think,

13   is Mr. Davis's argument and which you seem to be concerned

14   about as well, but that doesn't mean that the remedy is some

15   due process right to a hearing which might or might not lead to

16   better or different input for the board.  The board's free to

17   act with as much or as little input as it deems appropriate,

18   and so having a hearing isn't going to -- or a series of

19   hearings because each of these doctors has to stand on his or

20   her own footing.

21           THE COURT:  Uh-huh.

22           MR. ALSTON:  And I submit that PRO cannot act as a

23   proxy for each of the individual doctors because PRO itself, of

24   course, has no due process rights.  And Dr. Lederer can't act

25   as a proxy for his colleagues because his rights stand alone,

1    and the others, if they choose to file a claim, they should be

2    here in their own names with their own evidence, but they've

3    chosen not to do that.

4              And, you know, and related to that -- let me go back

5    to one other point.  Miss Black has given me a copy of the

6    resolution, which is exhibit F to our filing on February 9th.

7    It's a resolution of the board of trustees.

8              Paragraph 2 of the resolution says that management

9    shall offer employment to all of the radiation oncologists on

10   the staff.

11             Again that goes back to the point that, if, in fact,

12   there was any concern about competence or professionalism that

13   motivated the board, you would not see that:  you would not see

14   the offer of employment to each of them.  So, you know, I

15   submit that there's just a disconnect between the concerns

16   expressed by Miss Chadwick and the doctor in the declarations

17   and the decision of the board, and you can't -- you simply

18   can't say, well, they should have had a hearing because the

19   hearing officer or the hearing panel might have made a decision

20   which might have influenced the task force which might have

21   influenced the recommendation which might have influenced the

22   board.  That's too many jumps to make.

23             THE COURT:  Well, it's not "might have."  It did

24   influence the task force, and it did result in -- it says at

25   the bylaws --

1          MR. ALSTON:  I'm sorry.  What I meant was that the

2    result of a hearing might somehow affect --

3          THE COURT:  Oh, yeah, I mean I'm not sure it would

4    affect it, but, you know, the question is that were they

5    entitled to due process rights.  And looking at the bylaws,

6    "10.6-1.  Grounds for a hearing.  An individual is entitled to

7    request a hearing whenever QMC makes one of the following

8    recommendations."  And subsection (e) is Revocation of Clinical

9    Privileges.

10         MR. ALSTON:  Right.  Obviously, their privileges

11   aren't being revoked because they've been offered employment.

12   If they choose to take the employment, they can practice --

13   they can continue to practice fully.  But they chose not to

14   accept those offers, and, therefore, their privileges remain

15   intact; they're simply unable to exercise them because of the

16   closed model.  In the same way that doctors at Queen's who are

17   not employed by PRO can't practice at the Cancer Center of

18   Hawai'i because that's a closed model.  In the same way that

19   doctors who weren't affiliated with PRO couldn't provide

20   oncology service -- radiation oncology services at Queen's

21   during the near decade when there was an exclusive contract

22   with the PRO doctors.

23         It's true that somebody's not going to be able to

24   exercise their privileges, but that doesn't mean that they've

25   been revoked.

1          THE COURT:  Well, except that the people -- when PRO

2     had a closed facility, it's wasn't like people had privileges

3     and then they revoked them.  They were always known as a closed

4     facility.  And here you're going from an open facility to a

5     closed facility, and the question becomes why?  In part, was

6     this motivated in terms of the board -- or the recommendation

7     to the board?

8          But I understand what your argument is, yeah; so I

9     appreciate that.

10          MR. ALSTON:  All right.  Let me move on to some other

11     things.

12          THE COURT:  Okay.

13          MR. ALSTON:  There is no doubt as to both -- as

14     Mr. Davis said, that the record is in conflict.  We've got

15     allegations that are countered by other allegations.  And we've

16     provided to you this chart because it sets out on one side down

17     the left the allegations made by Dr. Lederer, by and large, and

18     only Dr. Lederer, and on the other side you've got the response

19     from various people at Queen's.  And one of the questions for

20     the court, obviously, is what do you do with these conflicting

21     allegations?  You've not been in a position to assess the

22     credibility of anyone.  But I would suggest to you that there

23     are objective considerations or factors in the record which

24     should lead you to give greater weight to the declarations of

25     the representatives of QMC.

 1           First, of course, you've got Dr. Lederer, who is

 2    virtually the sole source of information on their side, and he,

 3    obviously, has a significant financial motive to say what he

 4    said.  And yet he comes before the court representing that he

 5    is the manager of the two plaintiff entities, when, in fact, he

 6    is not, as we've shown from the records from the DCCA.  Dr.

 7    Brown is the manager of Pacific Radiation Oncology, and Pacific

 8    Radiation Oncology is the manager of PRO Associates.  So that

 9    you should take into account that he's misrepresented his

10    status before the court.

11           On the other hand, from the Queen's side you've got

12    an array of people, most of whom have no apparent economic

13    interest in the outcome of this dispute, who are, from all

14    appearances and, I think, in fact, doing their jobs as best

15    they can in looking out for the well-being of patients.

16           THE COURT:  Well, they have an economic -- I mean

17    they work for Queen's.

18           MR. ALSTON:  Yes, I understand.  But it's not as if

19    their income is going to rise or fall directly based upon what

20    they're allowed to do.  I mean it's true they have some

21    employee-employer relationship, and that undoubtedly creates

22    some potential for bias.  But on the other side we've got

23    somebody whose income will rise with every single procedure

24    he's allowed to do.  And I'm suggesting that with respect to

25    the testimony from those people in their declarations, I mean

1    to reject them you really, in effect, have to say that they are

2    prepared to abandon their moral, legal, ethical duties of all

3    kinds to compromise the well-being of patients, which there's

4    no basis for you to say that.

5             THE COURT:  No, I don't think so, but I mean I

6    understand their only employment is with Queen's --

7             MR. ALSTON:  I understand.

8             THE COURT:  -- and how many people are going to say,

9    you know, "My boss made the wrong decision"?

10            But that aside, yeah, I mean I guess a lot of the

11   problems that I have with the comparison, which I agree with

12   you and I touched upon with, you know, Mr. Davis, is a lot of

13   this goes out to medical judgment, of which this court is

14   painfully aware it has none.  And so, you know, I don't know.

15   I understand it's completely contrary.  "It can only be done at

16   Queen's."  The others are saying, "No, it can't, and, you know,

17   there's other places where this can be done."  I have no idea,

18   nor do I think I need to make a medical judgment with regard to

19   that.

20            MR. ALSTON:  Right.  I understand that, Your Honor.

21   And we wouldn't ask you to do that.

22            THE COURT:  Thank you.

23            MR. ALSTON:  We wouldn't put you in that position.

24            The second point that bears on how you should weigh

25   the evidence is in the website of Cancer Center of Hawai'i,

1    which we supplied to you.  And Mr. Davis was wrong in part and

2    right in part.  We do not offer that to show what services they

3    offered in 2011 but, in fact, to show that on the first page,

4    which is exhibit A, at the top it says in the box in the upper

5    right, "The closure of Hawai'i Medical Center does not affect

6    our daily operations."  And he admits that was something that

7    was put up recently; so you have that to weigh against the

8    claims of great harm, which Dr. Lederer is making.

9         Third, Your Honor, I would say that in the TRO order

10   you correctly observed we made a strong showing about the

11   reasons for the shift.  And I understand that you've been

12   studying that issue again.  I would submit that in the

13   supplemental materials we have laid out patient care reasons

14   for shifting to the closed model, and in response there has

15   been nothing that would diminish the force of that evidence.

16        Next, Your Honor, I would suggest that, if you

17   compare Dr. Lederer's claims about his competence and his --

18   the fact that he's indispensable, apparently, with respect to a

19   variety of treatments, I would submit that he is overselling

20   both the need for his services and the lack of skill on the

21   part of the QMC staff.  He said in his declarations -- in the

22   second declaration in paragraph 11 and 12 he said that there is

23   nobody at Queen's who is able to do the seed implantation and

24   implied there was nobody with any experience.  Well, of course,

25   he proctored Dr. Tsuji, and Dr. Tsuji has completed a

1  fellowship in which he did at least 30, he says, or about 30 of

2  these procedures.  So to suggest that there is nobody there who

3  is capable of doing it is simply overselling.

4       And the same with respect to him being the only one

5  who could do the high dose radiotherapy.  Again doctors at

6  Queen's described their competence to do that.  And, you know,

7  the fact is Dr. Lederer may get sick, he may go on vacation, he

8  may get hit by a bus, lots of things might happen, and it

9  defies the imagination to believe, as he would have you

10  believe, that there's no one else who could provide these

11  services competently in Hawai'i.

12       THE COURT:  Well, I mean I think it just points out

13  to a quality in terms of -- I mean there's -- you know, do you

14  hire Paul Alston to try your case with your experience and

15  reputation, or do you hire, you know, someone who worked for

16  Paul Alston for five years and now has opened their own shop,

17  you know?

18       MR. ALSTON:  I understand.

19       THE COURT:  There's a difference.  But you're right,

20  both can -- Paul Alston goes on vacation once every 20 years,

21  and others have to step into the void.

22       MR. ALSTON:  Thank you.  All right.  I appreciate the

23  compliment.

24       THE COURT:  Yeah, but I understand what your argument

25  is, yes.  It's not that --

 1          MR. ALSTON:  And, lastly, Your Honor, on this issue

 2    of credibility judgments, I would suggest that the absence of

 3    declarations of any substance from any of the other doctors

 4    about the importance of their access to Queen's and about the

 5    importance of them providing treatments is very telling.  I

 6    mean Dr. Lederer makes, you know, a very strong case for him

 7    being the only one anyone rational would look to to do these

 8    kinds of procedures.  We don't have that with respect to

 9    anybody else.

10          And so that if you're going to think about where the

11    balance of harms lies or where the public interest lies, you

12    have to weigh the complete absence of any evidence about any of

13    those other doctors being particularly good, much less very

14    skilled at what they're doing in weighing your decision.  I

15    would suggest that, you know, that's something that should

16    affect -- if you do decide against my argument to issue an

17    injunction, I would suggest that you need to take into account

18    who has access to Queen's and for what purposes.  And it's not

19    enough for everybody to draft along behind Dr. Lederer because

20    he is so good.  It's because they happen to be in the same

21    practice group.

22          THE COURT:  And so this is, you know, what I was

23    trying to cover with Mr. Davis in terms of irreparable harm.

24    Rightly or wrongly, I'm kind of looking at it two, three,

25    possibly four tiers of potential patient harm.  And the first

1  would be, of course, those who already are within the radiation

2  treatment, have established physician-patient relationships

3  with Dr. Lederer and physicians that are associated with the

4  plaintiffs.

5        MR. ALSTON:  Uh-huh.

6        THE COURT:  Now -- and then the other tiers that I

7  talked about.

8        I did notice in Mr. Ushijima's declaration -- he's

9  the president of Queen's Medical Center.

10        MR. ALSTON:  Yes, Your Honor.

11        THE COURT:  Paragraph 16, he represented that

12  radiation oncologists not employed by Queen's Medical Center as

13  of February 1, 2012, but who have patients who began their

14  radiation therapy treatments at Queen's Medical Center prior to

15  February 1, 2012, will be permitted to continue treating those

16  patients at Queen's Medical Center until radiation therapy

17  treatment and follow-up appointments are completed.

18        MR. ALSTON:  Uh-huh.  That's correct, Your Honor.

19        THE COURT:  So that appears to address all those that

20  I've kind of identified what I'm calling tier one.

21        Okay.  So if that's true, then there wouldn't be any

22  irreparable harm because they're going to, one, be able to

23  continue their physician-patient relationship with plaintiffs;

24  and, two, complete whatever radiation therapy treatment that

25  they've started at Queen's prior to February 1, 2012, with

 1    those doctors as well as any follow-up appointments, which may

 2    be two years, three years down the road.

 3              Is my understanding correct?

 4              MR. ALSTON:  That's correct, Your Honor.  If

 5    necessary.

 6              THE COURT:  So would you agree, then, that really I

 7    can't make a finding of irreparable harm as to that tier one?

 8              MR. ALSTON:  Well, let me have you take a step back

 9    on this issue of irreparable harm because I think that

10    Mr. Davis has done a good job at confusing the picture about

11    how irreparable harm is to be viewed.

12              And the Winter decision spoke very decisively and

13    strongly to what is needed to get a preliminary injunction.

14    And people, I think, think of it commonly as criticizing and

15    rejecting the Ninth Circuit's very loose sliding scale with

16    respect to the likelihood of success on the merits, but it also

17    spoke very strongly to the question of irreparable harm and

18    said that it is necessary to find that there's a likelihood of

19    irreparable harm.  And this is at page 20 of the decision.  555

20    U.S. at 20.  It says an applicant for an injunction must prove

21    he is likely to succeed, that he is likely to suffer

22    irreparable harm.  And so the second hurdle that the plaintiffs

23    have to clear is that they will suffer irreparable harm.

24              The third test or perhaps the fourth, depending how

25    you order them, is that public interest --

```
 1          THE COURT:  Right.

 2          MR. ALSTON:  -- calls for an injunction.  I would

 3  submit that the plaintiffs have to prove that they will suffer

 4  irreparable harm, and then independently the court considers

 5  the well-being of their concerns about patients.  And it's only

 6  if the plaintiffs themselves demonstrate that they suffer more

 7  than economic harm that they could possibly prevail.  And I

 8  submit that here it is something that is purely for them

 9  subject to being remedied just by an award of money.  They've

10  lost patients.  They've lost money.  That's it.  So because

11  Winter requires that the movant demonstrate that he or she

12  suffer irreparable injuries, they can't win on that prong.

13          When you get to the third point about the public

14  interest, then I think taking a count of the interest of

15  patients would be appropriate but so would taking a broader

16  view about the interest of the community at large.  And, in

17  addition to that, very importantly, it would be necessary for

18  the court to consider the interests of the hospital in

19  maintaining its own professional standards.

20          In Lew versus Kona Hospital the Ninth Circuit said --

21  754 F.Supp -- I'm sorry, F.2d -- that any public interest in

22  that case, which was a dispute about credentialing and the

23  revocation or loss of credentials, any public interest flows in

24  favor of the hospital, which must maintain professional

25  standards.
```

1           And so you've got this amorphous interest of

2    patients, you've got the amorphous interests of the community

3    at large, which wants Queen's to maintain its professional

4    standards and provide the best care, and then you've got the

5    interest of the institution itself.  And as appealing as it is

6    to look at some an anecdotal information about a handful of

7    patients, whether they're in group 1 or group 2 or group 3,

8    those interests are dwarfed, I submit, by the interests of the

9    community at large and the institution in maintaining the

10   quality of care and delivering the best service possible.

11          THE COURT:  Well, I think that's -- Lew is completely

12   distinguishable because Lew is talking about maintaining a

13   minimum.  You don't want incompetent people who are not

14   qualified.

15          What we're talking about is Queen's is saying they we

16   want to give the best possible patient care, and, you know,

17   it's like "education."  Everybody's for it, you know; so we all

18   want the best possible, you know, patient care.  But that's a

19   higher standard.  It's not sort of a cut-off to make sure

20   people aren't committing malpractice.

21          MR. ALSTON:  Sure.

22          THE COURT:  But going to the third is what I'm

23   talking about -- and I sort of touched upon it in the TRO

24   order -- is the intangible of the physician-patient

25   relationship.  And that's why I've kind of separated them

1    because, you know, patients are diagnosed today that they

2    haven't -- that a physician may want to refer them to Dr.

3    Lederer, but Dr. Lederer has not yet met with that patient,

4    begun a relationship with that patient, talked about a plan.   I

5    think that's in a very different category than one that maybe

6    in the last year he's been working with, you know, and seeing

7    through a treatment plan and so forth, or completed a treatment

8    plan and now is going with a follow-up.   That's the intangible.

9              I agree with you loss of revenue, economic loss, the

10   law is very clear on that:   that's not irreparable harm.   But

11   it's this intangible in terms of relationship.   So, you know,

12   that's why I've sort of tried to think of these patients in

13   their different conditions.

14             Someone you haven't yet met and haven't had a

15   physician-patient relationship, I mean how is that a loss?   I

16   think that's why they're saying he's the only one that can do

17   all of these things.   It's really a loss to other physicians of

18   their inability to refer them to Dr. Lederer, if they want them

19   treated at Queen's.   But again that's not the plaintiffs' --

20             MR. ALSTON:   Right.

21             THE COURT:   -- harm.

22             MR. ALSTON:   Right.

23             THE COURT:   So I think the patients that he has a

24   physician-patient relationship with either who are in treatment

25   or about to begin treatment, that's where I think that third

1    prong addresses.

2         But what I'm asking you is, I guess, on that first

3    tier, if Queen's is doing and continues to represent they're

4    going to do, as Mr. Ushijima has indicated in his declaration,

5    those patients to which they have a physician-patient

6    relationship and will allow that relationship to continue

7    because they've started treatment prior to February 1, 2012,

8    then they don't have irreparable harm because that

9    relationship's not going to be cut off.

10        MR. ALSTON:  That's correct.  That would be correct.

11   We're not retreating or modifying in any way what Mr. Ushijima

12   has said in his declaration.

13        THE COURT:  All right.  Thank you.  I appreciate that

14   clarification.

15        MR. ALSTON:  So I'm not sure it would be productive

16   to talk more about the due process argument, I think, unless

17   you have some particular questions.

18        THE COURT:  No, I don't have a change of heart or any

19   other questions for you.

20        MR. ALSTON:  Right.  I think the one thing that's

21   important is that their view of the due process argument is

22   informed a lot by the Satilla Health Services case from

23   Georgia.  That is an outlier.  We've cited many more cases that

24   are contrary to Satilla.  And if you shepardize Satilla, you

25   find that it has been cited not at all for that same

1        proposition, except by the same court on one occasion.

2              So Satilla hasn't -- although, you would think that

3        it would be, if it were right, would be attractive to courts

4        and doctors across the country.  It hasn't gotten any traction,

5        and I would submit that that's not the way to look at this.  I

6        mean because Satilla is exactly the same sort of circumstances

7        we have here.  We have a hospital that moved to a closed model.

8        The doctors said, "I'm entitled to due process.  I want to talk

9        to you about whether this is a good thing to do."  And the

10       Georgia court bought it, but nobody else has bought it.  In

11       fact, you know, as I said buying it would put this court at

12       odds with a lot of other decisions that reject the idea that

13       moving to a closed model or making any other policy decision

14       triggers due process.

15             And as I said, I mean I think the doctors waived any

16       right to a hearing based on what's in the bylaws with respect

17       to the impact of an exclusive contract.

18             With respect to the unfair competition claim, that

19       unfair competition claim fails sort of at the threshold because

20       there is nothing in the verified complaint that would meet the

21       Iqbal, Twombly standards of probable plausibility.  In the

22       briefing that's followed we don't have anything that supports

23       there being unfair competition.  In fact, what you have as a

24       result of the decision to close the Queen's radiation therapy

25       department and not have the open model is now you have multiple

 1  freestanding competitors in the market, each of which is able

 2  to create and market their own products independently and in

 3  competition with others; so they can't demonstrate an injury to

 4  competition, they can't demonstrate and certainly haven't on

 5  this record demonstrated injury to them from unfair

 6  competition.

 7          And, finally, you know, with respect to that there is

 8  simply no basis, other than their unsupported allegations, that

 9  there is some Stark violation here.  They haven't briefed it.

10  They haven't argued it.  In the same way Mr. Davis tried to

11  argue a couple of other theories, which aren't in his papers.

12  He'd argued that there was intentional interference with the

13  relationship of patients.  Nothing to support that.

14  Intentional interference with doctors' relationships with PRO.

15  No briefing, no argument, no evidence of any substance that

16  would support that.

17          So what we're left with, Your Honor, is, I submit, a

18  tenuous at best due process argument and for all the reasons

19  I've said.  When ultimately they're challenging a policy

20  decision at the board level, due process doesn't require that

21  they have a hearing so that they might influence the

22  decision-makers who recommended something to other

23  decision-makers.  I'd leave it at that, Your Honor.

24          If I could just briefly touch again on the

25  irreparable injury issue.

 1          THE COURT:  Yes.

 2          MR. ALSTON:  We've got Dr. Lederer talking about all

 3    the reasons why he needs to continue to provide service to

 4    patients.  Dr. Bieniek says she needs to -- or a patient of

 5    hers needs the tomotherapy machine.  We've offered evidence

 6    that there is a suitable alternative.  We've also offered

 7    evidence that, you know, it's available to patients of Queen's.

 8    If this patient needs it, they can get it at Queen's.  It's not

 9    that they're being locked out.

10          And I think there is also an absence of any evidence

11    that Dr. Bieniek or anyone else is actually involved in the

12    delivery of the SBRT, using the tomotherapy machine, as opposed

13    to Dr. Lederer, who's talked about implanting seeds and using

14    the afterloader and so on and so forth.  Again we have this

15    disparity between what Dr. Lederer has offered on his own

16    behalf and the paucity or complete absence of any significant

17    evidence on behalf of others to justify irreparable injury.

18          And, you know, with respect to PRO and PRO

19    Associates, you know, that although they seek -- they seek the

20    injunctive relief, PRO and PRO Associates are entities.  They

21    have no doctor-patient rights to protect; they have only

22    economic interests.  They should not get any relief.  And again

23    I think you come back to, if there's any evidence for anybody,

24    it would be Dr. Lederer.  I submit for all the reasons I've

25    discussed it's not enough, but that's for you to decide.

1              Lastly, Your Honor, with respect to the balance of

2      equities and the public interest there is nothing on this

3      record that would support the idea that QMC has to make its

4      facilities available to doctors who are outside the closed

5      model any more than they have to do that for their special

6      equipment at the Cancer Center of Hawai'i or Straub Hospital

7      has to do it for doctors who aren't there or Kaiser.  Each one

8      of them has their own unique attributes, but they don't have to

9      share, and no patient has the right to force their way in with

10     the doctor of their choice when at the policy level the

11     management, the board, has made a decision not to allow that.

12             So, in sum, Your Honor, I mean I think, although

13     Mr. Davis argues at length about how, you know, the interests

14     of patients require that his doctors continue to have access,

15     it is not -- that's not what's at stake here.  What's at stake

16     here is the independence of the hospital board to decide the

17     business model that they think is best, and they simply cannot

18     prevail with respect to their efforts to try to force their way

19     back in under these circumstances.  They aren't going to suffer

20     irreparable injury, they haven't lost their rights to due

21     process or been deprived of their rights to due process, and

22     there's no basis for the injunction.

23             Thank you, Your Honor.

24             THE COURT:  All right.  Thank you very much.

25             MR. DAVIS:  I will be brief.

 1              THE COURT:  All right.

 2              MR. DAVIS:  I have just a few comments because I know

 3    you've heard a lot.

 4              THE COURT:  All right.  Thank you.

 5              MR. DAVIS:  What struck me about Mr. Alston's

 6    presentation was the conspicuous absence of any reference

 7    whatsoever as to how Queen's would be harmed if an injunction

 8    is issued to continue the status quo for, you know, just for a

 9    short period of time -- for a period of time.

10              THE COURT:  Well, his basic argument is they have

11    their own sovereignty; they should be able to choose their

12    economic model.  And they'll lose money, or they may lose

13    money.

14              MR. DAVIS:  Right.  So it is true that their decision

15    will be -- will be foreclosed from being implemented for a

16    certain period of months.

17              THE COURT:  Right.  But they're saying patient care

18    is foremost and you're, basically, forcing us into this hybrid

19    model where we don't think we're delivering the best care

20    possible.  But you're right; they're not saying anybody's going

21    to die as a result of it.

22              MR. DAVIS:  Well, they're not even saying that they

23    will lose money.  In fact, they stand to make more money, if

24    the services that he would otherwise be able to provide at

25    another institution, were it available, will be available at

 1    Queen's.  So there is no financial harm.

 2           It is true it is, you know, interfering with their

 3    own sovereign decision to make whatever decision they -- but

 4    that is it.  That is it.  If their interest in patient care

 5    involves an implementation of a procedure -- of a policy that's

 6    going to result in the denial of care for cancer patients, then

 7    how, you know, what conceivable grounds do they say patient

 8    care is going to be harmed which we're interested in

 9    implementing immediately?  The bottom line is that the balance

10    of equities unquestionably, you know, in a case like this which

11    involves cancer patients tips in favor of the entry of an

12    injunction.

13           Mr. Alston -- couple other points.  Mr. Alston says,

14    essentially, that ultimately it's the decision of the board to

15    do with what they want, and, therefore, what's the necessity of

16    due process, which is what every defendant in due process case

17    says.  We will give them a fair trial before we hang him.  The

18    simple fact of the matter is the very nature --

19           THE COURT:  Only Assistant U.S. Attorneys argue that.

20    I'm just kidding.  All right.

21           MR. DAVIS:  The very essence of due process is a

22    process by which decisions are made, even if it may be

23    ultimately rejected.

24           And on the issue of irreparable harm, you know,

25    the -- as you know, there were patients that attempted to

1    intervene in this case and who would have asserted at least in

2    support of the injunctive relief.  And I think the court has

3    recognized that, you know, we have an interest because, if we

4    cannot practice and treat our cancer patients by virtue of this

5    decision in the environment that exists in Honolulu today with

6    only one hospital available to it, then they have been

7    irreparably harmed.  That is their profession.  That is their

8    ability to deliver the care to their patients.  And for the

9    court to make -- the court must be aware of the fact that

10   anybody could get diagnosed tomorrow or the next day and we

11   would all -- and if we were in need of the services, a seed

12   implantation, et cetera, there's no question that we would seek

13   to go have our treatment with someone of Dr. Lederer's

14   experience.

15        And in terms of just balancing the equities to

16   exclude those people that are yet to be diagnosed or that will

17   be diagnosed next week or next month creates precisely the same

18   problem that we are attempting to avoid by the entry of the

19   injunction.  And there should be no discrimination that, well,

20   if you've got your relationship as of today, if you get

21   diagnosed tomorrow, you're out of luck.

22        THE COURT:  Well, but, see, this is where, you know,

23   the quandary that I'm in.  All right.  Mr. Alston rightly

24   points out, you know, there's this what's irreparable harm to

25   the plaintiffs?  And there are other -- let me step back.

1            In this particular case the way that patients become

2     patients of radiation oncologists is that they're referred to

3     those specialists by oncologists, urologists, and so forth, by

4     their physicians, to the specialist.  So for those who have

5     already started their treatment with Dr. Lederer, basically,

6     then, you know, that physician, you know, patient relationship

7     has been created.  Queen's is representing even though they've

8     started -- because they've started their treatment before

9     February 1, we're not going to interfere with that.  Dr.

10    Lederer can continue to treat them.  PRO physicians can

11    continue to treat them until their follow-up.  Okay.  So that

12    takes care of them in terms of irreparable harm.

13           But then those that they've created a relationship

14    but haven't started, those Queen's are excluding; so then the

15    argument is irreparable harm is then the patient has to choose

16    between the physician I have relationship with or treating at

17    Queen's.  And that goes to the irreparable harm of the

18    physician because this relationship -- I'm less clear, though,

19    about this third group of -- because that's assuming that all

20    of these patients who may be diagnosed from tomorrow on or, you

21    know, after the order may be entered in this case, that they

22    would have been referred to Dr. Lederer and/or the other

23    plaintiffs, the entities, and treated by them.  And that's not

24    necessarily on the record true because they have radiation

25    oncologists at Queen's.

 1          And so the -- now the information may go out to the

 2    referring physician, the oncologists, the urologists, et

 3    cetera, and say, you know, "I really want my patient to be

 4    treated at Queen's.  I know that there are these three

 5    radiation oncologists.  Normally, I would refer them to Dr.

 6    Lederer or one of his partners at PRO, but I know they can't do

 7    this treatment at Queen's, and I want the patient to have the

 8    treatment at Queen's; so in my medical judgment I'm going to

 9    weigh these two things, and I'm going to refer them to X, Y, Z

10    at Queen's and -- so they'll have it."

11          MR. DAVIS:  So my response is they are perfectly free

12    to do that, you know, let them refer to anybody they want.

13    Everybody -- every referring physician right now knows the

14    circumstances, and, if they want to do that, they are free to

15    do that.  There's nothing in your order or our contention that,

16    you know, that's what competition is all about.  God bless

17    them.  Let them refer it.

18          But that's why we submitted to the court the

19    affidavit of at least one referring physician, a guy by the

20    name of -- at Straub named Todd Miller, who refers -- and he

21    says, "I refer all my patients for high dose brachytherapy to

22    Dr. Lederer.  I'm aware that Dr. Lederer has performed 95

23    percent and 98 percent -- between 95 and 98 percent of the

24    brachytherapy treatments on the island since 1998, and it's my

25    belief that no physician on the island has a level of skill

1   experienced in brachytherapy possessed by Dr. Lederer.  And no

2   other physician that -- no other physician who I would feel

3   comfortable referring my patients to."  That's what he says.

4        So this referring physician as well as every other

5   surgeon, urologist, and referring physician has their choice.

6   They can do it.  But they're not precluded from taking their

7   patient and sending them to the best guy in town.  And that's

8   what I would urge you not to separate out of this --

9        THE COURT:  But how does it transfer to harm to the

10  plaintiffs?  I understand that's harm to the referring

11  physician.

12       MR. DAVIS:  Because these are the plaintiffs.  These

13  are the patients that would walk in the door to Dr. Lederer's

14  office, who the patient wants, who the treating physician

15  wants, who Dr. Lederer is willing to treat, and in the absence

16  of any reasonable alternative to have that treatment done

17  without going to the mainland.  So all I -- so I think it's

18  absolutely complete -- absolutely irreparable harm to Dr.

19  Lederer, the plaintiffs -- I mean not to the patients but to

20  Lederer -- to the plaintiffs that they cannot treat their

21  cancer patients based upon an inability to do what they have

22  been doing because there is no other facility.

23       This is a very, very, very unique case because it is

24  the only, you know, surviving hospital.  And many of these

25  arguments I would not make and I could not make if there was an

1    alternative place because we like the waiting room or

2    facilities and so on.  So that's not the issue.

3           This is only a plea to the court to issue an

4    injunction to make sure that that person who's diagnosed

5    tomorrow is going to have -- and whose treating physician, you

6    know, believes that this is the referral that Dr. Lederer

7    believes it should be and the patient wants that, that he's not

8    going to be denied the treatment.  And that's why I think

9    that's absolutely essential to the court's injunction because

10   the referring physician is always free to refer to anybody else

11   they want to because they know who is the best to do that.

12          THE COURT:  Right.  But I guess the problem I have it

13   has to be the plaintiffs' harm, and you're saying it's harm of

14   prospective patients.

15          MR. DAVIS:  Well, if the -- the question is, and I

16   submit that the appropriate analysis is, that when a physician

17   who is able and perhaps the only person available to deliver

18   cancer treatment to his current patients and to his future

19   patients is denied the ability to do that -- although it

20   absolutely might have devastating effects to the patient, you

21   know, it might outrage the referring physician, it also has an

22   absolute impact and harm to the physician who wants to deliver

23   the cancer treatment to his patient.  And if he can't do it and

24   is barred from doing it in the future, then that is irreparable

25   harm.

1          I, you know, I wouldn't have to make that -- I
2    wouldn't have to make the argument totally on behalf of
3    patients if there were intervenors, which there will be in the
4    event that there is a denial of the injunction.  But the court,
5    I think, recognized in its denial of the intervention that, you
6    know, we had the ability and not only the responsibility to
7    assert those claims of patients who are going to be harmed by
8    this, and that moves us right into the balance of, you know,
9    the public interest.  And that's where the case ends.  That's
10   where the analysis ends.  There is no way that you can balance
11   a public interest and the potential harm to cancer patients in
12   this state by saying, "Oh, no problem.  You know, if you're not
13   diagnosed until next week, you don't get to get your
14   treatment."  Thank you.

15          THE COURT:  Okay.  They're not saying they don't get
16   their treatment.  They're just saying they don't get to have
17   Dr. Lederer do the treatment.

18          MR. ALSTON:  I wanted to respond to that point.  We
19   are not saying that anyone will be denied treatment.  They will
20   receive treatment.

21          THE COURT:  In fact, you're arguing they'll get
22   better treatment.

23          MR. ALSTON:  Indeed, we are.

24          And I think, Your Honor, the other thing is the
25   inability to choose a particular doctor and a particular

1    facility is a fact of modern medicine.  If the doctor isn't in

2    your insurance company's panel, you don't get that doctor.  If

3    the facility isn't one that the insurer recognizes, you don't

4    get to go to that facility.  I mean you can't build an

5    irreparable injury argument on the lack of complete unfettered

6    access to every doctor in every facility.

7              THE COURT:  All right.  Thank you very much.

8              I appreciate all of the information and the excellent

9    argument.  I'm going to take the matter under advisement, and

10   I'm going to issue a decision -- a written decision.  And to

11   the extent that I'm going to ask for findings, which I'm not

12   sure right now, I will, of course, give the plaintiffs an

13   opportunity to submit something; so don't go ahead and submit

14   something or work on it now.  I will let you know that, if

15   that's something I want to do.

16             I don't anticipate issuing a decision this week,

17   however.  All right.  So probably next week.  Definitely by

18   next week.  And once we have it in a format that I want to,

19   then I will send out on entering order, indicating when I will

20   actually issue it; so you don't have to be waiting or calling

21   us every day when it's going to come out.  Until then, of

22   course, my order granting the temporary restraining order is in

23   effect fully, and, if there are any concerns with regard to

24   that and following it or any problems, continue to work it out

25   together, or you can contact Judge Chang or myself with regard

 1     to any issues having to do with that.

 2                 All right.  Any questions?  Clarifications?

 3                 MR. ALSTON:  Just one, Your Honor.  I hesitate -- I

 4     feel like a defense lawyer deciding whether to argue damages to

 5     the jury, but if it would be helpful to you, I would welcome an

 6     opportunity to spend a few minutes talking about what might be

 7     included.  I don't want to encourage you to do that, issue an

 8     injunction, but we do have some thoughts about that, if that's

 9     your inclination.

10                 THE COURT:  That would be really helpful.

11                 MR. ALSTON:  All right, Your Honor.

12                 MR. DAVIS:  So, Your Honor, perhaps maybe a result --

13     because I understand your comments, Paul, to go to what should

14     be in or not be in an order -- that we both submit in writing

15     to the court our ideas because I've thought that maybe, you

16     know, some kind of a status or, you know, report, you know,

17     something involving either magistrate or special master might

18     assist, and then we could each put in the court, you know, or

19     submit to the court in writing our own thoughts with regard to

20     what ought to contain or how the order might work and so on.

21                 MR. ALSTON:  I agree with Mr. Davis in the sense that

22     it may be more productive as you refine your thoughts to have a

23     status conference where we can express our views.

24                 THE COURT:  I agree.  I agree.  So let me go ahead

25     and ruminate, and then we will contact you shortly but

```
 1   certainly no later than Thursday with regard to scheduling a

 2   status conference.

 3              MR. DAVIS:  Okay.

 4              MR. ALSTON:   Thank you, Your Honor.

 5              MR. DAVIS:  Thank you very much.

 6              THE COURT:  All right.   Thank you very much.

 7              We're adjourned.

 8         (Court recessed at 4:22 P.M.)

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    COURT REPORTER'S CERTIFICATE

2              I, Debra Kekuna Chun, Official Court Reporter, United

3    States District Court, District of Hawaii, do hereby certify

4    that the foregoing is a true, complete, and correct transcript

5    from the record of proceedings in the above-entitled matter.

6              DATED at Honolulu, Hawaii, March 9, 2012.

7

8                                        /s/ Debra Chun

9                                        DEBRA KEKUNA CHUN

10                                       RPR, CRR

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25