```
 1                  IN THE UNITED STATES DISTRICT COURT

 2                      FOR THE DISTRICT OF HAWAII

 3    PACIFIC RADIATION ONCOLOGY,  )
      LLC, a Hawaii Limited        )
 4    Liability Corporation, et    )
      al.,                         )
 5                                 )       Civil No. 12-00064 LEK-KSC
                 Plaintiffs,       )
 6                                 )       Honolulu, Hawaii
           vs.                     )       March 12, 2012
 7                                 )       2:05 p.m.
      THE QUEEN'S MEDICAL CENTER,  )
 8    a Hawaii Non-Profit          )
      Corporation, et al.,         )
 9                                 )       Status Conference
                 Defendants.       )
10    _____)

11                       TRANSCRIPT OF PROCEEDINGS
                  BEFORE THE HONORABLE LESLIE E. KOBAYASHI
12                   UNITED STATES DISTRICT COURT JUDGE

13    APPEARANCES:

14    For the Plaintiffs:       MARK S. DAVIS, ESQ.
                                CLARE E. CONNORS, ESQ.
15                              Davis Levin Livingston
                                851 Fort Street
16                              400 Davis Levin Livingston Place
                                Honolulu, Hawaii 96813
17
      For the Defendants:       PAUL ALSTON, ESQ.
18                              CLAIRE WONG BLACK, ESQ.
                                Alston Hunt Floyd & Ing
19                              American Savings Bank Tower
                                1001 Bishop Street, 18th Floor
20                              Honolulu, Hawaii 96813

21
      Court Reporter:           Katherine Eismann, CSR, CRR, RDR
22                              United States District Court
                                300 Ala Moana Boulevard, C-338
23                              Honolulu, Hawaii 96850
                                (808)554-5652  ke@hid.uscourts.gov
24
      Proceedings reported by machine shorthand, transcript produced
25    by computer-aided transcription.
```

1   (Monday, March 12, 2012, 2:05 p.m.)
2   --oOo--
3   COURTROOM MANAGER: Civil 12-00064 LEK-KSC, Pacific
4   Radiation Oncology, LLC, et al., versus The Queen's Medical
5   Group, et al. This case has been called for a status
6   conference.
7   Counsel, your appearances for the record, please.
8   Please speak into a microphone.
9   MR. DAVIS: Good morning. Good afternoon, Your
10  Honor. Mark Davis and Clare Connors for the plaintiff and
11  Dr. Lederer present.
12  THE COURT: All right. Good afternoon to all of you.
13  Mr. Alston.
14  MR. ALSTON: Good afternoon, Your Honor. Paul Alston
15  and Claire Black appearing for the defendants.
16  THE COURT: All right. Good afternoon to both of
17  you.
18  All right. So, I had asked for further information
19  with regard to those two areas and received your submissions.
20  So, who would like to follow up on where we are right now, or
21  is there any immediate other additional issues that we need to
22  discuss. Mr. Davis?
23  MR. DAVIS: Thank you, Your Honor. I'm going to --
24  after reading The Queen's comments or their supplemental
25  memorandum, I have got a couple of comments. And I actually

1  ask Dr. Lederer to be present, because there are, you know,
2  technical questions that I candidly don't understand.
3      And I think that -- it seems to me that the approach
4  the Court ought to take in entering the preliminary injunction
5  is that with regard to these particular procedures, things
6  should go back to the way they were as they have been for
7  decades before the termination of the privileges, as opposed to
8  having counsel come back and try to micromanage exactly the
9  process by which they are going to be done.  Because they know
10 how it has been done, or the process by which, you know, there
11 are going to be reviews and so on.
12     And that is based in part on the assumption that the
13 interests that Queen's has is identical to our interests with
14 regard to the -- you know, the quality of the care and the
15 continuity of care for our patients, which is the bottom line.
16     And if we cannot work it out, if there is ultimately
17 a dispute, after the Court lays down that fundamental
18 principle, then it seems to me that if we really can't work it
19 out, then it seems that we ought to be able to go to the
20 magistrate, who I presume, you know, will be monitoring this
21 thing, and we can raise our issues and figure out what is a
22 dispute and what is really not a dispute.
23     What shouldn't happen is for the Court to try to
24 detail every single little procedure, some of which didn't
25 exist before, as far as I can understand, and, you know, for

1  added little, you know, issues that are in fact going to create
2  problems rather than solve them.  So that is what I kind of
3  think ought to be the underlying principle that the Court
4  should apply with regard to the injunction that is going to put
5  Dr. Lederer back in the position he was beforehand.
6        Now, with regard to the specific procedures, I think
7  we've laid out, you know, our -- there was -- I guess there was
8  only a couple that are, you know, in controversy as to whether
9  it has to be done at Queen's and has not to be done at Queen's.
10 And that's one of the reasons I asked Dr. Lederer to be here,
11 so that if there were specific questions.
12       But it seems to me quite clear that, you know, the
13 main thing is, you know, the care of the patients.  And if
14 Queen's is right and we are wrong in terms of the presentation,
15 then there's really very little harm during this interim period
16 that would be suffered by especially a patient and certainly
17 not to Queen's, because of course it would be a procedure that
18 otherwise it would be done elsewhere, so Queen's will be paid
19 for it.
20       If we are right and they are wrong, then the
21 potential for harm is extraordinary -- is great, because it's
22 going to impact the patients not being able to get the care
23 that we have outlined, you know, pursuant to our meeting
24 with -- pursuant to our meeting with Dr. Lederer.
25       And, you know, some of these have to do with, you

1  know, the best modality for delicate procedures which include
2  the special ability that some of these Queen's procedures are
3  able to track movement in the lung for example.  And the old
4  way it has been done before this technology was available only
5  at Queen's was you would ask the patient, for example, to hold
6  their breath, so that -- and to exhale, and you could, you
7  know, get kind of points at which it actually -- where you
8  could aim the radiation based upon, you know, a graphing.
9        But now they have this new procedure that actually
10 tracks the movement of the lungs during breathing, so it makes
11 the delivery of the radiation, you know, much, much more
12 precise at areas in which precision is the key to success or
13 failure, because you are on a spine, or you are in a brain, or
14 you are at a place where you are close to, you know, the
15 services.
16       And that's why -- I mean of course Dr. Lederer's
17 position of course is that, you know, it's in their financial
18 interest to do as much as they can in their own facilities.  So
19 it would be counterintuitive for him to suggest that they want
20 to do things at Queen's that they could do, in fact, at their
21 other facilities.
22       But because they are -- it is equipment that is only
23 available at Queen's and provides this additional level of
24 accuracy, and I am only referring to the two or three
25 procedures that are in controversy as raised by them, but it's

1  because of this inner -- this additional level of accuracy that
2  we have asked that to be included in the preliminary injunction
3  as it was in the temporary restraining order.
4          I mean there are a few other issues raised by the
5  memo that was filed by Queen's which had to do, you know, with
6  access of medical records.
7          THE COURT: That's what I wanted to talk to
8  actually --
9          MR. DAVIS: All right.
10         THE COURT: -- more than the procedures.
11         MR. DAVIS: Okay.
12         THE COURT: Where are you folks on that? When you
13 say, "Dr. Lederer and all the plaintiffs' physicians need full
14 and unfettered access to" is rather a sweeping statement in
15 terms of the medical records of their patients. To whom are
16 you referring?
17         MR. DAVIS: To the plaintiffs' patients who they had
18 previously treated at Queen's and whose records are stored, you
19 know, at Queen's. And even with regard to the, you know, the
20 plaintiffs that aren't the subject of the injunction, just like
21 any -- any physician would be entitled to see their own medical
22 records on the Queen's system.
23         THE COURT: Okay. So, any patients that they have
24 seen at any point in time. We are not talking about those
25 patients that Queen's has agreed that they would continue care?

```
 1               MR. DAVIS:  Correct.  In fact I don't even -- I
 2   didn't even understand the restriction of the access to those
 3   medical records were part of the original termination of their
 4   privileges, because as was pointed out in one of these earlier
 5   hearings, you know, some of these patients who, 10 years after
 6   their service, have to get follow-ups.  And, you know, "Please
 7   come in and consult your doctor."
 8               THE COURT:  Right.  Understood.
 9               MR. DAVIS:  Okay.
10               THE COURT:  So it says, "Dr. Lederer also needs
11   access to the prostate patient database and spreadsheet."
12               MR. DAVIS:  Right.  So, Dr. Lederer has -- as being
13   the principal person who has done this particular procedure,
14   has kept his data and spreadsheets all on The Queen's
15   computers, because he publishes the results.
16               And so we are not, you know, asking to do anything in
17   terms of, you know, new access to The Queen's facility, but we
18   are just saying that, you know, he's got a history of data
19   going back years and years which he publishes and --
20               THE COURT:  Okay.  So that's not for patient care.
21               MR. DAVIS:  Correct, correct.
22               THE COURT:  That's for his publications.  All right.
23   Just I needed a clarification with regard to that.
24               MR. DAVIS:  Correct.
25               THE COURT:  Okay.  Thank you.  Is it going to be
```

1 Ms. Black or Mr. Alston who will be addressing?

2 MR. ALSTON: Thank you, Your Honor.

3 THE COURT: Okay.

4 MR. ALSTON: Unless you want me to do otherwise, Your
5 Honor, I will confine my comments to the issues about the
6 documents.

7 THE COURT: Okay. Thank you.

8 MR. ALSTON: And that is if you look at Page 7 of our
9 memorandum it says, "QMC has allowed and will continue to allow
10 Dr. Lederer full access to the medical records of patients
11 including existing databases and spreadsheets." So there's
12 really no issue about that.

13 THE COURT: Okay.

14 MR. ALSTON: And with respect all the records,
15 footnote two addresses that and says that notwithstanding the
16 scope of injunctive relief, the PRO-related doctors will be
17 given access to the medical records of patients as long as we
18 have appropriate safeguards for the records consistent with the
19 practices as outlined in footnote two.

20 I mean there are recognized ways to handle these
21 documents, and as long as everybody is willing to follow the
22 rules, we don't have a problem.

23 THE COURT: All right. And that's in agreement by
24 you, Mr. Davis?

25 MR. DAVIS: Yes.

1  THE COURT: Okay.

2  MR. DAVIS: I mean there's a long history of having
3  worked together and doing this.

4  THE COURT: Yes.

5  MR. DAVIS: And basically I think what -- you know, I
6  think what we are trying to say is just to make sure that in
7  these list of procedures and so on, there are not, you know,
8  new things and new burdens and so on --

9  THE COURT: Yes.

10  MR. DAVIS: -- beyond which has been the convention
11  and the norm for years and years.

12  THE COURT: All right.

13  MR. ALSTON: Let me just comment briefly about that.
14  I mean Queen's has asked that with respect to their continuing
15  presence in and around the campus, that they follow the rules.
16  And those rules are not fixed in stone from what they were 40
17  years ago. They may change for all doctors, but they need to
18  follow the rules. That's all we are asking.

19  THE COURT: Okay. All right. Anything else we need
20  to address? I think otherwise your written pleadings and
21  submissions address the information that the Court needed in
22  order to complete the order.

23  MR. ALSTON: Nothing from us, Your Honor, unless you
24  have questions.

25  THE COURT: No, I don't. Those are the questions

1  that I had.  I just wanted clarification with regard to what
2  kind of --
3          MR. DAVIS:  The only other issue, and I am not sure
4  whether this is -- you know, we -- even for the other
5  physicians who are not governed by the injunction, you know,
6  and who understandably will not be providing radiation
7  treatment on The Queen's campus, occasionally their patients
8  are hospitalized at Queen's and requires for those -- those
9  physicians to go back and, you know, there was a burn, or there
10 was some follow-up that they just needed to go to bedside and
11 see how's it doing and, you know, et cetera.
12         And I think that should be followed the way that it
13 has always been.  It seems to me what has now been prohibited
14 is that the physicians, other than Dr. Lederer, all their
15 delivery of radiation will be out of the Queen's campus.
16         But it seems to me that there -- and I -- we had this
17 debate in our office.  I am not even sure whether the initial
18 description of the termination of the exercise of the
19 privileges applied to them actually being able to visit their
20 patients for follow-up.
21         I understood that it didn't, you know, but I just
22 want to make sure that, you know, occasionally that is required
23 because the patient needs -- because he had a burn or an injury
24 or may be hospitalized for something completely unrelated that
25 requires them to come visit.

1  THE COURT: Right, but that's outside of the issue
2  that's before the Court.
3  MR. DAVIS: Well, I thought it was, but it was raised
4  in Mr. Alston's memo unless I am reading it wrong.
5  MR. ALSTON: No, I think it's outside the issues that
6  are before the Court, but that doesn't imply the answer. But I
7  think you and I need to sit down and talk about this, because I
8  haven't heard of this before.
9  THE COURT: Yeah, I think that is something that the
10 two of you can discuss and work things out for your clients.
11 MR. DAVIS: I agree. I agree.
12 THE COURT: But in terms of what's before the Court
13 on this issue, specifically the injunctive issue, I made my
14 rulings with regard to -- I mean Dr. Lederer came forward as an
15 individual plaintiff. These other doctors did not come forward
16 as individual plaintiffs.
17 I do recognize though that Pacific Radiation Oncology
18 is an LLC, and the LLC, you know, takes its citizenship and so
19 forth based on the individual members that comprise the LLC.
20 You know, that being said, you know, I went I think briefly
21 through and we'll go far more in depth in our order with regard
22 to the showing that was made as to all the other doctors other
23 than Dr. Lederer.
24 So, I am not going to go into my order as to what can
25 or can't happen as to those other physicians, that is

1   physicians other than a Dr. Lederer.  But on that issue, I
2   certainly can see that it's a concern and a need, and that's
3   something I would encourage you and Mr. Alston to address and
4   discuss to assist your individual clients.  But I'm not going
5   to address that in my order.
6           Okay?  Anything else that we need to address?
7           MR. ALSTON:  Just a question of timing, Your Honor.
8   When do you anticipate issuing your order?
9           THE COURT:  Yes, and so with this additional
10  information it's almost finished.  That being said, we are
11  still going to work on it, so I don't expect it to be out this
12  week.  Probably next week.  And the reason also is my law clerk
13  has a child who is ill, so we are kind of working around that.
14          But we are almost completed with it and with this
15  information we should do that and hopefully finalize it.  I'd
16  like to tell you the end of this week, but I don't want to tell
17  you that and then not do it, but definitely by next week.
18          MR. ALSTON:  Fine, Your Honor.  Thank you.
19          MR. DAVIS:  Thank you very much.
20          THE COURT:  All right?  Thank you very much.  If
21  nothing further, then we are adjourned.  Good day to all of
22  you.
23      (Recess, 2:20 p.m.)
24
25

|    |                                                                        |
|----|------------------------------------------------------------------------|
| 1  | --oOo--                                                                |
| 2  | COURT REPORTER'S CERTIFICATE                                           |
| 3  |                                                                        |
| 4  | I, KATHERINE EISMANN, Official Court Reporter, United                  |
| 5  | States District Court, District of Hawaii, Honolulu, Hawaii, do        |
| 6  | hereby certify that the foregoing is a true, complete, and             |
| 7  | correct transcript of the proceedings had in connection with           |
| 8  | the above-entitled matter.                                             |
| 9  |                                                                        |
| 10 | Date:  March 14, 2012.                                                 |
| 11 | /s/ ***Katherine Eismann***                                            |
| 12 | Katherine Eismann, CSR CRR RDR                                         |