IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

PACIFIC RADIATION ONCOLOGY,    )    CIVIL NO. 12-00064 LEK-KSC
LLC, a Hawai`i Limited          )
Liability Corporation, et       )
al.,                            )
                                )
          Plaintiffs,           )
                                )
     vs.                        )
                                )
THE QUEEN'S MEDICAL CENTER, a   )
Hawai`i Non-Profit              )
Corporation, et al.,            )
                                )
          Defendants.           )
_____ )


**ORDER GRANTING IN PART AND DENYING IN PART
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

On January 27, 2012, Plaintiffs Pacific Radiation

Oncology, LLC, a Hawai`i Limited Liability Corporation ("PRO"),

PRO Associates, LLC, a Hawai`i Limited Liability Corporation

("PROA", together with PRO "the LLCs"), and John Lederer, M.D.,

Individually and as a Manager of the LLCs appearing for the

Pacific Radiation Oncology Physicians (collectively

"Plaintiffs")[1] filed their Motion for a Temporary Restraining

_____

[1] The Court notes that Plaintiffs filed an amended complaint
on February 23, 2012, naming the following parties as plaintiffs:
PRO; PROA; John Lederer, M.D., individually; Vincent Brown, M.D.,
individually; Paul DeMare, M.D., individually; Thanh Huynh, M.D.,
individually; Laeton Pang, M.D., individually; and Eva Bieniek,
M.D., individually.  [Dkt. no. 44.]  Drs. Brown, DeMare, Huynh,
Pang, and Bieniek have neither moved for a preliminary injunction
nor sought leave to join in the instant Motion.  The term
"Plaintiffs" in this Order therefore refers only to the existing
                                              (continued...)

Order, or in the Alternative, for a Preliminary Injunction

("Motion")[2] with their complaint in state court.  [Dkt. nos. 1-1

(complaint), 1-3 to 1-19 (Motion and all supporting materials).]

Defendants The Queen's Medical Center, a Hawai`i Non-Profit

Corporation, Queen's Development Corp, a Hawai`i for Profit

Corporation, and the officers and/or trustees of Queen's Medical

Center, in their individual and official capacities (collectively

"Defendants") removed this action on January 31, 2012, and filed

their memorandum in opposition to the Motion on February 2, 2012.

[Dkt. nos. 1, 14.]  Plaintiffs filed their reply on February 8,

2012.  [Dkt. no. 30.]  Also on February 8, 2012, Defendants filed

their Submission of Affidavits for Direct Examination

("Defendants' Direct Evidence").  [Dkt. no. 29.]  Plaintiffs

filed a Compendium of Plaintiffs' Evidence ("Plaintiffs' Direct

Evidence") on February 9, 2012.  [Dkt. no. 31.]  On February 13,

2012, Defendants filed their Submission of Supplemental

Affidavits for Direct Examination ("Defendants' Supplemental

---

[1](...continued)
plaintiffs at the time the Motion was filed.  The Court
emphasizes that it makes no findings and expresses no opinions
about Drs. Brown, DeMare, Huynh, Pang, and Bieniek's entitlement
to a preliminary injunction.

    [2] This Court has already ruled on the portion of the Motion
seeking a temporary restraining order.  See Order Granting in
Part and Denying in Part Plaintiffs' Motion for a Temporary
Restraining Order ("TRO Order"), 2012 WL 381209 (D. Hawai`i Feb.
3, 2012).  Only the portion of the Motion seeking a preliminary
injunction is currently before this Court.

2

Evidence"), and Plaintiffs filed their Second Submission of Affidavits ("Plaintiffs' Supplemental Evidence"). [Dkt. nos. 36, 38.] Defendants also filed a Notice of Supplemental Authority on February 10, 2012, and a Request for Judicial Notice ("RJN") on February 14, 2012. [Dkt. nos. 35, 39.]

This matter came on for hearing on February 14, 2012. Appearing on behalf of Plaintiffs were Mark Davis, Esq., Loretta Sheehan, Esq., and Clare Connors, Esq. Dr. Lederer was also present. Appearing on behalf of Defendants were Paul Alston, Esq., Claire Wong Black, Esq., and Daniel Mulholland, III, Esq.[3] As ordered in this Court's February 22, 2012 preliminary ruling, Plaintiffs filed a supplemental memorandum on March 5, 2012, and Defendants filed their supplemental memorandum on March 9, 2012. On March 12, 2012, this Court held a status conference to discuss the issues addressed in the supplemental memoranda. After careful consideration of the Motion, supporting and opposing memoranda, the evidence presented by both parties, and the arguments of counsel, Plaintiffs' Motion is HEREBY GRANTED IN PART AND DENIED IN PART for the reasons set forth below.

---

[3] On February 17, 2012, Defendants filed a motion seeking leave to submit supplemental authorities, but this Court denied the motion in an entering order issued on February 24, 2012. [Dkt. nos. 41, 46.]

## BACKGROUND

The factual and procedural background of this case, as well as the parties' arguments in the Motion and Memorandum in Opposition, are set forth in this Court's TRO Order.  2012 WL 381209, at *1-4.  This Court granted Plaintiffs' request for a TRO to the extent that the Court ordered

> Defendants to allow Plaintiffs to perform the following procedures on Plaintiffs' patients at the Queen's facilities, including any in-patient treatment, hospitalization, chart or record review, surgery, follow-up care and/or scheduling:
>
> a.  Volume Studies for permanent seed implants of the prostate;
> b.  Permanent seed implants;
> c.  High dose rate brachytherapy implants of the prostate and substitute tumors;
> d.  Endoluminal trachea, bile duct, (brachytherapy) radiation therapy;
> e.  Tomotherapy;
> f.  4DCT;
> g.  Stereotactic body radiotherapy; and
> h.  Patients that need general anesthesia for external radiation including pediatric external beam radiation.

Id. at *8-9.[4]  The TRO Order provided that the temporary restraining order would remain in effect until this Court issued its ruling on Plaintiffs' request for a preliminary injunction.[5]

_____

[4] The Court will refer to the eight procedures encompassed in the TRO Order as the "Listed Procedures".

[5] On February 22, 2012, this Court issued its Preliminary Ruling on Plaintiffs' Motion for Preliminary Injunction ("Preliminary Ruling").  [Dkt. no. 43.]  The Preliminary Ruling clarified that the TRO Order remained in effect until the Court issued its final written order ruling on the instant Motion.
(continued...)

The following is a summary of the relevant portions of the parties' submissions filed after the Court issued the TRO Order.

## I.   **Plaintiffs' Reply**

Plaintiffs emphasize that the scope of the preliminary injunction that they seek is very limited.  They seek an order requiring Defendants to allow Plaintiffs to perform the Listed Procedures at The Queen's Medical Center ("Queen's" or "QMC"), but only until Plaintiffs complete their efforts to move their practice out of Queen's facilities.  Plaintiffs have already begun the process of securing the necessary equipment and clinical privileges at alternate facilities, and Plaintiffs estimate they will be able to perform some of the Listed Procedures at another facility within four months, but the remaining procedures may take as long as ten months.  [Reply at 1 (citing Decl. of John Lederer, M.D. at ¶ 32).]  Plaintiffs, however, state that it is not possible for Plaintiffs to give a definite time frame when the services will be available at the alternate facilities.  Plaintiffs emphasize that, until the services can be safely performed elsewhere, Queen's is the only facility where the Listed Procedures can be performed.  Further, the procedures are a matter of life and death for Plaintiffs'

---

[5](...continued)
[Id. at 4.]

patients.

Plaintiffs argue that the issue before the Court is not whether Defendants had a right to move Queen's radiation oncology department to a closed-department model.  Plaintiffs only challenge the manner in which Defendants made that decision and how Defendants implemented that decision.  Plaintiffs contend that they have established a likelihood of success on the merits of their claims that Defendants' actions in adopting and implementing the closed-department model violated Plaintiffs' due process rights and constituted various violations of Haw. Rev. Stat. Chapter 480.

Plaintiffs argue that, without a preliminary injunction allowing Plaintiffs to use Queen's facilities to perform the Listed Procedures on their patients, irreparable harm will result.  Plaintiffs also argue that the public interest weighs in favor of a preliminary injunction because the Listed Procedures can only be performed at Queen's and because there are certain therapies which only the PRO physicians are qualified to perform. Thus, without a preliminary injunction, any patient requiring one of those therapies will not be able to receive that treatment from a qualified physician in Hawai`i.  Plaintiffs argue that Defendants will not suffer any harm if the Court enters a preliminary injunction because Queen's will be paid in full for all of Queen's charges associated with procedures that Plaintiffs

6

perform at Queen's facilities.

Plaintiffs therefore urge the Court to grant a preliminary injunction allowing Plaintiffs to perform the Listed Procedures at Queen's until those procedures are available at alternative facilities.

## II.   **Defendants' Direct Evidence**

Defendants submitted Affidavits for Direct Examination from the following witnesses: 1) Darlena Chadwick; 2) Peter Bryant Greenwood, M.D.; 3) Emily Hirata; 4) Scott Moon, M.D.; 5) Randy Talavera; and 6) Arthur Ushijima.  [Dkt. nos. 29-1 to 29-5, 29-8.]

Ms. Chadwick is the Vice President of Patient Care for Oncology, Women's Health, Neuroscience, Pathology and Professional Services at Queen's.  She, *inter alia*, oversees Queen's patient care programs, policies, and procedures.  [Def.'s Direct Evid., Attch. A (Aff. for Direct Exam. of Darlena Chadwick ("Chadwick Aff.")), at ¶¶ 1-2.]  Ms. Chadwick testified that, in recent years, Queen's received numerous complaints from patients that PRO physicians were transferring patients they initially saw at Queen's to PRO affiliated facilities for no apparent medical reason and without an affirmative request from the patient.  These patients reported that they were dissatisfied with certain aspects of the post-transfer services.  In addition, Queen's received complaints from referring physicians who were not

notified when the PRO physicians transferred patients.
Ms. Chadwick asserts that this jeopardized the continuity of
patient care. [Id. at ¶¶ 12-13.]

At least in part due to these complaints, Queen's
convened the task force which ultimately recommended that Queen's
transition to a closed-department model for its radiation
oncology department. In the process, the task force identified
several concerns raised by the practice of transferring Queen's
patients for no medical reason. [Id. at ¶¶ 14-15, 19.] These
concerns included: "QMC patients that are transferred to PRO
facilities no longer receive the benefit of QMC's stringent
quality control measures and safety precautions[;]" [id. at ¶
17;] the practice "caused confusion and discord on the part of
both patients and referring physicians[,] disrupting the
continuity of care"; [id. at ¶ 18;] and Queen's ancillary
services are not available to patients who have been transferred
to PRO affiliated facilities [id. at ¶ 19]. Based on the task
force's findings and recommendations, the Queen's Board of
Directors adopted a resolution providing that the radiation
oncology department would be a closed department. [Id. at ¶ 22.]

Peter Bryant-Greenwood, M.D., is a physician who has
been the Chairman of Queen's Credentialing Committee for
physicians since January 2011. [Def.'s Direct Evid., Attch. B
(Aff. for Direct Exam. of Peter Bryant-Greenwood, M.D.

("Greenwood Aff.")), at ¶¶ 1-2.]  He was part of the Queen's task force and, through the task force investigation, he learned that PRO physicians had been consulting with some patients at Queen's initially but then transferring the patients to a PRO affiliated facility for treatment.  Dr. Greenwood states that he was greatly concerned about this practice because some of these patients would return for other treatment at Queen's after treatments at the PRO affiliated facility, but Queen's would not always receive the pertinent medical records from the PRO facilities.  This could detrimentally affect the patients' subsequent treatment at Queen's.  [Id. at ¶¶ 3-4.]  Dr. Greenwood also points out that PRO physicians refused to participate in the PAAROT program that Queen's implemented for its radiation oncologists.[6]  The PAAROT program "requires input of data concerning patients and treatment in order to effectively measure and understand outcomes . . . for improvement of care and treatment on an ongoing basis of breast cancer patients."  [Id. at ¶ 6.]  In addition, Dr. Greenwood states that some of the PRO physicians rarely attend Queen's

---

[6] PAAROT stands for Performance Assessment for the Advancement of Radiation Oncology Treatment.  It is "a national program cited by the American College of Surgeons as being mandatory for radiation oncologists involved in breast cancer care at centers accredited by them, such as" Queen's.  [Def.'s Direct Evid., Attch. D (Aff. for Direct Exam. of Scott Moon, M.D. ("Moon Aff.")), at ¶ 8.]

daily multi-disciplinary team meetings.[7]  [Id. at ¶ 7.]

Emily Hirata is the Chief Medical Physicist of the Radiation Therapy Department at Queen's Cancer Center.  She is board certified in Therapeutic Radiologic Physics by the American Board of Radiology.  [Def.'s Direct Evid., Attch. C (Aff. for Direct Exam. of Emily Hirata ("Hirata Aff.")), at ¶¶ 1-2.]  She states that, after a physician approves a patient's treatment plan, she or another physicist reviews the plan to ensure that it is correct, and the Queen's physicists can also take measurements from the machines to verify that the output matches the plan.  [Id. at ¶ 4.]

Scott Moon, M.D., is the Medical Director of the Queen's Radiation Therapy Department.  [Moon Aff. at ¶ 1.]  Dr. Moon was a radiation oncologist with PRO and PROA from approximately July 2003 to June 2008.  [Id. at ¶ 3.]  He states that, during his employment with PRO, the PRO physicians discussed ways to divert Queen's patients to PRO affiliated facilities to increase PRO's revenue from insurance reimbursements, but there was no discussion about telling the patients that they were being transferred to a facility that was

---

[7] A multi-disciplinary team meeting will "generally include physicians from various specialties such as surgery, oncology, pathology and radiation therapy to discuss and create the best treatment plan for a particular patient to ensure that all treaters agree on the course of treatment on an ongoing basis." [Greenwood Aff. at ¶ 7.]

partially owned by PRO.  He also states that he heard a PRO physician give a patient false information that Queen's would not pay for transportation to its facility, but that PRO would do so. Dr. Moon also states that when patients received some of their treatments at a PRO affiliated facility and other treatments at Queen's, the practice at PRO facilities was to only give patient records to Queen's upon request.  [Id. at ¶ 6.]  Dr. Moon states that Queen's "radiation oncologists are accredited and qualified to perform head, neck, and gynecological interstitial brachytherapy, and high dose radiation brachytherapy and seed brachytherapy for prostate cancer."  [Id. at ¶ 11.]

Randy Talavera is the Manager of Radiation Therapy and Medical Physics at Queen's Radiation Therapy Department.  As the department's manager, he is responsible for its daily operations. [Def.'s Direct Evid., Attch. E (Aff. for Direct Exam. of Randy Talavera ("Talavera Aff.")), at ¶¶ 1-2.]  He also discussed patient complaints about being transferred to PRO affiliated facilities after receiving an initial consultation at Queen's. [Id. at ¶¶ 4-6.]  Mr. Talavera presented data about the treatments received by and insurance coverage for Queen's radiation oncology patients who were transferred to PRO affiliated facilities.  [Id. at ¶¶ 9-10, Exhs. A & B.]

Arthur A. Ushijima is the President and Chief Executive Officer ("CEO") of Queen's.  [Def.'s Direct Evid., Attch. F (Aff.

for Direct Exam. of Arthur A. Ushijima ("Ushijima Aff.")), at ¶ 2.]  He also states that the Queen's task force noted the transfer of Queen's patients to non-Queen's facilities and found that the practice raised concerns about quality and continuity of patient care.  The task force concluded that the closed-department model "would effectively address concerns regarding quality, patient safety and continuity of care."  [Id. at ¶ 13.] He also states that the closed-department policy that Queen's ultimately adopted has one exception:

> in the interests of patient care, radiation oncologists not employed by QMC on and after February 1, 2012, but who have patients who began their radiation therapy treatments at QMC prior to February 1, will be permitted to continue treating those patients at QMC until radiation therapy treatments and follow up appointments are completed.

[Id. at ¶ 17.]

Defendants also presented an affidavit from Barry Bittman, M.D., the Chief Innovations Officer of Meadville Medical Center in Pennsylvania, and an affidavit from Richard O. Schmidt, Jr., J.D., LL.M., the President, CEO and General Counsel of United Hospital System in Wisconsin.  Both affidavits discuss the benefits of a closed-department model.  [Def.'s Direct Evid., Attch. G (Aff. of Barry Bittman, M.D.), Attch. H (Aff. of Richard O. Schmidt, Jr., J.D., LL.M.).]

### III. **Plaintiffs' Direct Evidence**

Plaintiffs submitted affidavits or declarations from

12

the following persons in lieu of direct examination: 1)
Dr. Lederer; 2) Cancer Patient 1; 3) Eva Bieniek, M.D.; 4) Cancer
Patient B.J.; and 5) Cancer Patient D.S.  [Dkt. nos. 31-1 to 31-
6.]

Plaintiffs submitted an affidavit by Dr. Lederer dated
January 27, 2012 ("Lederer Affidavit") and a declaration by
Dr. Lederer dated February 8, 2012 ("Lederer Declaration").[8]
Dr. Lederer states that PRO employs six of the eleven civilian
radiologists who practice on Oahu and, as of February 1, 2012,
Queen's employed all of the civilian radiologists who were not
employed by PRO.  According to Dr. Lederer,

> QMC offered to hire all PRO physicians, but only
> on the condition that we bring all of our patients
> to QMC and that we divest all of our interests in
> all of QMC's competitions (sic).  Had the plan
> worked, QMC would be the employer of all the
> civilian radiation oncologists in the state and
> there would be no competition.

[Lederer Aff. at ¶ 6, Exh. G (letter dated 11/18/11 to PRO
Physician Group from Darlena Chadwick explaining standard
conditions imposed on physicians employed by Queen's).]  He also
states that, in addition to the therapies which the PRO
physicians perform at PRO affiliated facilities, they perform
other therapies which require either a hospital operating room or
patient admission, and these therapies must be performed at a

---

[8] Plaintiffs originally submitted the Lederer Affidavit with
the Motion, [dkt. no. 1-3, at 26-34,] and Plaintiffs originally
submitted the Lederer Declaration with the Reply [dkt. no. 30-1].

facility which is licensed by the Nuclear Regulatory Commission ("NRC").  With the closure of Hawaii Medical Center - East ("HMC East") and Hawaii Medical Center - West ("HMC West"), Queen's became the only NRC-licensed facility with an operating room that the PRO physicians had privileges to use for these treatments. [Lederer Aff. at ¶ 9.]  Thus, once Queen's closed-department policy takes full effect, the PRO physicians will not be able to perform those procedures.  Queen's also informed PRO that PRO physicians will not be allowed to attend to PRO patients who receive treatment at Queen's during the patients' post-operative stays.  [Id. at ¶ 16.]  He asserts that Queen's has improperly "attempt[ed] to exclude [PRO] from continuing its practice" and that Queen's actions "will have important and severely adverse impacts on our physician-patient relationships and on our patients, all of whom are cancer patients in desperate need of lifesaving treatment."  [Id. at ¶ 17.]

Dr. Lederer states that, under the terms of the TRO Order, PRO has "had to refuse referrals from treating physicians who have inpatients at QMC and yet want PRO services."  [Lederer Decl. at ¶ 4.]  The Lederer Declaration also describes a typical course of treatment for patients in need of radiation therapy, from referral to seed implantation, and a typical course for higher risk treatment, from referral to high dose rate ("HDR") brachytherapy.  [Id. at ¶¶ 6-7.]  Dr. Lederer described examples

14

of his patients who would be affected if the Court denies a
preliminary injunction.  [Id. at ¶¶ 8-10.]  Further, he states
that Queen's radiation oncology department staff is not as
qualified to perform the procedures relevant to this Motion.
[Id. at ¶¶ 11-15.]  Dr. Lederer also discussed examples of some
of the other PRO physicians' patients, [id. at ¶¶ 17-18,] and
refuted several points in Ms. Chadwick's affidavit, including her
contention that Kuakini Medical Center ("Kuakini") is a viable
alternative location for the procedures at issue in this Motion
[id. at ¶¶ 19-25].  Dr. Lederer describes problems that he and
the other PRO physicians have had accessing their patients'
medical records at Queen's, [id. at ¶¶ 26-28,] and he discusses
Plaintiffs' ongoing efforts to secure alternative sites to
perform the procedures at issue in this Motion [id. at ¶¶ 32.a-
c].

Attached to the Lederer Declaration and the Lederer
Affidavit are several exhibits, including correspondence between
PRO, and/or its physicians, and Queen's.

Dr. Bieniek's declaration, the affidavit of Cancer
Patient 1, and the declarations of cancer patient B.J. and D.S.
all discuss individual cases in which Plaintiffs allege the
patients will be denied necessary treatment in the absence of a
preliminary injunction. [Pltfs.' Direct Evid., Decl. of Eva
Bieniek, M.D. ("Bieniek Decl."), Aff. of Cancer Patient 1, Decl.

15

of Cancer Patient B.J., Decl. of Cancer Patient D.S.]

IV.  **Defendants' Supplemental Evidence**

Defendants submitted Supplemental Affidavits for Direct Examination from the following witnesses: 1) Ms. Chadwick; 2) Ms. Hirata; 3) Dr. Moon; and 4) Mr. Talavera.  [Dkt. nos. 36-1, 36-3, 36-8, 36-11.]  Defendants also submitted Affidavits for Direct Examination from: 1) Stuart Tsuji, M.D.; 2) Marilynn Hata; and 3) Kaye K. Kawahara, M.D.  [Dkt. nos. 36-12, 36-14, 36-15.]

In pertinent part, Ms. Chadwick asserts that Queen's can maintain continuity of care for PRO patients, even if the PRO physicians are no longer able to perform procedures at Queen's. [Defs.' Suppl. Evid., Attch. A (Suppl. Aff. for Direct Exam. of Darlena Chadwick ("Suppl. Chadwick Aff.")), at ¶¶ 2-4.]  She also presents further testimony about Queen's concerns about the PRO physicians' practice of transferring patients to PRO affiliated facilities.  [Id. at ¶¶ 5-9.]  She states, "[t]he task force committee was convened in large part to address these concerns . . . .  The task force considered feedback, including the complaints above, and concluded that the transfers confused patients, caused discord among referring physicians, and jeopardized patient safety and continuity of care."  [Id. at ¶ 10.]

Ms. Hirata testified, *inter alia*, that all of the Listed Procedures can be delivered at other facilities besides

16

Queen's.  [Defs.' Suppl. Evid., Attch. B (Suppl. Aff. for Direct Exam. of Emily Hirata ("Suppl. Hirata Aff.")), at ¶¶ 2-2.i.]  She also states that "[f]rom a technical perspective, all radiation oncologists who are listed on a facility's Nuclear Regulatory Commission (NRC) license are able to perform high dose rate radiation brachytherapy, regardless of the site of treatment." [Id. at ¶ 3.]  Queen's has five radiation oncologists, who are not affiliated with PRO, listed on its NRC license.[9]  [Id.] Ms. Hirata acknowledges: "HDR Brachytherapy for the prostate, is considered an inpatient procedure requiring an operation room. Best practices would be to have a patient's entire continuum of radiation therapy, including the surgical insertion and radiation delivery, done at the same facility."  [Id. at ¶ 5.]  She argues that a non-Queen's radiation oncologist could perform an HDR Brachytherapy for the prostate at any hospital with an operating room and an NRC license, such as Kuakini, with the use of a mobile HDR treatment unit.  She argues that Kuakini is a viable alternative for HDR Brachytherapy treatments, in part because

---

[9] Queen's physician Stuart Tsuji testified that he has been "specifically trained and [is] competent to perform . . . "Permanent Seed Implantation for Prostate Cancer; Stereotactic Body Radiotherapy; Interstitial and Intercavitary HDR Brachytherapy; and Intensity Modulated Radiotherapy."  [Defs.' Suppl. Evid., Attch. E (Aff. for Direct Exam. of Stuart Tsuji, M.D. ("Tsuji Aff.")), at ¶¶ 1, 3.]  During the course of his residence and his work at Queen's, Dr. Tsuji has participated in over thirty permanent seed implants and HDR prostate brachytherapy procedures.  [Id. at ¶ 4.]

17

Queen's provides dosimetry staff to Kuakini on a contract basis. [Id. at ¶¶ 6-7.]

Dr. Moon states that HDR Brachytherapy can be performed at "any facility that has an HDR suite", and he believes the PRO affiliated facility on Liliha Street has an HDR suite. [Defs.' Suppl. Evid., Attch. C (Suppl. Aff. for Direct Exam. of Scott Moon, M.D. ("Suppl. Moon Aff.")), at ¶¶ 3.] He states that Kuakini's NRC license authorizes it to use radioactive materials, including brachytherapy and prostate seeds. [Id. at ¶ 7, Exh. B (Kuakini's NRC license).] PRO physicians Vincent Brown and Thanh Huynh have active privileges at Kuakini. [Suppl. Moon Aff. at ¶ 7.] He also emphasizes that prostate brachytherapy is never "the single best option for curative therapy. Rather, it is simply one of a number of treatment options that a patient may choose." [Id. at ¶ 9 (citation omitted).] He also contests Plaintiffs' claims that: 1) Dr. Lederer is the only radiation oncologist who can perform pediatric treatments; 2) pediatric external radiation treatments always require general anesthesia and can only be performed at Queen's;[10] and 3) stereotactic body radiotherapy ("SBRT") requires tomotherapy equipment and cannot be performed at the PRO affiliated facilities. [Id. at ¶¶ 10-15.]

_____

[10] Mr. Talavera also presented testimony that anesthesia was not used in the majority of pediatric oncology treatments at Queen's from 2008 to 2011. [Defs.' Suppl. Evid., Attch. D (Suppl. Aff. for Direct Exam. of Randy Talavera ("Suppl. Talavera Aff.")), at ¶¶ 2-3.]

Marilyn Hata, office manager for Island Urology, and Queen's oncologist Kaye Kawahara testified regarding referring physician complaints that Dr. Lederer, and PRO physicians in general, transferred their patients from Queen's to PRO affiliated facilities for procedures.  [Defs.' Suppl. Evid., Attch. F (Aff. for Direct Exam. of Marilyn Hata ("Hata Aff.")), Attch. G (Aff. for Direct Exam. of Kaye Kawahara, M.D. ("Kawahara Aff.")).]

## V.   Plaintiffs' Supplemental Evidence

Plaintiffs submitted an affidavit by urologist Todd Miller who testified that he refers all of his patients who require HDR brachytherapy to Dr. Lederer, who Dr. Miller believes has the most skill and experience in brachytherapy of any physician on the island.  Dr. Miller testified that he would not feel comfortable referring his patients to any other physician. [Pltfs.' Suppl. Evid, Aff. of Todd Miller, M.D. ("Miller Aff."), at ¶¶ 1, 5.]  He states that Queen's is the only facility where his patients could receive HDR brachytherapy, and that he needs to be able to refer his patients needing brachytherapy to Dr. Lederer for treatment at Queen's.  [Id. at ¶¶ 6-7.]

Plaintiffs also submitted a rebuttal affidavit by Dr. Lederer.  [Pltfs.' Suppl. Evid, Rebuttal Aff. of John Lederer, M.D. ("Rebuttal Lederer Aff.").]  Dr. Lederer contests Queen's allegations that PRO physicians have

19

unnecessarily transferred Queen's patients to PRO affiliated facilities.  [Id. at ¶¶ 4-5.]  He states that neither he nor any other physicians were aware that PRO affiliated facilities failed to provide Queen's with medical records upon request.  Further, the PRO physicians have not refused to participate in the PAAROT program or attend multi-disciplinary team meetings.  [Id. at ¶¶ 7-8.]  He also denied that the transfers of Queen's patients to PRO affiliated facilities were based on the patient's ability to pay for treatments.  [Id. at ¶¶ 10-11.]  Finally, Dr. Lederer contests Ms. Hirata's testimony that the Listed Procedures can be performed at other facilities besides Queen's.  [Id. at ¶¶ 12-12.n.]

## VI.  **Court Ordered Supplemental Briefing**

In the Court's February 22, 2012 Preliminary Ruling, the Court informed the parties that it was going to grant a preliminary injunction in favor of Dr. Lederer, but that the preliminary injunction would be limited to certain patients and would only apply to the Listed Procedures which Dr. Lederer cannot reasonably perform at other facilities besides Queen's. The Court ordered the parties to submit supplemental briefing on the issues of: 1) which of the Listed Procedures, if any, Dr. Lederer can reasonably perform at facilities other than Queen's; and 2) what procedures must be implemented to allow Dr. Lederer sufficient access to Queen's to perform those

procedures.

In their supplemental memorandum, Plaintiffs state that
the PRO physicians "have moved most of their practice" off of
Queen's campus and "are in the process of obtaining privileges at
alternative facilities.  They also are working through the
process of installing the necessary equipment and obtaining the
required approvals to provide all treatments at these
facilities." [Pltfs.' Suppl. Mem. at 1.]  Plaintiffs argue that,
at the present time, all of the Listed Procedures can only be
performed at Queen's, and Kuakini is not a viable alternative.
[Id. at 2-7.]  Plaintiffs state that they are in the process of
purchasing: "a new generation linear accelerator that can
perform" SBRT and tomotherapy; [id. at 2-3;] and "new CT scanners
for installation at alternative facilities" [id. at 5].

As to the administrative procedures necessary to allow
Dr. Lederer to perform the Listed Procedures at Queen's,
Plaintiffs argue that Dr. Lederer "needs to be able to exercise
his QMC privileges fully", including having access to a
consultation room, necessary equipment, dosimetry staff, and
other hospital personnel.  [Id. at 7.]  He also needs to be able
to conduct necessary follow up examinations, and Plaintiffs argue
that, in the event that Dr. Lederer himself is not available for
any follow up examinations, another one of the PRO physicians
should be able to exercise his or her privileges to examine the

21

patient.  [Id. at 7-8.]  In addition, Plaintiffs state that,

"[t]o the extent that a patient of Dr. Lederer, or any of the

Plaintiff physicians, happens to be an inpatient at QMC,

Plaintiffs request that they be allowed to exercise their

privileges with respect to that patient, including consulting

with and examining the patient."  [Id. at 8.]  Finally,

Plaintiffs argue that "Dr. Lederer and all the Plaintiff

physicians need full and unfettered access to the medical records

of their patients . . . . in perpetuity[.]"  [Id.]

Plaintiffs suggest the filing of quarterly status

reports and the referral of this matter to the magistrate judge

for the resolution of any ongoing disputes related to the

preliminary injunction or to Plaintiffs' transition of their

services off of Queen's campus.  [Id. at 8-9.]

In their supplemental memorandum, Defendants state that

Queen's will permit Dr. Lederer to perform the following

procedures at Queen's: 1) permanent seed implants for prostate

cancer; 2) HDR brachytherapy for prostate cancer; 3) volume

studies related to permanent seed implants or HDR brachytherapy;

4) external beam radiation therapy related to permanent seed

implants or HDR brachytherapy; 5) procedures requiring general

anesthesia, including pediatric external beam radiation; and 6)

endoluminal trachea, bile duct (brachytherapy) radiation therapy.

[Defs.' Suppl. Mem. at 2-4.]  Defendants argue that the following

procedures, or a comparable procedure which meets the applicable

standard of care, can reasonably be performed at other facilities

besides Queen's: 1) tomotherapy; 2) 4D CT scans; and 3) SBRT.

[Id. at 4-6.]

As to the alleged denial of access to patients' medical

records, Queen's states:

> QMC has allowed, and will continue to allow,
> Dr. Lederer full access to the medical records of
> patients under his care, including existing
> databases and spreadsheets, that fall within the
> scope of the Court's Temporary Restraining Order
> as well as its final ruling on the pending Motion,
> consistent with QMC's existing procedural and
> administrative requirements relating to access of
> medical records.

[Id. at 7 (footnote omitted).]  Further, although the ruling on

the Motion will be limited to Dr. Lederer, Queen's affirms that

all "PRO-affiliated radiation oncologists will also be provided

access to the medical records of their patients consistent with

QMC's existing procedural and administrative requirements

relating to such access."  [Id. at 7 n.2.]

As to the administrative procedures necessary to allow

Dr. Lederer to perform the procedures covered by the preliminary

injunction, Defendants emphasizes that Queen's should not be

forced to relax its existing administrative procedures, bylaws,

policies, and procedures, including scheduling procedures.  The

Court also notes that Queen's argues Dr. Lederer does not need a

consultation room at Queen's because he can conduct all

consultations at his office and, in the event Dr. Lederer cannot perform a necessary follow-up examination, a Queen's physician should provide any necessary coverage.  [Id. at 7-9.]

Defendants argue that the Court should require Dr. Lederer to: 1) within ninety days, stop taking patients who Dr. Lederer believes may require treatment at Queen's; [id. at 2;] 2) within 180 days, complete all treatments of all patients at Queen's; [id.;] 3) "submit a detailed plan and timeline specifying the equipment, approvals and licenses necessary for Dr. Lederer to provide the procedures at non-QMC facilities"; [id. at 10;] and submit "detailed monthly updates describing the status of Plaintiffs' license, approval and equipment acquisition efforts" [id.].

## VII.  Plaintiffs' Untimely Filings

Before turning to the merits of Plaintiffs' Motion, the Court notes that Plaintiffs have not complied with the Court's deadlines and the applicable Local Rules.

First, Plaintiffs' affidavits in lieu of direct testimony were due on February 8, 2012.  [1/31/12 Hrg. Trans., filed 1/31/12 (dkt. no. 8), at 31.]  Plaintiffs, however, did not file Plaintiffs' Direct Evidence until February 9, 2012.  Prior to the hearing on the Motion, the Court granted the parties' request for leave to file supplemental declarations.  The Court ordered the parties to file their respective declarations by

24

Monday morning, February 13, 2012, and to deliver the courtesy

copies, which are required by the Local Rules, to the Court by

noon that day.  [Minutes, filed 2/10/12 (dkt. no. 34).]

Plaintiffs, however, did not file Plaintiffs' Second Submission

of Affidavits until 7:18 p.m. on February 13, 2012, and

Plaintiffs did not submit their courtesy copies of that document.

        In light of the importance of the issues raised in the

instant Motion, this Court will not penalize Plaintiffs.  The

Court, however, emphasizes that it does not condone the failure

to comply with the applicable rules and the deadlines that the

Court imposes.  The Court CAUTIONS Plaintiffs and their counsel

that the failure to comply with court rules and deadlines in the

future may result in sanctions, including, *inter alia*, the

striking of the document and/or the imposition of attorneys'

fees.

## VIII.    <u>Judicial Notice</u>

        Defendants' RJN asks this Court to take judicial notice

of the contents of six pages from the website of The Cancer

Center of Hawai`i ("CCH").  [Dkt. nos. 39-2 to 39-7.]  According

to the website, CCH has two locations, Liliha and Leeward, and

the six PRO physicians are CCH's physicians.  [Dkt. nos. 39-2,

39-5.]  At the hearing on the Motion, Plaintiffs' counsel stated

that Plaintiffs own one-third of CCH.  Plaintiffs' counsel noted

that the website "was prepared in mid-2011, and the only update

that's been on there after 2011 was a statement that we're still

open even though [HMC West and HMC East] closed." [2/14/12 Hrg.

Trans., filed 3/9/12 (dkt. no. 57), at 5.]  Although he noted

some evidentiary issues associated with the content, Plaintiffs'

counsel stated that he did not did object to the Court's taking

judicial notice of the website.  [Id.]

     This Court "must take judicial notice if a party

requests it and the court is supplied with the necessary

information."  Fed. R. Evid. 201(c)(1).

> The court may judicially notice a fact that is not
> subject to reasonable dispute because it:
>> (1) is generally known within the trial
>> court's jurisdiction; or
>> (2) can be accurately and readily determined
>> from sources whose accuracy cannot reasonably
>> be questioned.

Fed. R. Evid. 201(b).

     In light of the foregoing, Defendants' RJN is HEREBY

GRANTED.

## DISCUSSION

     The applicable standard in light of Winter v. Natural

Resources Defense Council, Inc., 555 U.S. 7, 20 (2008), and

Alliance for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1131

(9th Cir. 2011), is set forth in this Court's TRO Order.  See

Brown Jordan Int'l, Inc. v. Mind's Eye Interiors, Inc., 236 F.

Supp. 2d 1152, 1154 (D. Haw. 2002) ("The standard for issuing a

temporary restraining order is identical to the standard for

issuing a preliminary injunction.").

At the outset, the Court notes that it must distinguish between Dr. Lederer's request for a preliminary injunction and the LLCs' request.

## I.   Dr. Lederer's Request for a Preliminary Injunction

Dr. Lederer is a plaintiff in his individual capacity and in his capacity as a manager of the LLCs.  He purports to act on behalf of all of the PRO physicians.  The Ninth Circuit has recognized that a court may deny standing to a party because of prudential limitations on the standing doctrine.  "The prudential limitations include a requirement that the plaintiff assert his own rights, rather than rely on the rights or interests of a third party[.]"  Wedges/Ledges of Cal., Inc. v. City of Phoenix, 24 F.3d 56, 61 (9th Cir. 1994) (citation and internal quotation marks omitted).  The Court therefore FINDS that Dr. Lederer does not have standing to pursue claims on behalf of the other five physicians who are either equity members or employees of PRO ("Other PRO Physicians").  The Court now turns to the Winter analysis of Dr. Lederer's claims.

### A.   Likelihood of Success

#### 1.   Due Process

Plaintiffs' due process claim is based on Silver v. Castle Memorial Hospital, 53 Haw. 475, 479-80, 497 P.2d 564, 568 (1972), in which the Hawai`i Supreme Court recognized that a

licensed doctor who is denied staff hospital privileges is

entitled to judicial review on the issue "whether the doctor

excluded was afforded procedural due process, and as to whether

an abuse of discretion by the hospital board occurred, resulting

in an arbitrary, capricious or unreasonable exclusion."

     In the discussion of whether there is federal

jurisdiction over the instant case, the TRO Order stated:

> Silver also discussed the distinction between
> public, private, and quasi-public hospitals.  Id.
> at 481-83, 497 P.2d at 569-70.  The Hawai`i
> Supreme Court limited Silver's holding to "to
> those situations where the hospitals involved have
> had more than nominal governmental involvement in
> the form of funding" and did not address "whether
> the decision of the board of a truly private
> hospital not to grant staff privileges is subject
> to judicial review."  Id. at 570, 497 at 483.
> Moreover, Silver did not rely on federal law, and
> therefore Silver does not necessarily stand for
> the proposition that the denial of privileges at a
> private hospital, either without due process or
> based on arbitrary, capricious, or unreasonable
> grounds, violates the United States Constitution.
> Even if Silver would support a due process claim
> for the denial of privileges at a quasi-public
> hospital, this Court cannot find on the present
> record that Queen's is a quasi-public hospital.
> At this stage of the case, the Court cannot
> conclude that federal jurisdiction exists based on
> Count I.

2012 WL 381209, at *5.  The Court clarifies that the TRO Order's

statement that it could not find that Queen's was a quasi-public

hospital was limited to Queen's status in relation to the federal

government for purposes of a due process claim under the United

States Constitution.[11]   In determining whether Queen's is a quasi-public hospital subject to the holding in Silver, this Court may also consider Queen's status in relation to the state government.   Although the parties have not devoted significant attention to this issue, based on the current record, this Court finds that Dr. Lederer has a reasonable likelihood of success on the issue whether Queen's is a quasi-public hospital under Silver.   See Winnemucca Indian Colony v. United States ex rel. Dep't of the Interior, No. 3:11-cv-00622-RCJ-VPC, 2011 WL 4377932, at *4 (D. Nev. Sept. 16, 2011) ("'Serious questions going to the merits' must mean that there is at least a reasonable probability of success on the merits.  'Reasonable probability' appears to be the most lenient position on the sliding scale that can satisfy the requirement that success be 'likely.'").

Under Silver, "'quasi public' status is achieved if what would otherwise be a truly private hospital was constructed with public funds, is presently receiving public benefits or has been sufficiently incorporated into a governmental plan for

---

[11] In the TRO Order, this Court ultimately concluded, for purposes of the order issuing the temporary restraining order, that: 1) it has federal question jurisdiction over Count VII, which alleges that Defendants violated 42 U.S.C. § 1320a-7b and that the violation constitutes an actionable claim under Haw. Rev. Stat. Chapter 480; and 2) it has supplemental jurisdiction over the remaining claims in the Complaint.  2012 WL 381209, at *6.

providing hospital facilities to the public."  53 Haw. at 481-82, 497 P.2d at 569 (footnotes omitted).  The Hawai`i Supreme Court held that Castle Memorial Hospital was quasi-public because it "was the recipient of state and federal funding during its construction."  Id. at 483, 497 P.2d at 570.  In the present case, Plaintiffs have submitted evidence that Queen's was established by King Kamehameha IV and Queen Emma in 1859, and it was "THE FIRST HOSPITAL IN THE UNITED STATES FOUNDED BY ROYALTY[12]."  [Lederer Aff., Exh. K (Queen's 2009 federal income tax return), at 2.]  This reasonably supports an argument that Queen's meets the Silver standard for a quasi-public hospital because Queen's was established by what was, at the time, the government of Hawai`i.  Thus, based on the current record, the Court finds, for purposes of the instant Motion, that Dr. Lederer has raised serious questions going to the merits of the issue whether Queen's is a quasi-public hospital.

Having determined that Dr. Lederer is likely to succeed on the issue whether Silver applies to Queen's, the Court turns

---

[12] The Court also notes that the footer of Queen's stationary states "Founded in 1859 by Queen Emma and King Kamehameha IV".  See, e.g., Lederer Decl., Exh. H (letter dated 12/12/11 to John L. Lederer, M.D., from Mark H. Yamakawa, Executive Vice President and Chief Operating Officer of Queen's).
  The Court notes that the parties did not provide evidence on the issue whether Queen's receives state or federal funding, such as through Medicare, Medicaid, or research grants.  The Court therefore expresses no opinion at this time on the issue whether quasi-public status applies because Queen's receives public funding.

to the merits of Dr. Lederer's due process claim.  In the section

of the TRO Order discussing Plaintiffs' likelihood of success on

the merits, this Court stated:

> even if <u>Silver</u> applies to Queen's in general,
> there is still the question whether <u>Silver</u> applies
> beyond a privileging decision regarding an
> individual physician's competency or
> qualifications to a hospital's policy decision
> that affects a group of physicians without regard
> to competency or qualification issues.  The Court
> also notes that <u>Silver</u> states: "If the exclusion
> of a person from its medical or surgical staff is
> based on the sound and reasonable exercise of
> discretionary judgment, courts will not intervene,
> but if the exclusion stems from unreasonable,
> arbitrary, capricious or discriminatory
> considerations, equitable relief is available."
> 53 Haw. at 480, 497 P.2d at 568 (citation and
> quotation marks omitted).  Defendants have made
> strong arguments that their decision to adopt a
> closed-facility model was made for legitimate, and
> not improper, reasons.

2012 WL 381209, at *8.

Throughout these proceedings, Defendants have taken the

position that Queen's adopted the closed-department model based

on a legitimate policy decision that it is the model which is

best suited for providing optimal patient care and which also is

in Queen's bests interests from an economic standpoint.  They

have steadfastly denied that the decision was based on concerns

about the PRO physicians' competence or qualifications.

Defendants' own affidavits, however, belie their claim that the

decision was unrelated to the qualifications of the PRO

physicians.

Ms. Chadwick testified that patient and referring physician complaints were one of the primary reasons why Queen's convened the task force which recommended adopting the closed-department model. [Chadwick Aff. at ¶¶ 14, 19; Suppl. Chadwick Aff. at ¶ 10.] Further, in the course of making that recommendation, the task force investigated the complaints and "found that the PRO radiation oncologists' practice of transferring patients for no apparent medical reason raised a number of concerns." [Chadwick Aff. at ¶ 15.] Dr. Bryant-Greenwood, a member of the task force, testified that, during the task force's investigation, he learned that PRO physicians were transferring patients who had their initial consultation at Queen's to a PRO affiliated facility for treatment. [Greenwood Aff. at ¶ 4.] Prior to stating that the closed-department model was in the best interests of radiation oncology patients, [id. at ¶ 8,] Dr. Bryant-Greenwood noted that the PRO physicians have refused to participate in the PAAROT program and that some PRO physicians failed to regularly attend patients' multi-disciplinary team meetings [id. at ¶¶ 6-7]. Other defense witnesses, including Dr. Moon – the Medical Director, and Mr. Talavera – the Manager of the Radiation Therapy and Medical Physics, of the Queen's Radiation Therapy Department, also discussed the PRO transfer issue. [Moon Aff. at ¶¶ 1, 6; Talavera Aff. at ¶¶ 1, 4-6.] Queen's President and CEO also

noted the task force's findings and conclusions about the PRO transfer issue: "The task force found that this practice raised quality and continuity of care concerns, and concluded that a closed department model with employed physicians would effectively address concerns regarding quality, patient safety and continuity of care."  [Ushijima Aff. at ¶ 13.]

The resolution itself states, in pertinent part:

> C.   WHEREAS, management and the task force believe that [the radiation oncology program] has many strengths, . . . and noted that the transferring of patients to other facilities for no medical reason or patient request raised concerns regarding patient satisfaction, quality of care and continuity of care;
> D.   WHEREAS, to improve upon the identified areas of concern, management and the task force outlined how such concerns may be best addressed; and
> . . . .
> **THEREFORE, BE IT RESOLVED:**
> **1.   Closed Radiation Therapy Department.** QMC shall have a closed radiation therapy department staffed by radiation oncologists that are employed by QMC.

[Lederer Aff., Exh. F at 1 (emphases in original).]  Thus, although the resolution itself does not name PRO or any of the PRO physicians, taken in the context of the current record as a whole, it is clear that the "transferring of patients" in the resolution refers to what Queen's perceived was a problem with the PRO physicians' referral practices.

It is undisputed that Queen's gave the PRO physicians the opportunity to join the Queen's staff, an indication,

perhaps, that Queen's had no concerns about the clinical competence of the PRO physicians.   The evidence currently before this Court, however, establishes that Queen's viewed the PRO physicians' referral practices as a serious problem and that this problem was a substantial motivating factor in Queen's decision to adopt the closed-department model.   The referral practice - which, based on the current record, was common to all PRO physicians - is arguably an issue of the PRO physicians' professional qualifications because it concerns the manner in which they were conducting their practice at Queen's.[13]   Under Silver, Dr. Lederer is entitled judicial review on the issue whether Defendants denied him procedural due process when they effectively revoked his privileges based on an evaluation of his professional qualifications.   Further, Dr. Lederer has presented evidence that, under the circumstances, Queen's decision to adopt the closed-department model was unreasonable, arbitrary and capricious because it was part of an attempt to eliminate all competition in the radiation oncology field in Hawai`i.   This Court therefore FINDS, for purposes of the instant Motion, that Dr. Lederer is reasonably likely to succeed on the merits of Count I, his due process claim.

---

[13]   Likewise, the criticism that the PRO physicians refused to participate in the PAAROT program and that some PRO physicians failed to regularly attend multi-disciplinary team meetings regarding patients' care plans are also arguably issues of the PRO physicians' professional qualifications.

## 2.   Unfair, Deceptive, Anti-competitive and Illegal Trade Practices Claim

Count VI alleges, in pertinent part:

> 46.   PRO and its members, including the other Plaintiffs are "persons" who have been injured in its (sic) business or property by reason of the unlawful acts alleged herein.  The actions as heretofore alleged constitute an unlawful and unfair business practice using illegal, improper devices to secure its competitive status.
> 47.   As a direct and proximate result of the Defendants' actions as heretofore alleged, Plaintiffs' (sic) have and will suffer economic damages which entitle the Plaintiffs to compensatory, punitive, and treble damages under Hawaii Revised Statutes Chapter 480, as amended.

[Complaint at pgs. 22-23.]

Unfair methods of competition are unlawful under Haw. Rev. Stat. § 480-2(a) and, under § 480-2(e), any person may bring an unfair methods of competition ("UMOC") claim.  Further, Haw. Rev. Stat. § 480-13(a) states, in pertinent part:

> any person who is injured in the person's business or property by reason of anything forbidden or declared unlawful by this chapter:
> > (1)   May sue for damages sustained by the person, and, if the judgment is for the plaintiff, the plaintiff shall be awarded a sum not less than $1,000 or threefold damages by the plaintiff sustained, whichever sum is the greater, and reasonable attorney's fees together with the costs of suit; provided that indirect purchasers injured by an illegal overcharge shall recover only compensatory damages, and reasonable attorney's fees together with the costs of suit in actions not brought under section 480-14(c); and
> > (2)   May bring proceedings to enjoin the unlawful practices, and if the decree is

> for the plaintiff, the plaintiff shall
> be awarded reasonable attorney's fees
> together with the costs of suit.

The Hawai`i Supreme Court has stated that there are "three
elements essential to recovery under HRS § 480-13: (1) a
violation of HRS chapter 480; (2) which causes an injury to the
plaintiff's business or property; and (3) proof of the amount of
damages." Davis v. Four Seasons Hotel Ltd., 122 Hawai`i 423,
435, 228 P.3d 303, 315 (2010) (footnote and citations omitted).
Further, the Hawai`i Supreme Court has held:

> "the elements of (1) resulting injury to business
> or property and (2) damages" are "two distinct
> elements" of HRS § 480-13(a), and went on to note
> that:
>
> > Indeed, federal case law has interpreted the
> > "injury to business or property" language of
> > section 4 of the Clayton Act as a causation
> > requirement, requiring a showing of
> > "antitrust injury." "Plaintiffs must prove
> > . . . [an] injury of the type the antitrust
> > laws were intended to prevent[, one] . . .
> > that flows from that which makes defendants'
> > acts unlawful. The injury should reflect the
> > anticompetitive effect either of the
> > violation or of anticompetitive acts made
> > possible by the violation. It should, in
> > short, be the 'type of loss' that the claimed
> > violations . . . would be likely to cause."
> >
> > Also known as the "fact of damage"
> > requirement, the antitrust plaintiff need not
> > prove with particularity the full scope of
> > profits that might have been earned.
> > Instead, it requires a showing, with some
> > particularity, of actual damage caused by
> > anticompetitive conduct that the antitrust
> > laws were intended to prevent.
>
> [Robert's Haw. Sch. Bus, Inc. v. Laupahoehoe

36

          Transp. Co., Inc., 91 Hawai`i 224, 254 n.31, 982
          P.2d 853, 883 n.31 (1999)] (internal citations
          omitted; ellipses and brackets in original).

Id. at 439, 228 P.3d at 319 (some citations omitted) (some

alterations in original).

      In the same letter informing PRO physicians of Queen's

adoption of the closed-department model, Ms. Chadwick stated that

Queen's intended "to offer employment to all of the current

radiation oncologists on the QMC Medical Staff who satisfactorily

meet the qualifications for and conditions of employment."

[Lederer Aff., Exh. E (9/15/11 letter to Thanh Huynh, M.D., from

Ms. Chadwick)[14].]  Ms. Chadwick confirmed that she invited all

radiation oncologists on Queen's medical staff, including the six

PRO physicians, to apply for employment at Queen's in light of

the transition to a closed-department model.  [Chadwick Aff. at ¶

23.]  Ms. Chadwick also informed PRO that radiation oncologists

employed by Queen's: 1) can only provide services at Queen's and

Queen's-affiliated facilities; and 2) cannot have an "ownership

interest or a compensation arrangement with any other hospital,

ambulatory service center, clinic, facility or other entity that

provides radiation oncology services."  [Lederer Aff., Exh. G

(11/18/11 letter to PRO from Ms. Chadwick).]  Dr. Lederer

testified that, had Queen's plan to hire all of PRO's physicians

---

      [14] Dr. Lederer states that the group was informed by letter
that the resolution affected the privileges of the entire group.
[Lederer Aff. at ¶ 11.]

worked, Queen's "would be the employer of all the civilian radiation oncologists in the state and there would be no competition." [Lederer Aff. at ¶ 6.]  He also testified that the conditions of Queen's employment "would require us to breach existing business relationships with non-QMC entities" and "prohibit us from generating income from our existing business relationships, and thereby eliminate most of its competition." [Id. at ¶ 12.]

Further, although it is not possible to determine based on the current record what Defendants knew about the status of HMC-West and HMC-East when they adopted the resolution, the facilities' closures were publicly announced during the period in which PRO continued to negotiate with Queen's regarding the transition to a closed department.  [Lederer Aff., Exh. H (12/21/11 letter to Dr. Lederer from Mark H. Yamakawa, Queen's Executive Vice President and Chief Operating Officer), Exh. I (12/28/11 Pacific Business News article, "Hawaii Medical Center West closed to public", stating that HMC officials announced the impending closure of its facilities on December 26); Lederer Decl. at ¶¶ 29-31, Exhs. Q, R, S (correspondence between PRO physicians and Queen's with dates from November 3, 2011 to January 23, 2012).]  With the closure of HMC-West and HMC-East, Queen's is the only NRC licensed facility with an operating room where certain procedures can be, or at least currently are being,

performed.  [Lederer Aff. at ¶¶ 16-17; Defs.' Suppl. Mem. at 2.]

After the Court entered the TRO Order, Dr. Lederer was allowed to continue performing the Listed Procedures for existing patients at Queen's, but he had to refuse new referrals from treating physicians who wanted to refer Queen's inpatients to him for services.  [Lederer Decl. at ¶¶ 4, 10.]  PRO, of which Dr. Lederer is a partner and member, generated almost fifty percent of its gross business revenue from its relationship with Queen's prior to September 15, 2011.  [Lederer Aff. at ¶¶ 1, 8.]

Based upon the current record, the Court FINDS that Dr. Lederer has shown that he is likely too succeed on the merits of Count VI.  Dr. Lederer is likely to succeed on the merits of each element of the § 480-13 claim: 1) the manner and timing in which Queen's implemented its new closed-department policy was an unfair method of competition under the circumstances; 2) Queen's actions caused an injury to Dr. Lederer's professional practice that is the type of injury that antitrust laws were intended to prevent; and 3) Dr. Lederer suffered damages.

### B.  <u>Irreparable Harm</u>

Dr. Lederer must also show that he is likely to suffer irreparable harm in the absence of a preliminary injunction.  As this Court noted in the TRO Order, monetary harm alone is generally not considered irreparable.  2012 WL 381209, at *6 n.6 (citing <u>Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football</u>

League, 634 F.2d 1197, 1202 (9th Cir. 1980); Cal. Pharmacists

Ass'n v. Maxwell-Jolly, 563 F.3d 847, 852 (9th Cir. 2009)).  In

contrast, if Queen's implementation of the closed-department

model would harm either Dr. Lederer's doctor-patient relationship

or his relationships with the referring physicians through whom

he establishes his client base and his ability to compete in the

industry, to Court finds that those are intangible harms which

cannot be remedied through an award of damages.  The Court has

identified three categories of Dr. Lederer's patients that are

relevant to the analysis of the irreparable harm factor, as well

as the public interest factor.

        1.    **Group One Patients**

        The first category consists of Dr. Lederer's patients

who, prior to February 1, 2012, began receiving radiation therapy

treatments at Queen's ("Dr. Lederer's Group One Patients").

Mr. Ushijima, Queen's President and CEO, testified that Queen's

will allow Dr. Lederer's Group One Patients to complete their

radiation treatments at Queen's, including follow-up

appointments.  [Ushijima Aff. at ¶¶ 2, 17.]  Insofar as

Dr. Lederer is able to continue treating his Group One Patients

at Queen's, the doctor-patient relationships between Dr. Lederer

and his Group One Patients, and Dr. Lederer's relationships with

the physicians who referred his Group One Patients to him, are

not jeopardized by Queen's current transition to a closed

radiation oncology department.  The Court FINDS that Dr. Lederer is not likely to suffer irreparable harm as to his Group One Patients in the absence of a preliminary injunction, and therefore the Court CONCLUDES that Dr. Lederer is not entitled to a preliminary injunction as to his Group One Patients.

> ### 2.   **Group Two Patients**

The second category consists of Dr. Lederer's patients for whom Dr. Lederer developed a treatment plan prior to February 1, 2012 which included one or more of the Listed Procedures, but who had not begun any of the Listed Procedures prior to February 1, 2012 ("Dr. Lederer's Group Two Patients"). When Dr. Lederer's Group Two Patients require procedures that can only be performed at Queen's, under Queen's closed-department policy, Dr. Lederer would have to refer those patients to a Queen's radiation oncologist for those procedures.  The patients, however, likely expected Dr. Lederer to perform the procedures and having another radiation oncologist, with whom the patients have not established relationships of professional confidence and trust, perform the procedures is likely to cause the patients significant anxiety during an already stressful and vulnerable period in their lives.  This, in turn, is likely to cause distrust and unease when Dr. Lederer resumes the patients' treatments, impairing the doctor-patient relationships that Dr. Lederer has with those patients.  The Court also notes that

this type of disruption in patient care is likely to dissuade the physicians who referred Dr. Lederer's Group Two Patients from referring future patients to him.  The Court therefore FINDS that Dr. Lederer is likely to suffer irreparable harm to his relationships with his Group Two Patients and their referring physicians in the absence of a preliminary injunction, and that this harm cannot be remedied through monetary damages.

### 3.   **Group Three Potential Patients**

The final category of patients consists of new patients who were referred, or who would have been referred, to Dr. Lederer after February 1, 2012, but who Dr. Lederer could not accept as patients pursuant to Queen's closed-department policy ("Dr. Lederer's Group Three Potential Patients").  Dr. Lederer does not have doctor-patient relationships with his Group Three Potential Patients and, as previously noted, the economic harm that Dr. Lederer will suffer because of the loss of income that he would have received if he had been able to accept his Group Three Potential Patients is not considered irreparable for purposes of a preliminary injunction.

Dr. Lederer, however, has presented evidence that: a standard course of treatment for many of his patients begins with a referral to him by the patient's urologist; [Lederer Decl. at ¶¶ 6.a, 7.a;] he receives other referrals from surgeons and, to a lesser extent, from patients' primary oncologists; [id. at ¶ 21;]

and, since the issuance of the TRO Order, Plaintiffs have been forced to refuse referrals from treating physicians who have inpatients at Queen's, but still want to refer those patients for services through PRO [id. at ¶ 4].  Plaintiffs presented testimony by Dr. Miller, who stated that he believes there is no other physician on Oahu who has Dr. Lederer's experience in brachytherapy and that he would not feel comfortable referring his patients to anyone else.  [Miller Aff. at ¶ 5.]  He also stated that, "[i]n order to provide the treatment necessary for [his] patients, [he] need[s] to be able to continue to refer patients to Dr. Lederer for brachytherapy, to be performed at QMC."  [Id. at ¶ 7.]

        Defendants themselves presented testimony regarding physicians who have referred patients to Dr. Lederer but who only want him to treat their referred patients at Queen's. Marilyn Hata, the office manager for Island Urology - a practice group led by William J. Yarborough, M.D., testified that both she and Dr. Yarborough have informed Dr. Lederer that "Dr. Yarborough expects and wants all Island Urology patients that are referred to PRO for radiation therapy to be treated at QMC rather than PRO-affiliated facilities."  [Hata Aff. at ¶¶ 1, 3.] Dr. Kawahara, an oncologist affiliated with Queen's, gave similar testimony regarding referral to PRO in general.  [Kawahara Aff. at ¶¶ 1, 3.]

43

The evidence presented establishes that Dr. Lederer relies on referrals for a significant number of his clients. Both parties' evidence establishes that Queen's facilities and support services for the Listed Procedures are superior to those available to Dr. Lederer elsewhere, if those procedures are available at all.  Further, both parties have emphasized the importance of continuity of care during treatment to, *inter alia*, ensure the accuracy of the equipment in relation to the area to be treated on a patient.  Thus, it can be reasonably inferred from the evidence that a significant portion of Dr. Lederer's referrals are contingent on his ability to perform procedures that currently can only be performed at Queen's.  The Court therefore FINDS that Dr. Lederer is likely to suffer irreparable harm as to his Group Three Potential Patients because, without a preliminary injunction: 1) he will be deprived of the opportunity to compete for those potential patients and will lose competitive ground in the industry; and 2) his relationship with the physicians who would have referred the Group Three Potential Patients, as well as future patients beyond the period at issue in this Motion, to Dr. Lederer is likely to suffer irreparable harm.

C.    **Balance of the Equities**

In the TRO Order, this Court stated:

In the context of a motion for preliminary injunction, a court weighing the balance of the

44

equities "must identify the possible harm caused
by the preliminary injunction against the
possibility of the harm caused by not issuing it."
<u>Univ. of Hawai`i Prof'l Assembly v. Cayetano</u>, 183
F.3d 1096, 1108 (9th Cir. 1999).  As previously
stated, the standard for a motion for a temporary
restraining order is the same as for a motion for
a preliminary injunction.

Defendants have stated that they adopted the
closed-facility policy to improve the quality and
efficiency of patient care.  At this stage of the
case, this Court will accept this explanation.
Defendants certainly have an interest in operating
Queen's in the manner they reasonably believe is
best suited for patients.  Defendants, however,
will suffer little harm if the implementation of
their closed-facility policy is delayed by a
temporary restraining order until the Court issues
its decision after the February 15, 2012
hearing. . . .

2012 WL 381209, at *7.

Similarly, the Court finds that Defendants will suffer

little harm if a preliminary injunction delays the implementation

of the closed-department policy, particularly where the

preliminary injunction only applies to a specific list of

procedures and where Plaintiffs are actively engaged in securing

other locations where they can perform those procedures.  This

Court therefore FINDS that the balance of the equities factor

weights in favor of granting a preliminary injunction to

Dr. Lederer.

D.   **Public Interest**

In the TRO Order, this Court stated:

In the preliminary injunction context, this
Court has recognized the following principles
relevant to the public interest inquiry:

45

The plaintiffs bear the initial burden of showing that the injunction is in the public interest.  See Winter [v. Natural Resources Defense Council, Inc.], [555 U.S. 7,] 129 S. Ct. [365,] 378 [(2008)].  However, the district court need not consider public consequences that are "highly speculative."  In other words, the court should weigh the public interest in light of the likely consequences of the injunction.  Such consequences must not be too remote, insubstantial, or speculative and must be supported by evidence.

Finally, the district court should give due weight to the serious consideration of the public interest in this case that has already been undertaken by the responsible state officials . . . who unanimously passed the rules that are the subject of this appeal.  See Golden Gate Rest. Ass'n [v. City and County of San Francisco], 512 F.3d [1112] at 1127 [(9th Cir. 2008)] ("The public interest may be declared in the form of a statute." (internal quotation marks omitted)); see also Burford v. Sun Oil Co., 319 U.S. 315, 318, 63 S. Ct. 1098, 87 L. Ed. 1424 (1943) ("[I]t is in the public interest that federal courts of equity should exercise their discretionary power with proper regard for the rightful independence of state governments in carrying out their domestic policy." (internal quotation marks omitted)).

Stormans, Inc. v. Selecky, 586 F.3d 1109, 1139-40 (9th Cir. 2009) (some citations and quotation marks omitted).  The public interest inquiry primarily addresses the impact on non-parties rather than parties.

Am. Promotional Events, Inc.—Nw. v. City & Cnty. of Honolulu, 796 F. Supp. 2d 1261, 1284-85 (D. Hawai`i 2011) (alterations in Am. Promotional

46

<u>Events</u>).  As previously stated, the standard for a
motion for a temporary restraining order is the
same as for a motion for a preliminary injunction.

<u>Id.</u> at *7-8.

The primary non-parties who will be affected by the
grant or denial of a preliminary injunction are Dr. Lederer's
Group Two Patients and any new patients that are likely to come
to Dr. Lederer in the near future and who require a procedure
that can only be performed at Queen's.  As to Dr. Lederer's Group
Two Patients, the factors discussed in connection with the
irreparable harm factor are also relevant to the public interest
factor.  As to the new patients who are likely to come to
Dr. Lederer in the near future requiring a procedure that can
only be performed at Queen's, Defendants have not presented any
evidence that Queen's has a radiation oncologist on staff with
comparable experience and qualifications to Dr. Lederer.

Defendants have presented evidence that there are
benefits to a closed radiation oncology department.  The
contemplated preliminary injunction in the instant Motion,
however, would still allow Defendants to begin implementing that
policy in a significant number of cases.  There are many
instances in which Dr. Lederer will not be permitted to use
Queen's facilities because he can reasonably perform those
procedures elsewhere and, as discussed *infra*, the preliminary
injunction does not apply the Other PRO Physicians.  This Court

47

therefore FINDS that the public interest factor also weighs in favor of granting Dr. Lederer's request for a preliminary injunction.

**E.   Summary of Factors**

Having found that all of the Winter facts weigh in favor of issuing the preliminary injunction, the Court CONCLUDES that Dr. Lederer is entitled to a preliminary injunction as to his Group Two Patients and his Group Three Potential Patients, but only as to the Listed Procedures that Dr. Lederer cannot reasonably perform at other facilities besides Queen's.

**II.  The LLCs' Request for a Preliminary Injunction**

The Court now turns to the Winter analysis of the LLCs' request for a preliminary injunction.

**A.   Likelihood of Success**

**1.   Due Process**

Count I, Plaintiffs' due process claim, is based on the effective termination of "Plaintiffs' hospital privileges". [Complaint at ¶ 31.]  The individual PRO physicians, however, had hospital privileges at Queen's; the LLCs as entities did not have hospital privileges.  It is possible for an entity to pursue the due process claims of its members under the doctrines of third party standing and representational or associational standing, but those doctrines do not apply in this case.

"The requirements to establish third party standing

include 'injury in fact,' a close relation to the third party,

and 'some hindrance to the third party's ability to protect his

or her own interests.'" <u>Legal Aid Soc'y of Hawaii v. Legal</u>

<u>Servs. Corp.</u>, 145 F.3d 1017, 1031 (9th Cir. 1998) (quoting <u>Powers</u>

<u>v. Ohio</u>, 499 U.S. 400, 411, 111 S. Ct. 1364, 113 L. Ed. 2d 411

(1991)).  In the present case, there is no evidence that there is

some hindrance to the Other PRO Physicians' ability to protect

their own interests, in fact, after this Court issued its

Preliminary Ruling, Plaintiffs filed an amended complaint adding

each of the Other PRO Physicians as plaintiffs.  [Filed 2/23/12

(dkt. no. 44).]

     As to representational or associational standing, the

United States Supreme Court has recognized:

> an association has standing to bring suit on
> behalf of its members when: (a) its members would
> otherwise have standing to sue in their own right;
> (b) the interests it seeks to protect are germane
> to the organization's purpose; and (c) neither the
> claim asserted nor the relief requested requires
> the participation of individual members in the
> lawsuit.

<u>Hunt v. Wash. State Apple Adver. Comm'n</u>, 432 U.S. 333, 343

(1977).[15]  This doctrine does not apply because the Court finds

---

     [15] In <u>United Food & Commercial Workers Union Local 751 v.</u>
<u>Brown Group, Inc.</u>, 517 U.S. 544 (1996), the Supreme Court held
that, in enacting the Worker Adjustment and Retraining
Notification Act ("WARN Act"), 29 U.S.C. § 2101 *et seq.*, Congress
intended to abrogate the third element of the <u>Hunt</u> analysis,
which the Supreme Court stated was an "otherwise applicable
standing limitation".  517 U.S. at 546.  The instant case,
                                                  (continued...)

that the establishment of a due process claim on behalf of each of the Other PRO Physicians requires their participation in the action.

Insofar as Dr. Lederer is pursuing a due process claim on his own behalf and the LLCs do not have standing to pursue due process claims on behalf of the Other PRO Physicians, the LLCs have not established that they are likely to succeed on the merits of the due process claims.

### 2. Unfair, Deceptive, Anti-competitive and Illegal Trade Practices Claim

The LLCs are persons entitled to bring unfair methods of competition claims pursuant to Haw. Rev. Stat. § 480-2(e). See Haw. Rev. Stat. § 480-1 ("'Person' or 'persons' includes individuals, corporations, firms, trusts, partnerships, limited partnerships, limited liability partnerships, limited liability limited partnerships, limited liability companies, and incorporated or unincorporated associations, existing under or authorized by the laws of this State, or any other state, or any foreign country."). The analysis of Dr. Lederer's likelihood of establishing a violation of Chapter 480 also applies to the LLCs. See infra Section I.A.2. As previously noted, PRO generated almost half of its business revenue from its relationship with Queen's prior to September 15, 2011, [Lederer Aff. at ¶ 8,] and

_____

[15](...continued)
however, does not involve the WARN Act.

PRO has had to refuse referrals in light of Queen's implementation of the closed-department model [Lederer Aff. at ¶ 4].  Thus, for purposes of the instant Motion, Plaintiffs have established that the LLCs' business has suffered an injury that anti-trust laws were intended to prevent and that the LLCs have suffered damages.  The Court therefore FINDS that the LLCs have established a likelihood of success on the merits of Count VI.

      **B.**    **Irreparable Harm**

        Insofar as Dr. Lederer is a member and partner in PRO, which is wholly owned by PROA, and he is likely to suffer irreparable harm that impairs his ability to compete, the LLCs are also likely to suffer irreparable harm in their ability to compete.  Plaintiffs have not submitted any specific evidence regarding the irreparable harm that the LLCs will suffer as to the Other PRO Physicians without a preliminary injunction. Dr. Lederer discussed a fifty-nine year-old patient of PRO physician Eva Bieniek and a sixty-eight year-old patient of PRO physician Paul DeMare, [Lederer Decl. at ¶¶ 17-18,] and Dr. Bieniek also discussed the fifty-nine year-old patient, H.M., in her declaration [Bieniek Decl. at ¶¶ 2-8].  Plaintiffs also presented a declaration by Dr. DeMare's sixty-eight year-old patient, D.S.  [Id., Decl. of (Cancer Patient D.S.).]  Both H.M. and D.S., however, fall within the group of patients who Queen's will allow the PRO physicians to continue to treat under the

exception to the closed-department policy because they have already begun treatments at Queen's, as described in the section discussing Dr. Lederer's Group One Patients.  See *infra* Section I.B.1.  Plaintiffs have not presented any evidence about other patients or the referrals that the Other PRO Physicians are likely to receive.  Plaintiffs have only presented general evidence of a loss of revenue as to the Other PRO Physicians, but that does not constitute irreparable harm for purposes of a preliminary injunction.  In light of the current record, Plaintiffs have not established that the LLCs are likely to suffer irreparable harm in relation to the Other PRO Physicians. The Court therefore CONCLUDES that the LLCs are not entitled to a preliminary injunction as to the Other PRO Physicians.

C.    **Balancing of the Equities and the Public Interest**

Although the LLCs have established that they are likely to succeed on Count VI and that they are likely to suffer irreparable harm as to Dr. Lederer, that harm will be addressed by the preliminary injunction granted to Dr. Lederer.  Any additional relief in a preliminary injunction to the LLCs would be duplicative.  Thus, the balancing of the equities favors Defendants and no further public interest would be served by granting a preliminary injunction to the LLCs in relation to Dr. Lederer.  The Court therefore CONCLUDES that the LLCs are not entitled to a preliminary injunction.

III. **Scope of the Preliminary Injunction**

The Court now turns to the scope of Dr. Lederer's preliminary injunction.  To the extent that Plaintiffs' supplemental memorandum requests that the relief in the preliminary injunction be extended to the Other PRO Physicians, Plaintiffs' request is DENIED.  The denial is without prejudice to the Other PRO Physicians' filing of their own motion for a preliminary injunction, if warranted.

As to the specific procedures that the preliminary injunction should encompass, in response to the Preliminary Ruling, Defendants agree to the inclusion of the following procedures: 1) permanent seed implants for prostate cancer; 2) HDR brachytherapy for prostate cancer; 3) volume studies related to permanent seed implants or HDR brachytherapy; 4) external beam radiation therapy related to permanent seed implants or HDR brachytherapy; 5) procedures requiring general anesthesia, including pediatric external beam radiation; and 6) endoluminal trachea, bile duct (brachytherapy) radiation therapy.  [Defs.' Suppl. Mem. at 2-4.]

Defendants argue that the preliminary injunction should not encompass the following procedures: 1) tomotherapy; 2) 4D CT scans; and 3) SBRT.  Having considered the parties' evidence and the arguments of counsel, the Court FINDS that 4D CT scans cannot reasonably be performed at facilities other than Queen's and that

similar procedures which are available at other facilities will not reasonably allow Dr. Lederer to perform the procedures encompassed by the preliminary injunction.

The Court therefore GRANTS Dr. Lederer's request for a preliminary injunction as to Dr. Lederer's Group Two Patients and Dr. Lederer's Group Three Potential Patients to the extent that those patients require any of the following procedures for the duration of the preliminary injunction: 1) permanent seed implants for prostate cancer; 2) HDR brachytherapy for prostate cancer; 3) volume studies related to permanent seed implants or HDR brachytherapy; 4) external beam radiation therapy related to permanent seed implants or HDR brachytherapy; 5) procedures requiring general anesthesia, including pediatric external beam radiation; 6) endoluminal trachea, bile duct (brachytherapy) radiation therapy; and 7) 4D CT scans ("Covered Procedures").

As to the administrative procedures required to allow Dr. Lederer to perform the Covered Procedures, after reviewing the evidence and counsel's arguments, the Court finds that the necessary procedures are best left to the parties' determination. This Court does not profess to practice medicine or to be in the business of hospital administration. Further, both Plaintiffs and Defendants have consistently affirmed their commitment to the quality and continuity of patient care. This Court therefore ORDERS the parties to meet and confer and to come to an agreement

54

regarding the procedures necessary to allow Dr. Lederer to perform the Covered Procedures at Queen's for the duration of the preliminary injunction.

As to the duration of the preliminary injunction, the Court first declines Defendants' request for a ninety-day deadline on Dr. Lederer's acceptance of new patients who he believes will require one of the Covered Procedures.  Such a deadline would be inconsistent with the analysis of Dr. Lederer's entitlement to a preliminary injunction with respect to Count VI. In the litigation of the instant Motion, Plaintiffs have represented that they may be able to move some of the procedures at issue off of Queen's campus within four months, but that others may take up to ten months.  This Court therefore ORDERS Plaintiffs to file a status report regarding their efforts to secure alternate facilities for the Covered Procedures. Plaintiffs must file the status report by **September 20, 2012**. Defendants may file a responsive status report by **September 27, 2012**.  After the Court reviews the parties' filings, the Court will issue an order regarding the termination of the preliminary injunction order ("Termination Order").  The instant preliminary injunction shall remain in effect until the Court issues the Termination Order.

In the event that the parties have a dispute regarding the scope or enforcement of the preliminary injunction, the

parties may request a status conference to address the matter. The Court, however, emphasizes that the parties must not request a status conference until they have met and conferred about the issue and determined that they cannot resolve the dispute without Court intervention. <u>Cf.</u> Local Rule LR37.1(a) ("The court will not entertain any motion . . . , unless counsel have previously conferred, either in person or by telephone, concerning all disputed issues, in a good faith effort to limit the disputed issues and, if possible, eliminate the necessity for a motion . . . .").

## IV.  **Medical Records**

Finally, although not encompassed within the scope of the instant Motion, the Court notes that, in the litigation of the Motion, the parties have reached an agreement that Queen's will allow Dr. Lederer, and all the PRO physicians, full access to the medical records of patients under their care, including existing databases and spreadsheets, subject to Queen's existing procedural and administrative requirements for access to medical records. [Defs.' Suppl. Mem. at 7 & n.2; 3/12/12 Hrg. Trans, filed 3/14/12 (dkt. no. 60), at 8-9.]

### CONCLUSION

On the basis of the foregoing, Plaintiffs' motion for preliminary injunction, filed January 27, 2012, is HEREBY GRANTED IN PART AND DENIED IN PART.  The Motion is GRANTED insofar as the

Court HEREBY ISSUES a preliminary injunction in favor of Plaintiff John Lederer, M.D., as to: 1) Dr. Lederer's patients for whom Dr. Lederer developed a treatment plan prior to February 1, 2012 which included one or more of the Covered Procedures, but who had not begun any of the Covered Procedures prior to February 1, 2012; and 2) new patients who were referred after February 1, 2012, and who, in the absence of a preliminary injunction, Dr. Lederer could not accept as patients pursuant to Queen's closed-department policy.  The Court ORDERS Defendants to allow Dr. Lederer to perform the following procedures at Queen's for the duration of the preliminary injunction:

 a. permanent seed implants for prostate cancer;
 b. HDR brachytherapy for prostate cancer;
 c. volume studies related to permanent seed implants or HDR brachytherapy;
 d. external beam radiation therapy related to permanent seed implants or HDR brachytherapy;
 e. procedures requiring general anesthesia, including pediatric external beam radiation;
 f. endoluminal trachea, bile duct (brachytherapy) radiation therapy; and
 g. 4D CT scans.

The preliminary injunction shall remain in effect until the Court rules upon the parties' status reports.  Plaintiffs' status report is due on **September 20, 2012**, and Defendants' status report is due on **September 27, 2012**.

  Plaintiffs' Motion is DENIED in all other respects.

  The Court's Order Granting in Part and Denying in Part Plaintiffs' Motion for a Temporary Restraining Order, filed

February 3, 2012 [dkt. no. 19], is HEREBY DISSOLVED, and has no effect except to the extent that it provides relevant background information for the instant Order.

IT IS SO ORDERED.

DATED AT HONOLULU, HAWAII, March 20, 2012.



    /S/ Leslie E. Kobayashi
Leslie E. Kobayashi
United States District Judge

**PACIFIC RADIATION ONCOLOGY, LLC V. THE QUEEN'S MEDICAL CENTER; CIVIL NO. 12-00064 LEK-KSC; ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**