OF COUNSEL:
DAVIS LEVIN LIVINGSTON

| | |
|---|---|
| MARK S. DAVIS | 1442-0 |
| MICHAEL K. LIVINGSTON | 4161-0 |
| LORETTA A. SHEEHAN | 4160-0 |
| MATTHEW C. WINTER | 8464-0 |
| CLARE E. CONNORS | 7936-0 |

851 Fort Street, Suite 400
Honolulu, Hawaiʻi 96813
Telephone: (808) 524-7500/Fax: (808) 356-0418
Email: mdavis@davislevin.com

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAIʻI

| | |
|---|---|
| **PACIFIC RADIATION ONCOLOGY, LLC,** A HAWAIʻI LIMITED LIABILITY CORPORATION; **et al.**,<br><br>Plaintiffs,<br><br>vs.<br><br>**THE QUEEN'S MEDICAL CENTER,** A HAWAIʻI NON-PROFIT CORPORATION, **et al.**,<br><br>Defendants. | CIVIL NO. **12-00064 LEK-KSC**<br>(Other Civil Action)<br><br>**PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS DEFENDANTS' COUNTERCLAIM; DECLARATION OF MARK S. DAVIS; EXHIBIT J; AND CERTIFICATE OF SERVICE**<br><br>*Hearing*<br>*Date :* May 19, 2014<br>*Time :* 9:45 a.m.<br>*Judge :* Leslie E. Kobayashi<br><br>Trial : December 2, 2014<br>Judge : LESLIE E. KOBAYASHI |

**PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF
ITS MOTION TO DISMISS DEFENDANTS' COUNTERCLAIM**

## I. INTRODUCTION

Defendants' opposition ignores the fundamental issues raised by Plaintiffs concerning the untimeliness of Defendants' counterclaim. Defendants contend that Plaintiffs' assertion – that Defendants delayed the filing of their counterclaim until after the 9th Circuit affirmed this Court's injunction to avoid taking a position inconsistent with what they had advanced before this Court and the 9th Circuit – is false. However, Defendants fail to explain this "coincidence" in timing and instead just deny the allegation. Nor do they offer any justification for taking Plaintiffs' depositions and the depositions of Plaintiffs' experts *before* they had revealed the claims and defenses they intended to assert and which Plaintiffs and their experts would have rebutted. Their failure to address Plaintiffs' allegations that this chicanery was designed to obtain an unfair, prejudicial tactical advantage speaks volumes as to their intent and demands that the counterclaim be dismissed.

Not only is Defendants' claim barred by virtue their failure to comply with Rule 12 of the Federal Rules of Civil Procedure ("FRCP"), the applicability of laches to the facts and circumstances of this case also warrants dismissal of Defendants' Counterclaim. In addition, Defendants fail to show that the affirmative defense of immunity, and/or provisions concerning payment of attorney's fees following the disposition of a legal dispute, constitute a valid affirmative claim for relief against Plaintiffs as opposed to a defense.

1

## II. DEFENDANTS' ANSWER AND COUNTERCLAIM ARE BARRED AS UNTIMELY UNDER FED. R. CIV. P. 12

In their opposition memorandum, Defendants cite to this Court's order entered on December 12, 2012, wherein the Court noted that Defendants' Motion to Dismiss had been pending for nine months and ordered that it was "deemed withdrawn without prejudice." Defendants' Memorandum, Docket #191, p. 3, *citing* Docket #93. This Court's order deeming Defendants' motion withdrawn fully supports Plaintiffs' position concerning the untimeliness of Defendants' counterclaim. As of December 12, 2012, there was no longer any motion pending before this Court and Defendants were therefore under an obligation to file their responsive pleadings, including an answer, defenses, and any claim for which they had a good faith basis to assert within 14 days. Defendants did not move to stay the litigation and no stay was ordered by the Court. Indeed, the parties continued to litigate the issues and comply with every other pending trial deadline.

Accordingly, as of December 12, 2012, the clock for filing responsive pleadings commenced running once again. Rule 12(a)(4) provides that if the Court postpones disposition of a motion until trial, *the responsive pleading must be served within 14 days.* Even if the full 21 days under Rule 12(a)(1)(A)(i) were afforded to Defendants, they failed to comply for a period of greater than one year and therefore were in default and barred from asserting responsive pleadings and claims, absent leave of Court.

The requirements set forth under Rule 12 ensure the transparent and fair adjudication of matters, including the assertion of all claims and defenses at the commencement of the litigation that will affect discovery and the litigation of a case. *See Lopez v. U.S. Fid. & Guar. Co.*, 18 F.R.D. 59, 61 (D. Alaska 1955) ("The purpose of an answer is to formulate issues by means of defenses addressed to the allegations of the complaint."). Defendants are represented by experienced counsel who knows full well that the rule does not contemplate discovery being conducted before the parties disclose their claims. Obviously, as in every case, the pleadings frame the issues that then allow for orderly discovery.

This process was confounded by Defendants' delay for all the reasons asserted in Plaintiffs' memorandum in support of their motion. The Court did more than postpone the motion until trial; it ordered that it be deemed entirely withdrawn and if Defendants so wished, it could be re-filed.[1] With no motion pending *at all*, Defendants were required to file their "initial pleading" so that the parties could proceed fairly and transparently with the litigation of this case. Moreover, while Rule 12(b)(6) provides that a party may move, in lieu of an answer, to dismiss for failure to state a claim, Defendants' motion to dismiss is more properly characterized as a motion for judgment on the pleadings, which Rule 12(c) says may be filed "[a]fter the pleadings are closed."

---

[1] As of the date of this pleading, Defendants have not re-filed their Motion, despite electing to file their Answer and Counterclaim.

## III. THE CIRCUMSTANCES OF THIS CASE WARRANT A FINDING OF LACHES TO BAR DEFENDANTS' COUNTERCLAIM

Plaintiffs do not dispute that laches, an equitable defense, requires the Court to evaluate the specific instances and to evaluate closely "all the particular facts in a case," which it can do here and at this juncture because there is a sufficient record that has been developed through the ongoing litigation, including extensive discovery. *See Kourtis v. Cameron*, 419 F.3d 989, 1000 (9th Cir. 2000), *overruled on other grounds by Taylor v. Sturgell*, 553 U.S. 880 (2008). Plaintiffs bring this motion precisely because there are sufficient facts to show the unreasonableness of Defendants' delay. Here, the Court need not rely simply upon the allegations in Defendants' counterclaim but has at its disposal more than two years of litigation history upon which to make its evaluation, contrary to the cases cited by Defendants where the courts were evaluating an initial complaint brought by a plaintiff.[2]  Defendants' Memo, p. 4-5.

As previously noted, to evaluate a laches defense, the Court is to apply a three part test. *See Petrella v. Metro-Goldwin-Mayer, Inc.*, 695 F.3d 946, 951-52 (9th Cir. 2012) *citing Danjaq LLC v. Sony Corp.* 263 F.3d 942, 951 (9th Cir. 2001) ("The underlying elements of a laches defense are factual determinations. A

---

[2] Consistent with Plaintiffs' position, where the laches defense is usually brought at the outset of litigation, it may indeed be the case that a factual record sufficient to make such a finding does not yet exist. However, because the counterclaim was filed so late, and after much discovery had been conducted, the laches defense is properly brought within the context of Defendants' failure to file their responsive pleadings at the outset of the litigation.

4

defendant must prove that (1) the plaintiff delayed in initiating the lawsuit; (2) the delay was unreasonable; and (3) the delay resulted in prejudice.").[3] As an initial matter, Defendants are incorrect in their position that because their claims fell within the applicable statute of limitations period, the laches defense does not apply to the facts of this case. Defendants' Memo, p. 6. To the contrary, the case law cited by Defendants provides that whether the applicable statute of limitations period has run is significant not because it automatically bars a claim but rather because it shifts the presumption from Defendants to Plaintiffs. *Jarrows Formulas, Inc., v. Nutrition Now, Inc.*, 304 F.3d 829, 835-36 (9th Cir. 2002). Accordingly, Plaintiffs, not Defendants have the burden of proving laches. Plaintiffs accept this burden and have met it.

Upon review of the circumstances particular to this case, Plaintiffs have without question met the first prong of the laches analysis. *See Petrella*, 695 F.3d at 952 ("[T]he relevant delay is the period from when the [party making the claim] knew (or should have known) of the allegedly infringing conduct, until the initiation of the lawsuit…"); *Fahmy v. Jay-Z*, 2013 WL 4500435, *4 (C.D. Cal. Aug. 15, 2013), *citing Danjaq*, 263 F.3d at 952-53 ("When determining the length of the delay, the inquiry focuses on the plaintiff's delay in initiating litigation, not on the defendants' knowledge of the potential claim.").

---

[3] Defendants' chastisement of Plaintiffs for citing only *Danjaq* ignores the fact it is a seminal case, directly on point regarding the analysis to be applied by this Court, and is cited as authority in the cases cited by Defendants.

Here, Defendants knew the basis of their counterclaim before Plaintiffs had any idea they were being targeted by the Queens' Medical Center ("QMC"). As Plaintiffs discussed in their memorandum, in July 2011, which was six months before Plaintiffs were forced to file suit, Defendants prepared a financial analysis that purportedly calculated a monetary amount they had lost to their competitors over a six month period.[4] For this Court's convenient reference, Plaintiffs have attached the analysis as Exhibit J. As demonstrated in Exhibit J, Defendants identified 52 patients who were allegedly "transferred" against their will from QMC to a facility operated by The Cancer Centers of Hawaii ("TCCH").[5] From this number, QMC extrapolated a loss figure of approximately $2.5 million.[6]

---

[4] Defendants do not take issue with the allegation that they were aware of the claim before the original lawsuit was filed. They simply fail to explain the inconsistency between this claim and their contention that no right to a hearing was triggered since there was no allegation of wrongdoing.

[5] In April 2014, Plaintiffs received records indicating that QMC had in fact ordered a review of the medical records of Plaintiffs Dr. Lederer, Dr. Pang, and Dr. Huynh's patients to identify the referring physician and other information. This shocking violation of HIPPA, whereby the medical records of hundreds of patients were reviewed by non-treating employees of QMC for absolutely no medical reason whatsoever, was followed by another HIPPA violation when QMC reviewed the medical records of the 52 patients whose medical information formed the basis of QMC's flawed analysis in Exhibit J.

[6] Since receiving the analysis in January 2014, Plaintiffs have taken depositions to explore how this analysis was prepared and for what purpose. Plaintiffs have learned that nearly every patient of the 52 had received only a consult at QMC, and that QMC could not confirm that these patients had in fact received radiation oncology treatments *anywhere*, let alone at TCCH. In addition, in nearly every case, the medical records identified a legitimate reason for the patient being treated elsewhere, including the fact they lived closer to TCCH or wanted to receive a treatment not offered at QMC, such as the prone breast treatment or treatment

Ironically, Defendants initially refused to produce the documents identified in Exhibit J, claiming improperly that they were protected by the attorney-client/work product doctrine. Thus, until January 16, 2014, Plaintiffs had no idea the documents existed, let alone could fathom that these misrepresentations and the numbers extrapolated therefrom would come to form the basis of a counterclaim.[7] In any event, Defendants' attempts to argue that Plaintiffs had knowledge of the claim, thus barring the defense, are unavailing, as the inquiry focuses on what *Defendants* knew, and not what Plaintiffs knew. *Fahmy*, 2013 WL 4500435, *4.

Along these lines, the excerpted portions of Plaintiffs' expert deposition testimony border on ridiculous, as the questions posed to the experts by defense counsel show nothing more than that Plaintiffs' experts did not know what they did not know. In the normal course of litigation, where an answer, defenses, and counterclaims are filed within 21 days of the complaint, the experts and the parties are generally well-apprised of the issues formulated not only by Plaintiffs' claims but by all pertinent claims and defenses in the case. Had Defendants filed their answer, defenses, and counterclaim within 14, or even 21 days of December 12, 2012, this would have been well in advance of the deadlines for submitting Plaintiffs' expert reports, which was September 13, 2013. Defendants' failure to

---

using the Calypso device. Thus, the $2.5 million figure was flawed because, among other reasons, it was extrapolated from fundamentally flawed data.

[7] Plaintiffs note that QMC employee Randy Talavera submitted a signed affidavit to this Court during the injunction proceedings, which he admitted under oath during his deposition on April 17, 2014, was not in fact supported by this analysis.

7

do so, however, placed Plaintiffs at a disadvantage in this regard because their experts could not be asked to review, analyze, and opine upon the full spectrum of issues at play at the time of their depositions.

Plaintiffs have also met the second prong of the laches defense, which requires the Court to find the delay unreasonable. *See Jarrows Formulas*, 304 F.3d at 838 (holding that the reasonableness of the delay is considered in light of the statute of limitations period and also whether the party bringing the action has "proffered a legitimate excuse for its delay"); *Fahmy*, *5, *quoting Danjaq LLC,* 263 F.3d at 954 ("[I]n determining reasonableness, courts look to the cause of the delay."). An analysis of a laches defense where the plaintiff has filed the initial action against a defendant outside of the statute of limitations may indeed render the expiration of the statute significant. However, the statute of limitations analysis is less relevant where the delay involves the specific circumstances of this case – a counterclaim filed more than one year after it should have been filed under Rule 12. In this case, the parties were already deeply embroiled in litigation, including the pursuit of discovery. Thus, the analysis is less about the adverse outcomes sought to be avoided by the statute of limitations but more about what is equitable in light of what has transpired in this case, where litigation had been ongoing for more than two years by the time the counterclaim was filed.

In this case, Defendants have not proffered a legitimate excuse for their delay, as withholding the filing of claims by a party in the manner orchestrated by

QMC confounds the litigation process irrespective of the statute of limitations for the claim.  *See Jarrows Formulas*, 304 F.3d at 838.  Defendants argue that Plaintiffs' explanation for their delay is "false" and "unsupported."  Defendants Memo, p. 7-8.  However, the Court has a sufficient factual record before it, as outlined in Plaintiffs' underlying memorandum, to find that indeed Plaintiffs claim of gamesmanship is fully supported.  Defendants focus on the month-long period that elapsed between the termination of mediation and the filing of their claim.  However, they completely fail to address the fact they filed their counterclaim the *day after* the resolution of their appeal in Plaintiffs' favor, which is the basis of Plaintiffs' assertions that Defendants' delay was a strategic decision designed to avoid revealing their incompatible positions.  *Id.* at 8.

Defendants offer no plausible justifications for their delay.  For example, characterizing the drawn out mediation, which proceeded even as the parties continued actively litigating the case, as an "administrative proceeding" places the glass slipper on the wrong foot.  Defendants' Memo, p. 8.  Mediation is an informal process that occurs while litigation and/or an administrative process is ongoing.  However, it is a stretch to describe mediation as the pursuit of an administrative remedy.  Defendants make this stretch in a weak attempt to meet an exception intended to apply to delays caused by an actual administrative process such as an employment action or a federal claims process.   Moreover, even if the

9

counterclaim were complicated, which it is not, Defendants had surmised the basis for the claim at least by February 2012, as they litigated the injunction proceeding.

The blame Defendants attempt to place on *Plaintiffs* for causing the delay by "refusing to disclose relevant financial information for The Cancer Center of Hawaii" is also entirely without merit. Defendants' Memo, p. 8. Defendants' mischaracterization of the discovery process is fundamentally disingenuous. First, there is no financial information in possession of Plaintiffs that is relevant to Defendants' counterclaim, as the "substantial revenue" allegedly derived by PRO from its partial ownership in TCCH has absolutely no bearing on either Defendants' counterclaim for damages based on misconduct allegedly engaged in at QMC or Plaintiffs' allegations of due process violations and anti-competitive conduct. Defendants have served discovery requests on Plaintiffs, TCCH, and Surgicare and all have responded, to which Defendants have not sought motions to compel or other actions. Moreover, whether PRO obtained substantial revenue from *any* source, including from stock investments or returns on their partial ownership interests in TCCH, in no way supports or bears upon Defendants' claim that Plaintiffs engaged in misconduct in order to steal patients from QMC. Any demonstration of revenue earned by PRO simply would not be relevant to QMC's counterclaim of misconduct, especially to the extent Defendants' claim is based on

the unsupported assumptions and extrapolations discussed above.[8] Accordingly, the delay cannot be characterized as reasonable but is instead a classic example of a party that chose to sleep on its rights to achieve a tactical advantage.

For many of these same reasons, Plaintiffs also have met the third prong by demonstrating the prejudice they have suffered by Defendants' strategic delay. "The very purpose of laches as an equitable doctrine—and the reason that it differs from a statute of limitations—is that the claim is barred because the plaintiff's delay occasioned the defendant's prejudice." *Danjaq*, 263 F.3d at 955. Defendants have not rebutted Plaintiffs' assertions that a delay of almost a year and a half while the case was actively being litigated, decisions were being made about discovery, and experts were opining on the various claims and gleaned defenses has caused them to suffer prejudice.

## IV. DEFENDANTS HAVE FAILED TO STATE A VALID COUNTERCLAIM REGARDING THE IMMUNITY PROVISIONS SINCE IMMUNITY IS A DEFENSE RATHER THAN AN AFFIRMATIVE CLAIM AND THE IMMUNITY PROVISION IN THE BYLAWS DOES NOT APPLY TO THESE FACTS

Defendants filed an affirmative claim for damages based on "immunity." Even if they correctly interpreted the Bylaws, which they did not, they would have only a defense and a right to attorneys' fees if they prevail. The Bylaws did not create an affirmative right to damages as alleged in the counterclaim. Thus, even if

---

[8] Defendants also have sought irrelevant information such as capitation fees and information about PRO's contract with Kaiser, which have no bearing on this case but which QMC could use in its pending lawsuit against Kaiser on related issues.

Defendants' twisted construction of the Bylaws granted some immunity, it is nothing more than a defense to be asserted against the claim. It is not, nor is the claim for attorneys' fees, a separate cause of action.

Defendants are incorrect on the merits as well. Their assertion that Plaintiffs have engaged in a myopic review of Article 12.3 is ironic in light of their initial failure to cite the entire provision in their counterclaim. The Court has before it the full provision, quoted now by both Plaintiffs and Defendants, and for its convenient reference, Plaintiffs direct the Court to the entire Medical Staff Bylaws of QMC attached as Exhibit A to Plaintiffs' Motion for Temporary Injunction. Docket #1, Attachment #4.

As argued previously by Plaintiffs, a plain reading of Article 12 confirms its application to credentialing and peer review activities, none of which, according to QMC, were in issue as it implemented its policy to terminate PRO's ability to practice at QMC.[9] Even now, Plaintiffs remain fully credentialed members of the QMC medical staff. Despite their rejection of Plaintiffs' allegations that QMC violated the due process provisions of the Bylaws, Defendants again present excerpts from those very same Bylaws to argue for "broad immunity prohibiting any claims against QMC, its Board, and members of the Medical Staff." Defendants' Memo, p. 10. Upon review of the provisions, however, it is clear that

---

[9] Of course, as both this Court and the Ninth Circuit found, QMC's justifications offered only *after* Plaintiffs' filed their lawsuit were based on allegations of professional misconduct, which confirmed Defendants had failed to afford the due process provided for in the Bylaws. *See* Docket#63, p.31-34; #177, p. 4.

immunity is not afforded in the manner argued by QMC, and under *Silver v. Castle Medical Center*, 53 Haw. 457 (1972), would be contrary to established precedent.[10]

Article 12.1 is a good starting place for the analysis, as it identifies the general purpose of the provision. *See* Docket #1, Attachment #4, at 51. A plain reading of 12.1 confirms that Article 12 applies to an "application for staff appointment" or the application for, or exercise of, clinical privileges. *Id.* Thus, the physicians agreed to hold QMC and the Medical Staff immune from actions to obtain and "act upon information bearing on … professional ability and qualifications" so long as the Hospital's representative "acts in accordance with the provisions of this Article" regarding the granting of Medical Staff membership or privileges. *Id.* In this case, it was QMC that failed to act in accordance with the Bylaws' provisions, which was an initial breach of contract that left Plaintiffs with no option but to obtain legal redress.

Defendants' statutory construction of Article 12-3.1 as merely providing "further examples of when the release and immunity would be effective" is simply wrong and does not render the first sentence meaningless, as it also deals with credentialing and peer review activities (e.g., "appointment, reappointment, clinical privileges, or the individual's qualifications for the same"). Defendants' Memo, p.

---

[10] The holding in *Silver* also renders Defendants' arguments regarding HCQIA unavailing, as *Silver* stands for "more stringent state laws or contracts interpreted under state law." Defendants' Memo, p. 14, *citing* the Delaware Supreme Court. The Hawai`i Supreme Court in *Silver* made very clear that a hospital will not be immune when it takes the precise type of action taken by QMC in this case.

13

9-10. Similarly, Defendants citations to 12.3-6 are unavailing as they ignore the fundamental application of "all of the provisions in Section 12.3" to the context of credentialing and peer review activities.[11]  Defendants' Memo, p. 10.

By QMC's own assertion, its action had nothing to do with PRO's clinical privileges or appointment.  Moreover, as the record before this Court demonstrates, QMC sought to prevent Plaintiffs from practicing at QMC because of improper financial motivations – Defendants believed they were losing business to TCCH and more importantly, wanted to capture all of PRO's patients and business.  QMC then sought to conceal this improper intent to take over the radiation oncology market by characterizing its actions as a business decision made for the purposes of "maintaining quality patient care."  Defendants' Memo, p. 11.  However, by using claims of professional misconduct against the PRO doctors to justify the need for quality of care measures, QMC implicated the Bylaws in Plaintiffs' favor.

As argued previously, QMC cannot both hide behind the Bylaws when it comes to immunity but fully disregard them when it comes to evaluating the unlawfulness of its termination of Plaintiffs' ability to practice without the due process afforded by those same Bylaws.  Moreover, if the Court were to construe

---

[11] Defendants are also wrong in their suggestion that Article 12.3-5, which applies to the separate issue of legal fees, grants immunity. Defendants' citation to cases in other states in which attorneys' fees were granted provides no support either for the argument that Plaintiffs' action should be dismissed or that the PRO doctors are in breach under the facts and circumstances of this case.  Certainly, those cases do not stand for the proposition that an alleged breach of an agreement not to sue for privileging decisions can form the basis of a counterclaim, which it does not.

14

the provisions as suggested by Defendants, Plaintiffs would be barred from raising a claim for economic credentialing simply because the claim alleges Plaintiffs' privileges were "otherwise affected." Defendants' Memo, p. 10-11. As described previously, economic credentialing, which Plaintiffs allege in their Eighth Claim for Relief (Docket #44, p. 28-29), is the unlawful conditioning of a medical provider's credentials upon an agreement that the provider will bring his or her business and referrals to the credentialing institution. It defies logic that Defendants are immune from such an allegation simply because QMC's Bylaws say so.[12] This also runs fundamentally counter to the Hawaiʻi Supreme Court's holding in *Silver*, which specifically authorizes legal actions by physicians against a hospital when it has acted, like QMC, in a manner contrary to public policy.

## V.   CONCLUSION

For these reasons, and all the reasons asserted in Plaintiffs' underlying memorandum and compelled by the record of this case, Plaintiffs' respectfully move this Court to dismiss Defendants' counterclaim.

DATED:   Honolulu, Hawai`i, May 5, 2014.

>   /s/ MARK S. DAVIS
>   MARK S. DAVIS
>   MICHAEL K. LIVINGSTON
>   CLARE E. CONNORS
>   Attorneys for Plaintiff

---

[12] Indeed, an immunity provision is invalid if it attempts to immunize conduct beyond that permitted by the law. *See Sternberg v. Nanticoke Mem'l Hosp., Inc.*, 62 A.3d 1212, 1218 (Del. 2013).